UNITED STATES DISTRICT COURT
SOUTERN DISTRICT OF FLORIDA

| | |
|---|---|
| DONATO DALRYMPLE, et al. | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 03-20588-CIV-MOORE |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR DISMISSAL

INTRODUCTION

The United States has moved for dismissal and/or summary judgment pursuant to Fed.R.Civ.P 12(b)(1) and (6) and 56(c). Because the use of force under the circumstances at issue was reasonable and, therefore, privileged, the United States is entitled to judgment as a matter of law. Although the court need not reach them, additional grounds mandate dismissal or summary judgment. First, certain plaintiffs have admitted that they engaged in conduct that constituted interference and/or obstruction with the execution of lawful search and administrative arrest warrants, thus barring their claims under the doctrine of illegality. Second, plaintiffs long-term injuries are not proximately related to the negligence alleged against the United States. Third, because the United States cannot be held liable solely based upon the violation of federal law, plaintiffs' claims based on alleged violations of INS regulations, guidelines, policies, and procedures, must be dismissed. Finally, because the plaintiffs' claims for intentional and negligent infliction of emotional distress are not actionable, these claims must be dismissed.[1] As such, plaintiffs claims must be dismissed and/or fail to present genuine issues of material

---

[1] Because the majority of the plaintiffs have renounced their false imprisonment claims and the claims of the plaintiffs' who have maintained such claims are barred by the illegality doctrine, all false



fact and the United States is entitled to judgment as a matter of law.

## BACKGROUND

Plaintiffs filed this action purporting to invoke jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.[2] The suit arises out of the Immigration and Naturalization Service's ("INS")[3] execution of search and administrative arrest warrants for the removal of Elian Gonzalez ("Elian") from the Gonzalez family home. Plaintiffs, who were present during Elian's removal, have asserted claims for negligence, assault and battery, intentional and negligent infliction of emotional distress, and false imprisonment.

## ARGUMENT

I.  THE FORCE USED BY THE UNITED STATES IN EXECUTING THE WARRANTS WAS PRIVILEGED AND, THEREFORE, NOT TORTIOUS

Plaintiffs' claims of assault and battery, false imprisonment, and emotional distress arise from their contact with the INS during a law enforcement operation the INS was legally authorized to undertake. *See* Am. Cmplt. ¶¶ 154-276; *Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003). As established by the facts set forth in the United States' Statement of Material Facts Not In Issue In Support of Its Motion for Summary Judgment ("Statement"), the use of reasonable force by the INS officers to accomplish their mission was privileged as a matter of law and, therefore, not tortious.

Under Florida law, police officers are privileged to use reasonable force in order to carry out their law enforcement activities. *See* Fla. Stat. § 776.05 (West 2003) ("A law enforcement officer . . .

---

imprisonment claims should be dismissed. *See* United States' Statement of Material Facts Not In Issue In Support of Its Motion for Summary Judgment, Fact No. 96.)

[2] On August 30, 2004, ninety-five plaintiffs filed an Amended Complaint. Plaintiff Sandra Cobas, who was a plaintiff in the original Complaint and who is now separately represented, did not file an amended complaint. The claims of several plaintiffs have been or will be voluntarily dismissed, *see* United States' Statement of Material Facts Not in Dispute in Support of its Motion for Summary Judgment, Fact No. 97. The claims of several other plaintiffs were dismissed by the Court, *see* Order, 3/29/04, and some of these plaintiffs have filed appeals. *See id*, Fact No. 97.

[3] The Immigration and Naturalization Service is now a part of the Department of Homeland Security.

2

is justified in the use of force . . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest"). Accordingly, "activity that would otherwise subject a person to liability in tort for assault does not constitute tortious conduct if the actor is "privileged' to engage in that conduct." *Hinojosa v. City of Terrell*, 834 F.2d 1223 (5th Cir. 1988), *cert. denied*, 493 U.S. 822 (1989), citing *Restatement (Second) of Torts* 10; *W. Keeton, Prosser and Keeton on Torts* 16 (5th ed. 1984); *see also, Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), *aff'd*, 338 F.3d 448 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1655 (2004); *Garza v. United States*, 881 F. Supp. 1103 (S.D. Tex. 1995).

    A.    The Use of Pepper Spray and/or Tear Gas, A
Permissible Law Enforcement Technique, was Reasonable

The use of riot control agents such as pepper spray and tear gas has been judicially recognized as an appropriate law enforcement tool. The Eleventh Circuit has established that pepper spray gas used to facilitate the execution of a warrant "is an especially non-invasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003), *reh'g denied*, 85 Fed. Appx. 728, ___ F.3d ___, 2003 WL 22438591 (11th Cir. Fla. 10/6/04). Additionally, "'as a means of imposing force, pepper spray is generally of limited intrusiveness,' and it is 'designed to disable a suspect without causing permanent physical injury.'" *Vineyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), *quoting Gainor v. Douglas County*, 59 F.Supp.2d 1259, 1269 (M.D. Ala. 1996).

Here, it is undisputed that on April 22, 2000, when the INS officers arrived at the Gonzalez home, more than a hundred protestors were gathered outside the Gonzalez house. A substantial number of these protestors were the plaintiffs in this case and many of them have testified that they crossed the police barricade with the intention to prevent the officers from taking Elian away and/or were otherwise interfering with the operation. *See, infra*, p. 10. Many plaintiffs, including the ones who were interfering, testified that they observed other protestors jump over and/or push down the barricade, run to the Gonzalez house, form human chains, and/or observed objects being thrown at the officers, the gas likely prevented many individuals (who are not plaintiffs in this case) from becoming

3

seriously injured.[4] Under these circumstances, the use of riot control gas was warranted and reasonable as a matter of law. To the extent that other plaintiffs were sprayed or simply smelled the gas but who were located behind the police barricade, on their property, or otherwise in their homes, their claims also fall within the privilege because the dispersal of the gas was an unavoidable consequence of the effort to control the situation and the crowd which included individuals who were jumping over the barricade to get to the Gonzalez house or advancing upon the officers who were executing the warrants.

*Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), is instructive. In that case, the plaintiffs, Branch Davidians, initiated a gun battle with ATF officers who were attempting to serve a lawful warrant at the Davidians compound. Thereafter, for 51 days, the Davidians refused to leave the compound. When the FBI used tanks to insert tear gas into the compound in an effort to force the residents to leave, certain Davidians intentionally set the compound on fire. Plaintiffs alleged, *inter alia*, that the FBI was negligent when it deployed tear gas to force the Davidians to surrender. The court found "<u>as a matter of law</u> that the use of tear gas, an accepted law enforcement practice, was reasonable under the circumstances, given the refusal of the Davidians to comply with lawful orders to surrender." *Id.* at 788 (emphasis supplied).

Accordingly, the use of riot control gas, which is an accepted law enforcement practice, to stop protestors from advancing upon the officers and interfering with the operation was a reasonable use of force and, therefore, privileged under the circumstances.

B.  The Display and Use of Physical Force During the Operation was Privileged and Not Tortious

As shown in detail in the United States' Statement of Material Facts Not In Issue In Support of its Motion for Summary Judgment, every plaintiff who had physical contact with an INS officer either

---

[4] *See* the deposition testimony of plaintiffs Blanca and Juan Chils, Josefa Gonzalez, Estelva Guevara, Marta Lorenzo, Anaisa Machlin, Morgan Marcos, Jorge Morales, Antonio F. Ortega, Cristobal and Madeleine Peraza, Melissa Pumariega, Nestor Ramos, Patricia Rodriguez, and Divaldo Valdes. *See* the Tabs 15, 16, 34, 36, 41, 42, 43, 51, 57, 60, 61, 66, 67, 76, and 82, which are attached to the Statement.

jumped over and/or passed through the front barricade, was in the front or back yard of the Gonzalez house, was in the path of the officers who were securing the area, or was the inside the Gonzalez house, and thus, they were resisting, obstructing and/or opposing the officers' efforts to execute the warrants.[5]

---

[5] Plaintiff Arce testified that after he walked through the barricade and had formed a human chain with a woman, he was hit with a butt of a rifle when he attempted to help this woman after she attempted to interfere with the INS officer who was taking Elian out of the house. Statement, Fact No. 16. Plaintiff Beltran testified that after he jumped over the barricade and ran to the front porch of the Gonzalez home and held onto the rails located on either side of the front door, he was hit in the chest with a rifle butt or a battering ram but he held on to the rails until an officer grabbed his hands and twisted them off the rails and was thrown off the porch. *Id.*, Fact No. 17. Plaintiff Benitez testified that she was in the front yard of the Gonzalez house when she struggled with an officer. *Id.*, Fact No. 18. Plaintiff Ledia Betancort-Garcia testified that after she walked through the barricade and ran to the Gonzalez house, she was pushed against a wire fence by a Miami City Police Officer. *Id.*, Fact No. 19. Plaintiff Canizares testified that she was sitting in a chair in front of the house located behind the Gonzalez house. When the officers arrived they told her not to move, but asked them to identify themselves. She was then pushed up against a fence and then down on the ground where they held her with their feet. *Id.*, Fact No. 21. Plaintiff Dalrymple testified that he was in the house and batted the officer's hand away when the officer attempted to take custody of Elian. *Id.*, Fact No. 26. Plaintiff Lenia Fernandez testified that after she jumped over the barricade and ran toward the Gonzalez home, she was pushed to the ground by an officer. *Id.*, Fact No. 33. Plaintiff Freijo testified that after he walked through the barricade and ran to the Gonzalez house, he was pushed to the side with some bolt cutters. *Id.*, Fact No. 36. Plaintiff Rosa Garcia testified that after she passed through the barricade to get to the Gonzalez house in order to prevent the officers from taking Elian away, two officers kicked and hit her. *Id.*, Fact No. 39. Plaintiff Carlos Gonzalez testified that after he jumped over the barricade and ran toward the Gonzalez house to form a human chain at the front door to prevent the officers from taking Elian away, officers tugged at him until the chain was broken and then they threw him to the ground and then he was pushed out of the front yard. *Id.*, Fact No. 42. Plaintiff Jose Gonzalez testified that after he jumped over the barricade and ran toward the Gonzalez house in order to form a human chain to prevent the officers from taking Elian away, several officers pushed him to the ground on several occasions because he attempted to get to the Gonzalez house several times. *Id.*, Fact No. 43. Plaintiff Lara testified that she was in front of the barricade and after she walked toward the Gonzalez house to protect Elian, an officer pushed her to the ground. *Id.*, Fact No. 49. Plaintiff Marcos testified that after he walked through the barricade and to the Gonzalez house to form a human chain to prevent the officers from taking Elian away, an officer told him to get out of the way, but he was pushed to the ground and held there by an officer with his foot and was hit on the shoulder with the battering ram the officers used to break down the front door. *Id.*, Fact No. 53. Plaintiff Alfredo Martell testified that after he ran back and forth in the front and back yards of the Gonzalez house, an officer pushed him to the ground. *Id.*, Fact No. 54. Plaintiff Mesa testified that after he jumped over

5

Therefore, the INS officers' use of physical force during the execution of the search and arrest warrants was privileged because it occurred while they were carrying out their lawful duties, was necessary to secure custody of Elian, and was not excessive. Indeed, the amount of force at issue is properly characterized as *de minimus*.[6]

A court can "determine as a matter of law that the amount of force was *de minimus*" based upon a "factual record establishing the degree of Plaintiffs' injuries." *See Dalrymple v. Reno*, 164 F. Supp.2d 1364, 1373 (S.D. Fla. 2001), citing *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000). The Eleventh Circuit, in the *Bivens* context, has found that grabbing persons, throwing them to the ground, causing blunt force injuries, and restraining them on the ground are *de minimis* applications of force even if injuries are sustained requiring minor medical treatment. *See Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (holding that grabbing suspect from behind, throwing suspect into van several feet away, and kneeing suspect in back are all *de minimis*); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th. Cir. 1997) (holding that slamming suspect's head against a wall and kicking suspect in the legs are both *de minimis*).

The physical force allegedly employed by the INS in the instant case is similar to the *de minimis* force described by the Eleventh Circuit in *McCormick*, *Nolin* and *Jones*. *See id*; Am. Cmplt. ¶¶ 183-276 (detailing types of force used by agents, such as being sprayed in the face with gas, struck, and pushed). In fact, there is no evidence that any of the plaintiffs were hospitalized as a direct result of any physical assault by any of the law enforcement officers at the scene.

---

the barricade and ran toward the Gonzalez house, an officer pushed him away from the Gonzalez house. *Id.*, Fact No. 58. Plaintiff Jorge Morales testified that after he jumped the barricade and went to the fence surrounding the Gonzalez house, he was hit on the hip by someone he could not identify as an INS officer. *Id.*, Fact No. 62. Plaintiff Otoniel Ramos testified that after he walked through the barricade to get to the Gonzalez house, an officer pushed his shoulder. *Id.*, Fact No. 79. Many of the plaintiffs in this case, forty-nine of them, testified that they did not have any physical contact with the officers at the scene. *See* Statement, Fact Nos. 9, 10, 13, 15, 20, 22, 23, 24, 25, 27, 29, 30, 31, 34, 35, 37, 40, 41, 44, 45, 46, 47, 48, 50, 56, 61, 64, 65, 66, 68, 69, 70, 71, 72, 74, 76, 77, 81, 82, 84, 86, 87, 88, 89, 90, 92, 93, 94, and 95.

[6] The term *de minimis* has been defined to be "[t]rifling" or "so insignificant that a court may overlook it in deciding an issue or case." *See* Black's Law Dictionary 443 (7th ed 1999).

Because the INS law enforcement officers used reasonable, and even *de minimis,* force to execute the warrants at issue, their conduct is privileged and not tortious and, therefore, judgment should be entered in favor of the United States on all claims.

II.   PLAINTIFFS WHO ENGAGED IN ILLEGAL ACTIVITIES CANNOT MAINTAIN THEIR CAUSES OF ACTION AGAINST THE UNITED STATES

Although the Court need not reach them, additional grounds support dismissal of plaintiffs' claims. As shown by their admissions, certain plaintiffs interfered with the execution of the warrants in question.[7] In doing so, these plaintiffs engaged in unlawful conduct and their claims are barred by the illegality doctrine.

   A.   Federal and Florida State Law Prohibits Resisting, Obstructing, or Opposing, Without Force, Law Enforcement Officers Executing Legal Process

Both Federal[8] and state law prohibit the type of resistence, obstruction or opposition to the law enforcement operation at issue here. Florida Statute § 843.02, "Resisting officer without violence to his or her person," states in pertinent part: that "[w]hoever shall resist, obstruct, or oppose any . . . person

---

[7] The search warrant was valid because it was supported by probable cause. *See Gonzalez v. Reno,* 325 F.3d 1228, 1232 (11th Cir. 2003).

[8] Federal law also prohibits the interference with the execution of search warrants. 18 U.S.C. § 2231 states in pertinent part:

> Whoever forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties, shall be fined under this title or imprisoned not more than three years, or both.

Courts have interpreted 18 U.S.C. § 2231 to prohibit "[a]nything which interferes with the physical ability of officers of the law...." *Lewin v. United States,* 62 F.2d 619, 620 (1st Cir. 1933) (holding that placing an incapacitating smoke screen in the path of an officer pursuing by boat constituted interference); *United States v. Johnson,* 412 F.2d 906 (5th Cir. 1969) (defendant who, after being advised of identity of officers and their purpose, interfered with officer in the execution of search warrant by continuing to destroy evidence and brandishing a weapon).

7

legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree. . . . [9]

Florida courts, in interpreting Fla. Stat. § 843.02, have held that violations occur when individuals block an officer's path, refuse to obey a command and/or engage in conduct that appears threatening to an officer's efforts to carry out his authorized duties and responsibilities. *See H.A.P. v. State*, 834 So.2d 237 (Fla. Dist. Ct. App. 2002); *Francis v. State*, 736 So.2d 97 (Fla. Dist. Ct. App. 1999); *M.M. v. State*, 674 So.2d 883 (Fla. Dist. Ct. App. 1996); *Wilkerson v. State*, 556 So.2d 453 (Fla. Dist. Ct. App. 1990), *review denied*, 564 So.2d 1088 (Fla. 1990).

*Francis*, 736 So.2d 97 (Fla. Dist. Ct. App.1999), is pertinent. In that case, the court stated that "to support a conviction for resisting an officer without violence, the state must show (1) that the officer was engaged in lawful execution of legal duty, and (2) that the action by the defendant constituted obstruction or resistence of that lawful duty." *Id*. The court found that both prongs of the statute were satisfied because the officer had responded to a 911 call about an abused child and that the mother physically blocked the officer's path when he attempted to investigate the boy's condition. In rejecting the argument that the mother's conduct did not constitute obstruction because the officer succeeded in his efforts to determine the boy's condition, the court found that

> [t]he test under section 843.02 is not whether [the officer] ultimately was able to carry out the execution of his legal duties, but rather, whether [the mother] resisted his efforts in doing so. [T]here is competent substantial evidence that she obstructed [the officer's] efforts to get close to [the boy] by blocking his path. . . .

In *Wilkerson*, 556 So.2d 453 (Fla. Dist. Ct. App.), *review denied*, 564 So.2d 1088 (Fla. 1990), while the officers were in the process of arresting certain individuals for selling drugs and determining whether they possessed weapons, the defendant emerged from a crowd that had formed

---

[9] According to 16 Fla. Jur.2d Criminal Law § 4123, "[t]he word 'obstruct' in the statute prohibiting obstruction of an officer without violence, Fla. Stat. § 843.02, means to interfere with, impede or retard, while 'oppose' in the same statute means to be in contention or conflict with, to combat, or to resist."

8

and began cursing the officers. One of the officers ordered the defendant to leave the area because she was "interfering with their efforts to make the arrests." *Id.* at 454. The defendant was arrested after she refused to do so and was convicted of violating section 843.02. In affirming the conviction, the court found that the defendant "was not arrested for merely yelling at and cursing the officers" but "because the officer considered her physical presence was obstructing or impeding him in the performance of his duty." *Id.* at 456.

*M.M.*, 674 So.2d 883 (Fla. Dist. Ct. App. 1996), is also instructive. In that case, the officer was attempting to detain an alleged trespasser when the defendant started screaming profanities and told the officer to get away from the alleged trespasser. The officer ordered the defendant to stay away because he thought she was going to interfere with his investigation. The defendant did not comply and continued to approach even though the officer put out his hand to further indicate she should stop. The defendant's conviction for violating section 843.02 was affirmed on appeal because she had "interfered with the officer's ongoing efforts to arrest or detain a suspect." *Id.*

The Eleventh Circuit has concluded that "[a]s we understand Florida law, it is a crime not only to oppose or to obstruct a law officer in the execution of the officer's duty, but also to attempt to oppose or obstruct the officer. And none of these crimes require violence or the offer to do violence." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558-59 (11th Cir. 1993) (holding that the plaintiff's conduct of continuing to talk after being told to keep quiet constituted interference with the execution of a law enforcement officer's duties where the area was crowded and the officer knew that defendant resisted arrest on a previous occasion). *See L.S.T., Inc. v. Crow*, 49 F.3d 679, 681, 685 (11th Cir. 1995) (holding that plaintiff resisted law enforcement officer by refusing to comply with three lawful orders to leave a crowded parking lot so that order could be restored); *Dreske v. Holt*, 536 F.2d 105, 106-107 (5th Cir. 1976) (holding that plaintiff resisted arrest by refusing to accompany police officers to sheriff's department to post bond and locking himself inside his car during a routine traffic stop).

In fact, the Eleventh Circuit has noted the likelihood that the instant plaintiffs who "moved closer" to the Gonzalez home may well have interfered with the INS officers' mission:

> the complaint alleges that thirty-three of the plaintiffs who were allegedly unlawfully seized were actually moving closer to the Gonzalezes' home as the raid was being

9

executed, undoubtedly causing the agents to feel uncertainty and perhaps alarm regarding the plaintiffs' possible intentions to interfere with the agents' mission.

*See Dalrymple v. Reno*, 2003 WL 21403539 (11th Cir.(Fla.)).

In fact, forty plaintiffs have admitted that they engaged in conduct that resisted, obstructed and/or opposed the INS's operation to execute the warrants in question. Plaintiffs Arce, Carlos Gonzalez, Jose Gonzalez, and Marcos testified that they jumped over the barricade in order to form a human chain. *See* Statement, Fact Nos. 16, 42, 43, and 53. Plaintiff Beltran testified that he jumped the barricade, ran to the porch, and held onto the rails on either side of the Gonzalez's front door. *Id.* at Fact No. 17. Plaintiffs Alejandro, Rosa Garcia, Lara, and Zaldivar testified that they walked through the barricade with the intention to prevent the officers from taking Elian away. *Id.* at Fact Nos. 9, 39, 49 and 95. Plaintiff Martell testified that he ran back and forth in the front and back yards of the Gonzalez house. *Id.* at Fact No. 54. Plaintiffs Meana and Miranda testified that they were in the backyard of the Gonzalez house. *Id.* at Fact Nos. 57 and 59. Plaintiffs Abelairas, Benitez, Ledia Betancort-Garcia, Juan Chils, Lenia Fernandez, Freijo, Gomez, Huet, Mesa, Morales, Ondarza, Oropesa (Pumariega), Antonio F. Ortega, Ortiz, Palacio, Cristobal and Madeleine Peraza, Perez-Barroto, Angel Pina, Melissa Pumariega, Nestor and Otoniel Ramos, Pedro Riveron, Manuel Rodriguez, Sanchez, Santana, and Treto all testified that they either jumped over, walked through, were in front of the police barricade, and/or ran down the street in an effort to get to the Gonzalez house during the operation. *Id.* at Fact Nos. 8, 18, 19, 24, 33, 36, 41, 48, 58, 62, 65, 67, 68, 69, 70, 71, 72, 73, 74, 77, 78, 79, 82, 84, 89, 90 and 92. Finally, plaintiff Dalrymple testified that he was in the Gonzalez house and that he batted the officer's hand away when the officer attempted to take custody of Elian. *Id.* at Fact No. 26.

Accordingly, because the aforementioned plaintiffs violated Fla. Stat. § 843.02 by unlawfully interfering with the INS officers in their efforts to execute the warrants in question, their claims should be barred pursuant to the illegality doctrine.

  B. The Claims of the Plaintiffs Who Interfered with the Execution of the Warrant are Barred by the Doctrine of Illegality

Florida has long recognized the well-established principle that "no court shall aid men who

found their cause of action upon illegal acts." *Goldring v. Johnson*, 65 Fla. 381, 382 (1913) (quoting *Cook v. Fernandez*, 11 Fla. 100 (1864)). Florida courts have consistently barred claims that are grounded on illegal activities. *Goldring*, 65 Fla. at 382 (dismissing claim for recovery under contract requiring the defendant to buy liquor from plaintiff and resell it using plaintiff's license contrary to law); *Hauer v. Thum*, 67 So.2d 643, 645 (Fla. 1953) (holding that defendant in a contract action cannot use defense that contract under which plaintiff brought suit was consummated pursuant to a conspiracy to defraud the lending bank); *Yost v. Rieve Enterprises, Inc.*, 461 So.2d 178, 184 (Fla.App. 1984) (holding that broker could not bring action against seller of real property for unpaid commission where broker participated in seller's defrauding the buyer).

The *Goldring* court underscored the public policy considerations of the illegality defense by stating that "the courts can best preserve the law by refusing their aid to willful violations of the law." *Goldring*, 65 Fla. at 382-383. This very important policy goal of upholding and protecting the law has led courts to extend the illegality defense to bar negligence actions, including personal injury tort claims, arising from criminal activity. *See Ward v. Emmett*, 37 S.W.3d 500 (Tex.App. 2001) (plaintiff could not maintain action against doctors for medical malpractice that caused her to commit a murder); *Manning v. Brown*, 689 N.E.2d 1382, 1385 (N.Y. 1997) (because plaintiff's injuries were a direct result of her participation in the unauthorized use of a vehicle, public policy precluded recovery against the driver and owner of the vehicle); *Feltner v. Casey Family Program*, 902 P.2d 206, 208 (Wyo. 1995) (parents could not maintain action against foster care agency for placing a minor female in their custody who seduced their 19-year-old son, resulting in his prosecution for statutory rape); *Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.*, 621 So.2d 953 (Ala. 1993) (estate could not maintain action against defendant for wrongful death based on vending machine that fell on decedent while he was attempting to steal soft drinks); *Pappas v. Clark*, 494 N.W.2d 245 (Iowa Ct.App. 1992) (wife could not maintain action that arose from husband's illegal conduct that led to his death); *Lord v. Fogcutter Bar*, 813 P.2d 660 (Alaska 1991) (intoxicated man who was convicted of raping a girl he met in a bar could not recover on theory that the bartender was criminally negligent in continuing to serve him after he had become intoxicated); *Interstate Title Corp. v. Miller*, 581 So.2d 213, 214

(Fla.App. 1991) (trial court properly reached merits of defendant's illegality defense to plaintiff's negligence claim); *Glazier v. Lee*, 171 Mich.App. 216, 429 N.W.2d 857 (1988) (man who murdered his girlfriend could not recover on theory that his psychiatrist had negligently failed to prevent him from shooting his girlfriend); *Barker v. Kallash*, 63 N.Y.2d 19 (1984) (holding that a boy who was injured when an illegal homemade bomb that accidentally exploded in his hands could not maintain action against the persons who provided him with the gunpowder); *Adkinson v. Rossi Arms Co.*, 659 P.2d 1236 (Alaska 1983) (man convicted of intentionally shooting a third person could not recover from manufacturer and seller of shotgun on theory that the shotgun was defectively designed); *Cole v. Taylor*, 301 N.W.2d 766, 768 (Iowa 1981) (wife convicted of murdering her husband could not maintain action on theory that the psychiatrist had negligently failed to prevent her from shooting her husband).

The plaintiffs in the instant case engaged in the unlawful interference with the INS's execution of a search warrant, conduct that is prohibited by both federal,18 U.S.C. § 2231, and state law, Fla. Stat. § 843.02. Because the plaintiffs' injuries "were a direct result of a serious violation of the law involving hazardous activities which were not justified under the circumstances," *Manning*, 689 N.E.2d at 1384, recovery is precluded.

III.     THE PLAINTIFFS' LONG-TERM INJURIES ARE NOT PROXIMATELY RELATED TO NEGLIGENCE ALLEGED AGAINST THE UNITED STATES

The overwhelming majority of the plaintiffs' injuries are *de minimis*, lasting at most, a few days. However, to the extent that the plaintiffs seek damages for serious injuries allegedly resulting from exposure to CS and/or OC, those claims for damages fail as a matter of law because plaintiffs cannot establish legal causation. In a negligence action, the burden of proof is on the plaintiff to show that: (1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages. *See Lake Parker Mall, Inc. v. Carson*, 327 So.2d 121, 123 (Fla. 2d DCA 1976). It is axiomatic that a plaintiff must plead and prove that the defendant's negligent act was the cause of his injuries. *Salinetro v. Nystrom*, 341 So.2d 1059 (Fla. 3d DCA 1977); *McWhorter v. Curby*, 113 So.2d 566 (Fla. 2d DCA 1959); W. Prosser, The Law of Torts 236 (4th ed. 1971). "The general rule seems to be that it

is necessary to demonstrate legal causation by expert testimony where this issue is beyond the common knowledge of laymen." *Greene v. Flewelling*, 366 So.2d 777, 779 (Fla. Dist. Ct. App.), *cert. denied*, 374 So.2d 99 (Fla. 1979), citing W. Prosser, The Law of Torts 241 (4th ed. 1971); *Biedenharn Candy Co. v. Moore*, 184 Miss. 721, 186 So. 628 (1939); and *Parris v. Johnson*, 3 Wash.App. 853, 479 P.2d 91 (1970). Although several recent Florida cases have found that expert testimony is not required to establish legal causation even where the issue in question is beyond the common knowledge of laymen, these cases do not "obviate the claimant's burden of demonstrating legal causation by some competent evidence in order for him to recover for his injuries." *Greene*, 366 So.2d at 779.

Dr. Ballantyne, who has been designated by the United States, is a well-qualified expert.[10] He has opined that the exposure to CS and OC produces short-term effects, *i.e.*, peripheral sensory irritation to the eyes, skin, mouth, throat, esophagus and stomach, most of which are transient and likely to have disappeared within 24 hours. (The Declaration and curriculum vitae of Dr. Ballantyne are attached to the Statement; *see* Fact No. 6 and Tabs 1 and A.) Plaintiffs have not designated any expert to testify on this subject. Nevertheless, many plaintiffs testified that the duration of the effects of their exposure to the CS and/or OC was much longer than what is supported by the credible published scientific and medical literature and/or that they suffered from illnesses not associated with such exposure. They assert that the effects of the CS and/or OC lasted days, weeks, months, and even years. *See* Statement, Fact Nos 9, 14, 16, 17, 18, 21, 22, 23, 24, 25, 27, 29, 30, 31, 32, 33, 34, 35, 37, 40, 41, 43, 44, 47, 48, 49, 50, 51, 53, 54, 58, 61, 70, 71, 77, 78, 79, 81, 84, 85, 87, 88, 89, 90, 92, 93, 94, and 95. Several other plaintiffs have testified that after being exposed to CS and/or OC, they suffered from sarcoidosis, retinal hemorrhage, hypothyroidism, prostatitis, and attempted suicide. *See* Statement, Nos. 8, 63, 65, and 76. However, the only evidence of the legal cause of the plaintiffs'

---

[10] Dr. Ballantyne has extensive practical experience, over a period of 35 years, in the specialization of toxicology, particularly clinical, occupational and forensic toxicology. *See* Statement, Fact No. 6, Tabs 1 and A. Declaration of Dr. Bryan Ballantyne, Tab A. He has researched, performed developmental work, and written extensively on various aspects of chemical warfare and riot control agents, including CS and OC. *Id.*

long-term (chronic) injuries is their own testimony, which is insufficient as a matter of law.

*Greene v. Flewelling*, 366 So.2d 777 (Fla. Dist. Ct. App. 1979), is instructive. In that case, plaintiff and his wife testified that he was able to taste and smell prior to the accident at issue but could not do so after the accident and that this condition had not improved. A physician testified that the plaintiff reported a loss of the senses of taste and smell but that such an occurrence usually only results when the olfactory nerves have been damaged, which was not the case there. The physician concluded that plaintiff had suffered "a subjective complaint that can't be corroborated with objective findings." *Id.* at 778. On appeal, the court held that plaintiff failed to "carry his burden of demonstrating that [the defendant's] negligence was the legal cause of his loss of smell and taste, because the "only evidence of legal causation" was simply that plaintiff "could smell and taste before the accident, but could not shortly thereafter." Finding that this evidence only "raises a mere possibility of legal causation, and nothing more . . . [which] is not sufficient to allow a claimant to recover," the court relied upon and cited Dean Prosser:

> On the issue of fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

*Id.*

Likewise, the instant plaintiffs cannot prove that their long-term (chronic) injuries were legally caused by the inhalation of the CS and/or OC by competent substantial evidence. In other words, plaintiffs' testimony alone is insufficient to satisfy their burden of proof that the INS's use of CS and/or OC caused their long-term (chronic) injuries.

CS and OC, which are deployed to control crowds and to avoid the possibility of physical injury to bystanders, produce transient (reversible) harassing or incapacitating effects by interacting with the sensory nerve receptors in exposed body surfaces which results in the development of uncomfortable sensations such as stinging or burning to pain. *See* Statement, Fact No. 6, Tab 1.

Exposure to the eyes causes stinging, burning or severely painful sensations, which slowly disappear within two to three hours. Redness of the eyes normally completely disappears within 24 hours. *Id.* Inhalation of CS or OC will cause stinging and burning sensations in the nose and throat, excess mucus and may cause sneezing, coughing, a choking sensation, and rapid shallow breathing, which will begin to subside 15 minutes or so after the person begins to breathes fresh air. *Id.* Exposure to the skin will cause stinging or burning sensations, including local reddness of the area, which will subside within a few hours. *Id.* Swallowing CS or OC will cause stinging or burning sensations in the mouth and throat and may cause a burning sensation in the chest; these effects will subside within 24 hours. *Id.* CS or OC may also irritate the stomach causing a feeling of nausea which may result in vomiting; these effects will subside in two or three days. *Id.* There are no credible published reports in the scientific and medical literature that exposure to CS and/or OC produces any other physical effects such as sarcoidosis, retinal hemorrhage, hypothyroidism, prostatitis, or suicide. *Id.*

Because plaintiffs' claims that the inhalation of the CS and/or OC caused their long-term (chronic) injuries are not supported by competent substantial evidence, including an expert who will testify that these agents produce such injuries, the United States is entitled to judgment as a matter of law.

IV.     THE UNITED STATES CANNOT BE HELD LIABLE
        UNDER THE FTCA BASED SOLELY UPON THE VIOLATION
        OF FEDERAL STATUTES, REGULATIONS OR GUIDELINES

The Amended Complaint repeatedly alleges that, in violation of INS regulations, guidelines, policies, and procedures, the officers engaged in certain negligent conduct, including the deploying of "CS" gas from a "weapon known as an 'Israeli gas gun,'" that allegedly caused plaintiffs a variety of injuries. *See* Am. Cmplt. ¶¶ 157-165, 278-282. To the extent that plaintiffs' claims are based upon the purported violation of INS regulations, guidelines, policies and procedures, the United States cannot be held liable under the FTCA unless there is an analogous state law basis for making such claims. If there is an analogous liability under Florida law, it can form the basis of liability; if no such liability exists, then the claims must be dismissed for lack of subject matter jurisdiction. *See, Art-Metal*, 753 F.2d at 1156-58; *Sellfors*, 697 F.2d at 1365; *United Scottish Ins. Co. v. United States*, 614 F.2d 188, 192

(9th Cir. 1979) ("plaintiffs may not base their claims on alleged breaches of a duty arising solely out of federal law when there is no corresponding duty under state law"), *affirmed after remand,* 692 F.2d 1209 (9th Cir. 1982), *reversed on other grounds,* 467 U.S. 797 (1984); *Clemente,* 567 F.2d 1140 (1st Cir. 1977). Because, as shown above, the use of CS and/or OC was reasonable and breached no corresponding duty under Florida law, plaintiffs' claims based on the use of "CS" fails as a matter of law. *See McCormick,* 333 F.3d 1234, 1245 (11th Cir. 2003), *reh'g denied,* 85 Fed. Appx. 728, ___ F.3d ___, 2003 WL 22438591 (11th Cir. Fla. 10/6/04); *Vineyard,* 311 F.3d 1340 (11th Cir. 2002), *quoting Gainor v. Douglas County,* 59 F.Supp.2d 1259, 1269 (M.D. Ala. 1996); *Andrade,* 116 F. Supp. 2d 778 (W.D. Tex. 2000)

Congress gave the federal courts jurisdiction over only those tort claims for which "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346 (b). Thus, it is a requirement of the FTCA "that the United States be held liable only if private parties would be held liable for comparable conduct." *See, e.g., Zabala Clemente v. United States,* 567 F.2d 1140, 1144 (1st Cir. 1977), *cert. denied,* 435 U.S. 1006 (1978); *Pate v. Oakwood Mobile Homes, Inc.,* 374 F.3d 1081, 1084 (11th Cir. 2004) (holding that district court erred when, in deciding wheter OSHA officers acted negligently, it inquired into whether OSHA officers violated their own regulations and "failed to perform their mandatory obligations"); *Hardaway Co. v. United States Army Corps. of Engineers,* 980 F.2d 1415, 1416-17 (11th Cir. 1993) (per curiam) (holding that in determining whether the Army Corps. acted negligently, the court could not consider whether federal officers had breached "an affirmative duty" imposed by federal regulation, but only ask whether the alleged conduct violated a state law); *Howell v. United States,* 932 F.2d 915, 917-18 (11th Cir. 1991) (holding that in determining whether the FAA acted negligently in failing to ground a dangerous airplane, the court could not consider whether the FAA breached "federal statutes and internal FAA orders" but only ask whether the alleged conduct violated a state law). Hence, a dismissal for failure to prove a duty owed under the law of the place where the conduct occurred is actually a dismissal for lack of subject matter jurisdiction. *See, e.g., Davis v. United States,* 395 F. Supp. 793 (D. Neb. 1975), *affirmed per curiam,* 536 F.2d 758

(8th Cir. 1976).

Because a private individual would not incur liability under Florida law under analogous circumstances, Count I, to the extent it is based upon the failure of the INS to follow its regulations, guidelines, policies and procedures, including the use of "CS" gas, should be dismissed.

V.         PLAINTIFFS' CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE NOT ACTIONABLE

To establish a claim for intentional infliction of emotional distress,[11] a plaintiff is required to show: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress."[12] *Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp.2d 1187, 1187 (M.D. Fl. 2002).

The Florida Supreme Court has defined "outrageous conduct" as "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985). "Only in extremely rare circumstances will courts uphold claims for intentional infliction of emotional distress." *Gonzalez-Jimenez de Ruiz*, 231 F. Supp.2d at 1187. "The

---

[11] In order to state a claim for negligent infliction of emotional distress, a plaintiff must show that (1) the defendant's negligent act caused plaintiff a demonstrable injury, and (2) this physical injury caused plaintiff's emotional distress. *See R.J. v. Humana of Florida, Inc.*, 652 So.2d 360, 363 (Fla. 1995). Because the officers' conduct is executing the warrants was privileged, as shown above, plaintiffs cannot establish the first prong, *i.e.*, that the defendant's negligent act caused plaintiffs demonstrable injuries. Therefore, their claims for negligent infliction of emotional distress fails as a matter of law.

[12] For the most part, Florida courts have limited relief to situations where a special relationship exists between the tortfeasor and a vulnerable plaintiff. *See McAlpin v. Sokolay*, 596 So.2d 1266, 1268-69 (Fla.Ct.App.1992) (hospital patient verbally assaulted and threatened by a physician about a debt she owed to the physician's friend); *Dominguez v. Equitable Life Assurance Society*, 438 So.2d 58, 61-62 (Fla.Ct.App.1983), *approved*, 467 So.2d 281 (Fla.1985) (insurer falsely accused an injured insured of fabricating his claim); *Smith v. Telophase Nat'l Cremation Society, Inc.*, 471 So.2d 163, 166 (Fla.Ct.App.1985) (defendant failed to dispose of her late husband's ashes in accordance with certain specific instructions). Here, no special relationship exists between the INS and the plaintiffs.

determination of whether a plaintiff has alleged conduct which meets the essential elements for a claim for intentional infliction of emotional distress is a matter of law to be decided by the court." *Id.*; *see also, Hare v. Citrus World Inc.*, 39 F. Supp.2d 1365, 1369 (M.D. Fl. 1999), citing *Baker v. Florida National Bank*, 559 So.2d 284, 287 (Fla. Ct. App. 1990).

The Florida Supreme Court has also pointed out that when defendant's actions are otherwise "legally permissible" and "privileged under the circumstances," as a matter of law, those actions cannot be considered the type of "atrocious conduct" needed to establish a claim for intentional infliction of emotional distress. *McCarson*, 467 So.2d at 278-79. This holds even in extreme circumstances, where it is clear that the defendant acted in "in reckless disregard of the potential for [a] tragedy," and the victim suffered emotional distress so severe that it caused her untimely death. *Id.* In *McCarson*, the Florida Supreme Court declined to impose liability for intentional infliction of emotional distress based on conduct that was quite egregious: termination of the benefits of an elderly patient suffering from Alzheimer's disease. The court found that although this action caused the patient emotional distress so severe that it led to her early death and was taken "in reckless disregard of the potential for such tragedy," the defendant's actions were legally "privileged" and the claim failed as a matter of law. *Id.* at 279.

Similarly, in *Baker v. Fla. Nat'l Bank*, 559 So. 2d 284 (Fla. 4th Dist. App. 1990), the court dismissed a plaintiff's claim that his trustee had mismanaged his money for personal gain. The plaintiff provided evidence that this mismanagement caused him emotional distress so severe that it led to a life-threatening heart condition requiring hospitalization. The court held that because the defendant had acted within the terms of the trust instrument "in a permissible way," it could not be held liable for intentional infliction of emotional distress, even if it was "well aware that such insistence [wa]s certain to cause emotional distress." *Id.* at 288.

Here, as a matter of law, as established above, the INS's officers' conduct in executing the warrants was "legally permissible" and their use of force was "privileged under the circumstances." Therefore, such conduct, as a matter of law cannot be considered extreme and outrageous within the intendment of Florida law and, accordingly, plaintiffs' cannot establish claims for intentional infliction of

18

emotional distress. *See McCarson*, 467 So.2d at 278-79. Furthermore, given the confrontation that resulted from the interference with the operation, *e.g.*, moving closer to the Gonzalez family home, jumping the barriers, getting in the officers' way, attempting to prevent the officers from entering the home and/or by refusing to leave the area once the operation began, the actions of the officers cannot be considered extreme or outrageous. Therefore, the emotional distress claims should be dismissed.

## CONCLUSION

For the foregoing reasons, the United States' Motion for Summary Judgment and/or Dismissal should be granted.

Dated: Oct. 13, 2004

                                        Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General
                                        Civil Division

                                        PHYLLIS J. PYLES
                                        Director, Torts Branch
                                        Civil Division

                                        /s/ Stephen Handler
                                        STEPHEN E. HANDLER
                                        Florida Bar No. A5500749
                                        Lead Counsel
                                        CLAY MAHAFFEY
                                        Florida Bar No. A5500845
                                        Trial Attorney
                                        DIMPLE GUPTA
                                        Counsel to the Assistant Attorney General
                                        Torts Branch, Civil Division
                                        U.S. Department of Justice
                                        P.O. Box 888
                                        Washington, D.C. 20044
                                        (202) 616-4279
                                        (202) 616-5200 (fax)
                                        Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on Oct. 13, 2004, I caused to be served upon the following counsel a true and correct copy of the United States' Memorandum in Support of its Motion for Summary Judgment or, in the Alternative, for Dismissal, via First Class Mail to:

Paul Orfanedes
Judicial Watch, Inc.
501 School Street
Suite 500
Washington, DC 20024
Attorney for the plaintiffs

Larry Klayman
P.O. Box 31007
Miami, FL 33231

_____
Stephen E. Handler