## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

DONATO DALRYMPLE,

    Plaintiff,

  vs.

UNITED STATES OF AMERICA,

    Defendant

)   Case No.: 03-20588-CIV-
)   MOORE/O'SULLIVAN
)
)
)
)
)
)
)



## PLAINTIFF, SANDRA COBAS', STATEMENT OF MATERIAL FACTS AT ISSUE

1.   Plaintiff, Sandra Cobas, did not use force against or interfere with federal agents on the day of the subject raid on the home of Elian Gonzalez, or at any time thereafter.


2.   Plaintiff, Sandra Cobas, suffered substantial physical and other injuries as a result of the Defendant's actions, and this is not controverted by any other testimony, including but not limited to alleged experts.  See Exhibit 1.

         Respectfully submitted,

         Larry Klayman, Esq.
         540 Brickell Key Drive,
         Suite #732
         Miami, Florida 33131

1

EXHBT 1

1

1

2

3          UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
4
                CASE NO. 03-20588 CIV MOORE
5

6   DONATO DALRYMPLE,

7               Plaintiff,            CERTIFIED COPY

8         vs.

9   UNITED STATES OF AMERICA,

10              Defendant.
    --------------------------------x
11

12
                      99 N. E. Fourth Street
13                    Miami, Florida
                      August 11, 2004
14                    11:12 a.m.

15

16

17      DEPOSITION OF SANDRA MARIA COBAS

18

19          Taken on behalf of the Defendant

20   before LOIS E. GUFFEY, RDR, Notary Public in

21   and for the State of Florida at Large, pursuant

22   to a Notice of Taking Deposition filed in the

23   above cause.

24

25

1    APPEARANCES:

2        LAW OFFICE OF LARRY KLAYMAN

3        540 Brickell Drive, Unit 732

4        Miami, Florida 33131

5        By:  LARRY KLAYMAN, ESQ.

6        Appearing on behalf of Sandra Cobas.

7

8

9        U.S. DEPARTMENT OF JUSTICE

10       1331 Pennsylvania Avenue, Northwest

11       Washington DC 20004

12       By:  Stephen E. Handler, Esq.

13

14       And Dimple Gupta, Esq.

15       RFK Main Justice Bldg,  Room 3613

16       950 Pennsylvania Avenue, NW

17       Washington, DC 20530

18       Appearing on behalf of the Defendant.

19

20

21

22

23

24

25

3

```
 1                    I N D E X

 2        WITNESS                DIRECT

 3        SANDRA MARIA COBAS        4

 4

 5        SANDRA MARIA COBAS EXHIBITS

 6        1, copy of photo            17

 7        2, copy of photo            21

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          Thereupon:

2                      SANDRA MARIA COBAS,

3          a witness named in the notice heretofore filed,

4          being of lawful age, and being first duly sworn

5          in the above cause, was examined and testified

6          on her oath as follows:

7                      DIRECT EXAMINATION

8    BY MR. HANDLER:

9          Q.    Could you, please, state your full name

10   and spell your last name for the record.

11         A.    Sandra Maria Cobas, C-O-B-A-S.

12         Q.    Let the record reflect this is a discovery

13   deposition of Sandra Cobas taken pursuant to notice

14   in accordance with the Federal Rules of Civil

15   Procedure and the local rules for the Southern

16   District of Florida.

17               Ms. Cobas, have you ever had your

18   deposition taken before?

19         A.    No.

20         Q.    Let me go over some of the rules.

21   Testifying here today under oath is just like

22   testifying in court.  The court reporter to my

23   right is taking down everything you say verbatim so

24   it's very important that you respond verbally.  So

25   if you want to say yes, please, say yes.  If you

FERNANDEZ & ASSOCIATES   (305) 374-8868

5

1   want to say no, say no, as opposed to nods or

2   shakes of the head, because they don't translate

3   well on the record.

4        A.   Okay.

5        Q.   After the deposition is over you will be

6   given an opportunity to read it over and make any

7   changes you want.  Fair enough?

8        A.   Yeah.

9        Q.   If I ask a question and you don't

10  understand it, please, let me know.  I will

11  rephrase it or I will ask you a different question.

12  Okay?

13       A.   Okay.

14       Q.   If you respond to a question I will

15  conclude you understood it and you were giving an

16  appropriate response.  Fair enough?

17       A.   Yes.

18       Q.   Many times during the deposition you will

19  anticipate what I am asking and you will cut me off

20  and you will respond.  Please, don't do that

21  because it's difficult for the court reporter to

22  take down the responses, and also it will deprive

23  your attorney of making an objection if he thinks I

24  am asking something improper.

25       A.   Okay.

1     Q.   So pause before you respond.

2     A.   All right.

3     Q.   Okay.  What is your present address?

4     A.   9241 Southwest 11th Street, Miami, Florida

5  33174.

6     Q.   How long have you lived there?

7     A.   18 years.

8     Q.   Where were you born?

9     A.   I was born in Havana, Cuba.

10    Q.   When did you come to the United States?

11    A.   1956.

12    Q.   Are you a U. S. citizen?

13    A.   Yes.

14    Q.   Have you ever been arrested?

15    A.   No.

16    Q.   Just in general you are aware that in the

17 United States there is an immigration service that

18 regulates people coming in the United States and

19 leaving the United States?

20    A.   Yes.

21    Q.   And they used to be called the INS?

22    A.   Yes.

23    Q.   Just walking around Miami when you see law

24 enforcement officers you recognize them because

25 they are wearing like guns and badges and things

1    like that?

2         MR. KLAYMAN:    Objection.  Leading.  You

3      can answer.

4         THE WITNESS:  Ask the question again.

5    BY MR. HANDLER:

6         Q.    Sure.  When you are walking around in

7    Miami do you ever see law enforcement officers,

8    policemen?

9         A.    Policemen, yes.

10        Q.    How do you recognize them?

11        A.    They have a hat and they are in blue

12   uniform.

13        Q.    Sometimes they wear badges?

14        A.    Yes.

15        Q.    Wear guns?

16        A.    Yes.

17        Q.    Okay.  And you are a law-abiding citizen?

18        A.    Yes.

19        Q.    In this case here you are bringing a cause

20   of action against the United States for money

21   damages, and I understand that you are making

22   claims for physical and perhaps emotional damages,

23   correct?

24        A.    Yes.

25        Q.    I want to know if you are making a

1   separate claim for lost wages.

2       A.   No.

3       Q.   Are you presently employed?

4       A.   Yes.

5       Q.   Where do you work?

6       A.   I work for Larry Klayman.  That's friend

7   of the U.S. Senate.  Friends of Larry Klayman.

8       Q.   How long have you held that position,

9   approximately?

10      A.   About seven months, six months.

11      Q.   And what is your job title?

12      A.   Chief of staff.

13      Q.   So you basically help Mr. Klayman in terms

14  of his appearances and his scheduling?

15      A.   Scheduling.  That's correct.

16      Q.   This is a full-time position?

17      A.   Yes.

18      Q.   Is it a paid position?

19      A.   Yes.

20      Q.   Did you ever work for Judicial Watch?

21      A.   Yes.

22      Q.   What was your title there?

23      A.   Director of the Miami office.

24      Q.   Are you a lawyer?

25      A.   No.

9

1    Q.    Do you have any legal training?

2    A.    No.

3    Q.    Did you ever conduct any interviews of the

4 plaintiffs in this case?

5    A.    I don't understand the question.

6    Q.    With regard to all of the plaintiffs that

7 are listed in the complaint in this case did you

8 ever talk to them and take statements from them?

9    A.    I have talked to them, but before.  A long

10 time ago but never -- I don't --

11        MR. KLAYMAN:   I want to caution you not

12    to get into areas of work product.

13        MR. HANDLER:  Shes's not an attorney.

14        MR. KLAYMAN:   No, but she was working for

15    attorneys, so you will be getting into work

16    product.  We would raise an objection to that.

17        MR. HANDLER:  Okay.

18        MR. KLAYMAN:   I would instruct you not to

19    answer on my discussions you had with

20    plaintiffs or potential plaintiffs in this

21    case.

22        THE WITNESS:   Okay.

23 BY MR. HANDLER:

24    Q.    Did any of the plaintiffs ever give you

25 any written statements that you have retained,

10

1  first of all?

2         MR. KLAYMAN:   Objection.   Use of the word

3      "you" is vague and ambiguous.

4  BY MR. HANDLER:

5      Q.   You can answer.

6      A.   What was the question again?

7      Q.   Did any plaintiffs give you any documents

8  concerning this case that you have kept in your

9  possession?

10     A.   No.

11     Q.   I took the deposition of a woman named

12  Rosa Garcia.   She's a plaintiff in this case.   And

13  she testified that she received a letter from the

14  United States Government detailing the operation

15  that took place on April 22nd, 2000.   And I believe

16  she testified that she gave it to somebody at

17  Judicial Watch, perhaps you.   Did she give you any

18  such document?

19     A.   Not that I recall.

20     Q.   Do you have any documents from the United

21  States Government regarding the operation that took

22  place on April 22nd, 2000 regarding the removal of

23  Elian Gonzalez from Lazaro Gonzalez's home?

24         MR. KLAYMAN:   Documents from the United

25      States Government?

11

1    BY MR. HANDLER:

2        Q.   Documents generated from the United States

3    Government.

4        A.   No.

5        Q.   Do you have in your possession any

6    documents from the United States Government

7    regarding any issues in this case?

8        A.   No.

9        Q.   Do you have any photographs or videotapes

10   that were taken by any of the plaintiffs in this

11   case?

12       A.   I have my own photographs.

13       Q.   I am talking about other plaintiffs.

14       A.   No.

15       Q.   Did you take photographs during the April

16   22nd events?

17       A.   No.

18       Q.   Are your photographs from news events?

19       A.   Yes.

20       Q.   So they're commercially-available

21   photographs?

22       A.   Yes.

23       Q.   Did you remove any documents from Judicial

24   Watch regarding this matter?

25       A.   No.

12

1      Q.    So anything that you collected in

2   materials of documentation would have been retained

3   at Judicial Watch?

4      A.    Yes.

5      Q.    Now the event that brings us here today

6   concerns law enforcement officers coming into the

7   neighborhood of Lazaro Gonzalez and removing Elian

8   Gonzalez from his home on April 22nd, 2000,

9   correct?

10      A.    Correct.

11        (Brief interruption.)

12   BY MR. HANDLER:

13      Q.    Could you tell me why you left Judicial

14   Watch.

15        MR. KLAYMAN:   Objection.

16   BY MR. HANDLER:

17      Q.    You can answer.

18        MR. KLAYMAN:   No.   I am going to instruct

19      her not to answer on that.   That is subject to

20      the employment relationship between Judicial

21      Watch and her, and we will take an objection

22      and instruct her not to answer.

23        MR. HANDLER:   Well --

24        MR. KLAYMAN:   We can go off the record.

25        MR. HANDLER:   Well, let me make a

13

1    statement for the record.  You can only

2    instruct your client not to answer on the basis

3    of privilege, okay.

4        MR. KLAYMAN:   No.  I understand.  But

5    there are issues right now before the court and

6    I would ask this portion of the record be

7    sealed because that portion is sealed.  So I

8    would like to go off the record.

9        MR. HANDLER:  All right.  Let's go off the

10   record for a second.

11   (Discussion off the record)

12       MR. HANDLER:  On the record.

13   BY MR. HANDLER:

14   Q.   Were you ever a member of any Cuban

15   organization like the Democracy Movement or Alpha

16   66?

17   A.   No.

18   Q.   Prior to April 22nd, 2000 were you ever a

19   part of any type of organization that was formed to

20   protect Elian Gonzalez?

21   A.   No.

22   Q.   Were you friends with Lazaro Gonzalez and

23   his family?

24   A.   No.

25   Q.   Prior to April 22nd, 2000 how often did

14

1  you visit Lazaro Gonzalez's, the neighborhood where

2  Elian was staying with him?

3      A.   Practically every evening.

4      Q.   What was the purpose of visiting?

5      A.   The purpose of visiting?  A place where I

6  just went because I thought they needed support.

7      Q.   Did you ever engage in any activities with

8  the protestors at the site?

9      A.   No.

10     Q.   When you were in the neighborhood of

11  Lazaro Gonzalez did you ever see any of the

12  protestors form human chains?

13     A.   Yes.

14     Q.   And when I am talking about human chains,

15  I am talking about people locking arms in a line.

16     A.   Oh, no.  No.  Not like that.

17     Q.   What do you mean by human chains?

18     A.   Just standing like, you know, across, each

19  one standing and praying or saying the National

20  Anthem in Cuba, Cuba or the American National

21  Anthem.

22     Q.   In front of Lazaro Gonzalez's home?

23     A.   Yeah.

24     Q.   Did you ever participate in that?

25     A.   No.  Not that.

FERNANDEZ & ASSOCIATES   (305) 374-8868

15

Q.   When you visited the Lazaro Gonzalez neighborhood when Elian was staying there, did you see anybody carrying any weapons?

A.   No.

Q.   Did you ever see anybody with chains beating the street (indicating)?

A.   No.

Q.   Do you know any Alpha 66 members?

A.   Yes.

Q.   Did you see them in the area of Lazaro Gonzalez's home when Elian was staying there?

A.   No.

Q.   Do you know why they were in the neighborhood?

A.   No.

Q.   Were you ever aware of -- strike that. Did you ever have any discussions with anyone regarding how Elian could be protected?

A.   No.

Q.   Did you ever have any discussions with anybody about the possibility of anyone, including the Federal Government, removing Elian from Lazaro Gonzalez's home?

A.   No.

Q.   Were you ever inside Lazaro Gonzalez's

1 home?

2     A.   The day of the raid?

3     Q.   Before.

4     A.   No.

5     Q.   Now we have agreed that the law

6 enforcement officers arrived on April 22nd, 2000,

7 correct?

8     A.   Yes.

9     Q.   Would you agree with me that they arrived

10 very early in the morning?

11     A.   Yes.

12     Q.   Do you remember where you were shortly

13 before the law enforcement officers arrived?

14     A.   Yes.

15     Q.   Where were you?

16     A.   I was across the street right next to the

17 tent where the reporters were.

18     Q.   Let's see if we can pinpoint that a little

19 bit better here.  I am going to mark this as an

20 exhibit but I want to make sure I have the right

21 photograph.

22     I am just showing you an aerial photograph

23 of Lazaro Gonzalez's neighborhood, and I am

24 pointing to the center of the photograph, which is

25 Lazaro Gonzalez's home.  Do you recognize that?

17

A.   Yes.

Q.   Okay.  Let's just mark this as Exhibit No.
1.

(Sandra Cobas Exhibit  1 is marked.)

BY MR. HANDLER:

Q.   So in Exhibit No. 1 you would agree that I
am pointing to the roof of Lazaro Gonzalez's home?

A.   Correct.

Q.   I am going to put his initials on that
roof, LG, for Lazaro Gonzalez, okay?

A.   Yes.

Q.   Now this picture wasn't taken on April
22nd, 2000 but it was taken sometime before.  But
we are just using it just to orient ourselves to
your testimony where you were and what you were
doing.  Okay?

A.   Correct.

Q.   Now in front of Lazaro Gonzalez's home
across the street there were the media tents,
correct?

A.   Yes.

Q.   And there was a barricade in front of
them?

A.   Correct.

Q.   Then there is a barricade cutting off the

18

street where, in general, protesters and other

people stood behind, correct?

A.   Correct.

Q.   Now can you tell me where you were located

shortly before the arrival of the law enforcement

officers on April 22nd, 2000?

A.   Right here (indicating).

Q.   Okay.

A.   There's a tent.  Where the tent finishes,

where the barricade is right there.

Q.   I have my pen where you were pointing.

That's behind the barricade; is that correct?

A.   Yes.  Correct.

Q.   Do you mind if I make a circle right

there?

A.   Yeah.

Q.   I am making a circle just in the general

area you were.  It's a dark circle.  So I put a

circle on Exhibit 1 behind the barricade away from

Lazaro Gonzalez's home in the general area where

you were located shortly before the law enforcement

officers arrived on April 22nd, 2000, correct?

A.   Correct.

Q.   Now what were you doing in this area; do

you remember?

19

A.    I was praying.

Q.    Okay.  Now what first alerted you to the presence of the law enforcement officers?

A.    What first alerted me?  The screams, and the yelling and the gas.

Q.    Did you see all three at once or hear and see all three at once?

A.    First was the screaming.

Q.    First was of the screaming?

A.    And the yelling.

Q.    And what did you hear?  Did you hear -- could you distinguish what they were saying or screaming?

A.    So many screams at one time.  Terrorized.

Q.    I am asking you the actual words.

A.    I heard people scream, "Stop."  "Get away."

Q.    What else?

A.    "Oh, my God."  Just closing my eyes trying to think.  "Get down."  Basically that's what I can remember now.

Q.    Did you hear anybody say "They're here," or "They're taking Elian away" or anything like that?

A.    Well, that I heard after.

```
 1        Q.    But I am saying --
 2        A.    Right there.  That -- yeah.  "Estan aqui."
 3  That means "they're here."  I remember that in
 4  Spanish.  I am thinking in English.  I am thinking
 5  in English and  --
 6        Q.    Right.  Did you look over toward the
 7  Gonzalez home when you heard the screaming?
 8        A.    Yes.
 9        Q.    What did you see?
10        A.    Gas.  White, white.
11        Q.    Before the gas.
12        A.    Just people.  To me, I thought they were
13  soldiers getting out (indicating) and just
14  pointing, shooting.
15        Q.    So --
16        A.    But there were guns.  Heard the screaming.
17        Q.    Did you see the white vans pull up?
18        A.    Yes.
19        Q.    Is that yes?
20        A.    Yes.
21        Q.    Did you actually see them drive up or when
22  you looked over were they already parked?
23        A.    They were parking.
24        Q.    They were parking?
25        A.    Parking.
```

1      Q.    And then you saw what you describe as

2   soldiers coming out of the vans, correct?

3      A.    Yes.

4      Q.    And they were dressed how?

5      A.    Well, they were dressed -- helmets and

6   uniforms, but not fatigue uniforms.  They were like

7   uniforms.  Uniform.  Combat uniform.

8         (Sandra Cobas Exhibit 2 is marked.)

9      Q.    Let me show you another picture.  This is

10   a picture -- it's actually from one of the news

11   videos.  And this is in the street in front of

12   Lazaro Gonzalez's home looking at Exhibit 1.  It's

13   in this general location in front of the barricade.

14         I want you to look at the two officers.

15   They have, "INS Federal Officer."  They are wearing

16   helmets and gun belts.  Is that the type of people

17   you saw?

18      A.    Yes.  With helmets on.

19      Q.    And can you read what it says on the

20   shirt?

21      A.    "INS Federal Officer."

22      Q.    And you would recognize this as a law

23   enforcement officer, correct?

24      A.    Not at that moment.  Now I do.

25      Q.    You wouldn't?

1    A.    At that moment, no.

2    Q.    Why wouldn't you?

3    A.    Because there were -- I didn't see the

4    front.  I just -- you know, coming at them with the

5    gas and all the screaming, I didn't see the

6    uniform.  I just saw helmets and I didn't see that.

7    Q.    If you look at the videos they actually

8    say, "INS Federal Officer" right on the front too.

9    A.    I didn't see it.

10   Q.    You don't remember seeing that?

11   A.    No.

12   Q.    But when you looked over at the Gonzalez

13   home and the officers are coming out of the vans

14   you recognized them to be some type of law

15   enforcement authority, correct?

16   A.    Not really.  How can I say -- not law

17   enforcement but I describe it as some kind of

18   soldiers.

19   Q.    Soldiers?

20   A.    Soldiers.

21   Q.    Whether they are state or federal, some

22   type of soldiers?

23   A.    Soldiers.  That's correct.

24   Q.    Now when the officers came out of the van,

25   where did they go?  Do you remember where they

1   went?

2        A.    They looked like they were running towards

3   the Gonzalezes.

4        Q.    Home?

5        A.    Yes.

6        Q.    Up the front porch?

7        A.    Some were running to the Gonzalezes,

8   others were going straight on up.

9        Q.    When you say straight on up you mean --

10       A.    Front barricades.

11       Q.    At that time did you see people from

12  behind the barricade jump over the barricade and

13  run toward the Gonzalez home?

14       A.    No.

15       Q.    Did you jump over the barricade?

16       A.    No.

17       Q.    Did you move closer to the front of the

18  barricade?

19       A.    I moved towards the barricade.

20       Q.    Why did you do that?

21       A.    To see what was happening.

22       Q.    Okay.  And how close did you get to the

23  front of the barricade?

24       A.    Right to the barricade.

25       Q.    Before the gas was sprayed, what else did

24

1    you see the officers do?

2         A.    Just screams, yells.

3         Q.    What were they yelling?

4         A.    "Get back, get back."  Something like

5    that.  "Get back."

6         Q.    Did you hear the officers say, "Get back

7    behind the barricades"?

8         A.    I didn't hear barricade.  I just heard,

9    "Get back."

10        Q.    "Get back, get back"?

11        A.    And they started spraying.

12        Q.    And they started spraying?

13        A.    (Witness nods head.)

14        Q.    Is that a yes?

15        A.    Yes.

16        Q.    I apologize for --

17        A.    No.

18        Q.    -- for reminding you, but when you shake

19   your head like that she --

20        A.    She can't say it.

21        Q.    She's writing "shakes head."  Before the

22   gas was sprayed did you see people from behind the

23   barricade throwing objects at the officers?

24        A.    What was the question again?

25        Q.    Before the gas was sprayed did you see

25

1    people from behind the barricade throwing objects

2    at the officers?

3        A.    No.

4        Q.    Before the gases sprayed did you see

5    people standing in front of the barricade?

6        A.    In front of the barricade?

7        Q.    Uh-huh.

8        A.    In back of the barricades.

9        Q.    In front of the barricade.

10       A.    No.

11       Q.    You see in Exhibit 2?

12       A.    Yes.

13       Q.    Okay.  Now --

14            MR. KLAYMAN:    I am going to object to the

15        authenticity of the exhibits 1 and 2 but you

16        can question her with those objections.

17            MR. HANDLER:  Okay.

18            MR. KLAYMAN:    They haven't been

19        authenticated.  Go ahead.

20    BY MR. HANDLER:

21       Q.    Let's look at Exhibit 2.  This is -- do

22    you recognize anything in Exhibit 2?

23       A.    Just a cameraman, INS, flags and signs.

24    Some signs in the back.  I can't see people's faces

25    because it's -- so it was there.  It was the event.

26

1    Q.    It was the event?

2    A.    Yes.

3    Q.    So Exhibit 2 looks like the event that you

4    witnessed, correct?

5    A.    Yes.

6    Q.    Okay.  Now the -- in this picture you can

7    see that part of the front barricade where people

8    had put signs and pictures, correct?

9    A.    Yes.

10   Q.    Now you were standing behind that

11   barricade, correct?

12   A.    Yes.

13   Q.    And the officers, these other gentlemen

14   are standing in front of the barricade, correct?

15   A.    From the picture, yes.

16   Q.    Do you remember seeing any people standing

17   in front of the barricade before the gas was

18   sprayed?

19   A.    No.

20   Q.    Okay.  Now you see this object in the

21   photograph?  There is an arrow pointing, and it

22   says it's a stool?

23   A.    Yes.

24   Q.    I am just asking.

25   A.    Yes.

1    Q.    Did you see somebody throw a stool from

2    behind the barricade at the officers?

3    A.    No.

4    Q.    Do you remember seeing any objects being

5    thrown at the officers at any point in time?

6    A.    No.

7    Q.    Okay.  If you remember, you remember.  If

8    you don't, you don't.

9    A.    Yeah.  No.

10    Q.    From your vantage point could you see the

11    front porch of Lazaro Gonzalez's home?  Exhibit 1

12    you were in this location.  Could you see the front

13    porch?

14    A.    Partly.

15    Q.    I know there were some vans.

16    A.    Not -- not --

17    Q.    Not totally?

18    A.    No, not when the vans got there, no.

19    Q.    Could you see any part of Lazaro

20    Gonzalez's front yard from where you were behind

21    the barricade?

22    A.    Yes.

23    Q.    Could you see that there were law

24    enforcement officers in that front yard?

25    A.    When?  Which?

28

1      Q.   Well, at the time the vans were in front

2  of Lazaro Gonzalez's home.

3      A.   No.  No.  Because the vans and the gas and

4  everything.

5      Q.   Blocked your view?

6      A.   You couldn't see.  Yeah.

7      Q.   Before the gas was in the area did you see

8  any confrontation between the law enforcement

9  officers and anyone else?

10     A.   I don't remember.

11     Q.   Did you come into physical contact with

12  any law enforcement officer at any point in time?

13     A.   No.

14     MR. KLAYMAN:   I am sorry.  Want one?

15     MR. HANDLER:  What are they?

16     MR. KLAYMAN:   Mints.

17     MR. HANDLER:  No.  That's okay.

18    (Discussion off the record)

19  BY MR. HANDLER:

20     Q.   Anyway, I am sorry.  Let's continue.

21  Okay.  Now did you observe any of the officers

22  actually spraying the gas?

23     A.   Yes.

24     Q.   And can you -- do you remember what the

25  officer looked like, in terms of how he was

1  dressed?

2      A.    God.   They looked like they were dressed

3  heavier than these fellows for some reason.

4      Q.    So similar to the dress of the officers --

5      A.    Yeah.

6      Q.    -- depicted in Exhibit 2?

7      A.    Yes.  But more -- I don't know.  Looked

8  more (indicating).

9      Q.    Bulky?

10      A.    Bulky, yeah.

11      Q.    Maybe wearing some more equipment?

12      A.    I don't know.

13      Q.    The guy that was actually spraying, could

14  you tell what he was holding in his hands when he

15  was spraying?

16      A.    Looked like long -- looked like a gun to

17  me (indicating).

18      Q.    He was holding it with both hands?

19      A.    Yeah.  A gun, shoo, shoo.

20      Q.    Like a white cloud came out of the gun?

21      A.    Yeah, but there wasn't just one.

22      Q.    Right.  He sprayed several times?

23      A.    Yeah.  There was more than one person.

24      Q.    You think it was more than one person

25  holding the --

1    A.    That I remember, yes.

2    Q.    How many do you remember seeing?

3    A.    At least three.

4    Q.    Three people holding these tubes?

5    A.    Yeah.

6    Q.    Spraying?

7    A.    Uh-huh.

8    Q.    Is that yes?

9    A.    Yes.

10   Q.    Where were all of these people located?

11   A.    At the front, somewhere -- like somewhere

12   here.  Like they were spread out.  In front.  They

13   were in back of the barricade.  This side.

14   (Indicating).

15   Q.    You mean in front of the barricade?

16   A.    Well, yeah.  Because I was on the other

17   side.

18   Q.    Let's -- for definition purposes, the

19   barricade in Exhibit 1, you were standing behind

20   it.

21   A.    I was behind it.

22   Q.    So when I say that, that means -- when I

23   refer to that it means the barricade was separating

24   you from walking to Lazaro Gonzalez's home?

25   A.    That's correct.

FERNANDEZ & ASSOCIATES   (305) 374-8868

31

1    Q.    So when we are talking about in front of

2  the barricade, that means the barricade is not

3  separating that person from walking to the Gonzalez

4  home.

5    A.    Right.

6    Q.    So you were behind the barricade?

7    A.    Yes.

8    Q.    And the barricade was preventing you from

9  walking to Lazaro Gonzalez's home?

10   A.    Correct.

11   Q.    And the guys with the guns that were

12 spraying the gas were in front of the barricade,

13 correct?

14   A.    Yes.

15   Q.    Okay.  Now how far away were they from the

16 front of the barricade; do you remember?

17   A.    Can I say pretty close?

18   Q.    I just want to know what you remember.

19 Were they as close as I am to you?

20   A.    Uh-huh.

21   Q.    Okay.  That's about three or four feet

22 away?

23   A.    Yeah.

24   Q.    And were they spraying people that close?

25   A.    Yes.

1      Q.    And were they spraying the people that

2   were standing behind the barricade?

3      A.    Yes.

4      Q.    How close were -- what was the closest

5   that you were from one of these people that were

6   spraying?

7      A.    Next to them.

8      Q.    How far away?  Three to four feet away?

9      A.    Three to four feet away from being gassed

10  or the person next to me?

11     Q.    From the officer that was holding the gun,

12  from the end of the gun to your body.

13     A.    Like you (indicating).  Three.

14     Q.    You are saying that person -- hold on a

15  second.  You are saying that the guy that was

16  holding the gas gun that was spraying you was three

17  to four feet away from you when you got sprayed?

18  Is that what you are saying?

19     A.    Or even less.

20     Q.    Two feet away?

21     A.    Yes.

22     Q.    And where did you get sprayed?

23     A.    Face.  Face.

24     Q.    And he was spraying the -- everyone behind

25  the barricade, correct?

33

1    A.    Yes.

2    Q.    And when he sprayed, the people backed up;

3   is that correct?

4    A.    Yes.

5    Q.    And then the people came up forward again,

6   and they sprayed again; is that right?

7    A.    Well, at that time what happened to me

8   was, I like blacked out because of -- the gas was

9   so bad. I -- I -- you know, I bent over and

10  (indicating).

11   Q.    So you were sprayed once and you blacked

12  out?

13   A.    Yes.  Not blacked out, that I fainted.

14  It's just -- I couldn't --

15   Q.    You couldn't see?

16   A.    Couldn't see and choked, and I couldn't

17  comprehend what was going on.

18   Q.    And so you don't know what everyone else

19  was doing, correct?

20   A.    No.  Just screaming, and I heard the

21  screaming.

22   Q.    Is that correct?  Once you got sprayed,

23  you couldn't see and you didn't know what else --

24  what everyone else was doing, correct?

25   A.    Correct.

1    Q.    Were you able to regain your sight and see

2    what else was going on after that, before the

3    officers left?

4    A.    I forgot what I did.  Somewhat.

5    Q.    Okay.  And what did you see?

6    A.    I saw them -- well, I didn't see them.  I

7    saw some of the demonstrators like backing away

8    here (indicating).

9    Q.    Backing away from being gassed?

10   A.    Yeah.  Running.

11   Q.    Did you see what the law enforcement

12   officers were doing?  This is after you got sprayed

13   when you regained your sight.

14   A.    Someone -- can I explain what I saw?

15   Q.    Sure.  Go ahead.

16   A.    Okay.  There was a white tent here.

17   Q.    This is behind the barricade?

18   A.    Yeah, a white tent.

19   Q.    Referring to Exhibit 1?

20   A.    Yes.  Right here.  And I was already over

21   here (indicating).

22   Q.    On the other side of the street?

23   A.    And I could see them going into the tent.

24   Q.    Okay.  So the people that were behind the

25   barricade, that were on the same side of the

35

1    barricade you were, ran to the other side of the

2    street underneath the tent, correct?

3        A.    Yeah.    I was -- no.    I was -- I was always

4    over here (indicating).    I never got to this side.

5    But being here, I could see after, after, what was

6    going on, when I was here at her house, at this

7    person's house.    When I -- you know, sprayed my

8    face and all I could see what they were doing on

9    the other side.    They were still continuing.

10       Q.    Let me try to get it clear for the record.

11   In referring to Exhibit No. 1 with the dark circle

12   is that where you were located?

13       A.    Correct.

14       Q.    After you got sprayed and you regained

15   your sight -- you had splashed water on your face,

16   correct?

17       A.    I went -- I started running to this house

18   screaming for help.    Because I couldn't -- I was

19   like bent over, and I couldn't see.    Like I

20   remember -- because I remember the house here.    And

21   I tried to go to the house to be able to help

22   myself, because I couldn't breathe and I looked for

23   help.

24       Q.    And you saw other demonstrators or

25   protestors walking behind the --

36

1    A.    Yes.

2    Q.    -- barricade toward the other side of the

3    street, correct?

4    A.    Yes.

5    Q.    Now what I am interested in is were you

6    able to see what any of the law enforcement

7    officers were doing at this time?

8    A.    No.

9    Q.    Okay.   How many times were you sprayed?

10   A.    Once.

11   Q.    So would it be fair to state that, after

12   you got sprayed, that the law enforcement officers

13   finished whatever they were doing and left the area

14   and you didn't see what happened after you got

15   sprayed with regard to the law enforcement

16   officers?   Would that be fair?

17   A.    Say it again.

18   Q.    Let me ask it differently.

19   A.    Yeah.

20   Q.    After you got sprayed with the gas --

21   A.    Okay.

22   Q.    -- before the law enforcement officers

23   left with Elian, did you see what they were doing

24   in any respect?

25   A.    No.   I saw demonstrators, but not them.

1       Q.    Why don't you tell me how the gas affected

2    you.

3       A.    Shortness of breath, nausea, eyes.  That

4    was the first thing, the eyes, throat.

5       Q.    Your eyes and throat were irritated?

6       A.    Yes.  Very irritated.  Coughing, tightness

7    of chest.  I felt immobile for a minute there, like

8    distraught.

9    —  Q.    Anything else?

10      A.    Sad.

11      Q.    Physical effects of the gas.

12      A.    (Witness nods head.)

13      Q.    Is that it?

14            MR. KLAYMAN:    Let the record reflect the

15        witness is crying and shaking.

16            THE WITNESS:  Emotionally upset.

17   BY MR. HANDLER:

18      Q.    We will get to the emotions in a second.

19   With regard to all of the effects of the gas, how

20   long did they last?

21      A.    The eyes and throat, about a week and a

22   half.  The breathing was over a month.  I would

23   taste the gas in my mouth.

24      Q.    The breathing and shortness of breath is a

25   month?

1       A.    (Witness nods head.)

2       Q.    Is that a yes?

3       A.    Yes.

4       Q.    The nausea, how long?

5       A.    Nausea was like the next day.

6       Q.    Nausea was one.  What about the rest of

7    the symptoms of the effects of the gas, how long

8    did they last?

9       A.    I could taste the gas in my mouth and in

10   my throat, my lungs, for about a month.

11      Q.    So it would be fair to state that the

12   effects of the gas only lasted for about one month

13   total?

14      A.    The taste and the -- (witness nods head).

15      Q.    After a month all the effects had gone

16   away?

17      A.    No, no, no.  After a month, no.  Tightness

18   of the chest.

19      Q.    How long did the tightness of the chest

20   last?

21      A.    Stayed -- still is.  Still have that.

22      Q.    You still have that after four years?

23      A.    Yes.

24      Q.    And the coughing, how long did that last?

25      A.    That lasted I could say about four or

1  five months after.  I get repeated colds after.

2      Q.    And did you receive any medical treatment

3  for the effects of the gas?

4      A.    No.

5      Q.    And has the effects of the gas affected

6  your day-to-day activities at all?

7      A.    Oh, I forgot to mention something else.

8      Q.    Sure.

9      A.    Headaches.  Very bad headaches.

10     Q.    How long did the headaches last?

11     A.    They lasted for -- wow.  Still get them.

12  Not as tense like I used to be.

13     Q.    How often do they occur?

14     A.    About four times a week.  Because I would

15  wake up with real bad headaches then, too.

16     Q.    And has that subsided over the years?

17     A.    Somewhat.  Some, yeah.  But not

18  altogether, no.

19     Q.    So how often do you have headaches now?

20     A.    About twice a week.

21     Q.    Now have you ever had headaches prior to

22  April 22nd, 2000?

23     A.    No.

24     Q.    Never had any headaches?

25     A.    Never had any.

40

Q.   So the only time you ever had headaches --

A.   After.

Q.   Was after the event?

A.   After that.

Q.   Now has the effects of the gas ever affected your day-to-day activities?  For example, has it ever affected your ability to work?

MR. KLAYMAN:   Objection.  She's not making a claim for lost wages.

MR. HANDLER:  I understand that.

BY MR. HANDLER:

Q.   You can answer.

A.   Right after the event or -- what are you saying?

Q.   Did it affect your ability to go to work every day and do your job?

A.   Yeah.

Q.   How did it affect it?

A.   I couldn't go to work.  How I felt.  The breathing, the shortness of breath, crying.  I would just cry.

Q.   And how long did it prevent you from going to work?

A.   Maybe about a -- about three weeks after that.

41

1    Q.    And at the time you were working for

2    Judicial Watch?

3    A.    No.

4    Q.    Were you -- who were you working for?

5    A.    I was working for my father as a sales

6    rep.

7    Q.    What kind of position was that?

8    A.    Sales rep.

9    Q.    I am sorry.  What kind of job was it?

10    A.    Cigar factory, cigar manufacturer.

11    Q.    Was this after you were employed by

12    Judicial Watch?

13    A.    I worked with my dad before I was employed

14    with Judicial Watch.

15    Q.    You were not?

16    A.    I wasn't employed -- I was working with my

17    father.

18    Q.    Okay.  So were you employed by Judicial

19    Watch after April of 2000?

20    A.    Way after.

21    Q.    Way after?

22    A.    Yeah.

23    Q.    When did you first start at Judicial

24    Watch?

25    A.    I started with Judicial Watch

1    September 2000 -- September or October.  End of

2    September, beginning of October of 2000.

3         Q.   So by the time you started working for

4    Judicial Watch you worked full time and the effects

5    of the gas didn't have any effect on you working

6    for Judicial Watch, correct?

7         A.   No.

8              MR. KLAYMAN:   Objection.  Leading.

9    BY MR. HANDLER:

10        Q.   Is that correct?

11        A.   I had headaches but --

12             MR. HANDLER:  This is cross-examination,

13        Counselor.

14             THE WITNESS:  I just have -- I would get

15        bad headaches.

16   BY MR. HANDLER:

17        Q.   But the effects of the gas didn't prevent

18   you from going to work for Judicial Watch full time

19   when you started; is that correct?

20        A.   Yes.

21        Q.   Why don't you tell me about the emotional

22   problems you had as a result of the April 22nd

23   event.

24        A.   Emotional.  I cry.  I get very depressed.

25   Feel sometimes helpless.

43

```
 1      Q.    Okay.

 2      A.    And like distrusting of people.

 3      Q.    Anything else?

 4      A.    Can't sleep sometimes at night, sleeping.

 5 Depression.  Depressed.  Yeah, I had that.

 6 Depressed.

 7      Q.    You said crying, depression --

 8      A.    Yeah, crying.

 9      Q.    -- hopeless -- let me finish.  You said

10 you were crying, depressed, helpless?

11      A.    I cry, still do.

12      Q.    Ms. Cobas, you are going to have to let me

13 finish my question.

14      A.    Okay.  All right.

15      Q.    This is -- these are the emotional

16 problems you have already stated.  Crying,

17 depression, helplessness, distressed, lack of

18 sleep.  Were there any other emotional responses?

19      A.    Anxiety.

20      Q.    Anything else?

21      A.    It's emotional, right, you are saying?

22      Q.    Yes.

23      A.    That's about it.  That's about it, that I

24 can think of right now.

25      Q.    Okay.  Would it be fair to state that your
```

44

1   emotional problems that resulted from this event

2   deal with the manner in which the Federal

3   Government took Elian away from Lazaro Gonzalez?

4       A.   Yes.

5       Q.   Have you received any psychological or

6   psychiatric care for these emotional problems?

7       A.   No.

8       Q.   Have any of these emotional problems

9   prevented you from doing your day-to-day

10  activities?

11      A.   Prevent me from doing my daily activities

12  you said?

13      Q.   Right.  You said for about three weeks

14  after the event you weren't able to work for your

15  father, who is a cigar manufacturer as a result of

16  the effects of the gas?

17      A.   Yeah.

18      Q.   Would that also be true with regard to

19  your emotional problems?

20      A.   With -- when I worked for my dad, yes,

21  but  --

22      Q.   Sorry?

23      A.   I don't understand.

24      (Discussion off the record)

25  BY MR. HANDLER:

FERNANDEZ & ASSOCIATES  (305) 374-8868

1       Q.   The reason you stated that you could not

2    work for about three weeks for your father as a

3    sales representative was because of the effects of

4    the gas?

5       A.   Yes.

6       Q.   Would you also include in that that your

7    emotional response also prevented you from working

8    during that period of time?  Would that be fair?

9    The effects of the gas and your emotional problems

10   prevented you from working during that three-week

11   period?

12      A.   Prevented me from working --

13           MR. KLAYMAN:   During the three-week

14      period.

15           THE WITNESS:  During a three-week period,

16      yes, and it continues on.  The only thing -- I

17      have to work, but it affects me.

18   BY MR. HANDLER:

19      Q.   Okay.  Did you -- did your emotional

20   problems affect your ability to work anywhere else

21   where you would like say, I can't work today

22   because I am emotionally distraught?

23      A.   Some days I felt like that but I worked.

24      Q.   You worked anyway; is that correct?

25      A.   That's correct.

```
 1        Q.    Okay.   What about your other day-to-day
 2   activities, your social life?  Did the effects of
 3   the gas or the -- your emotional problems have any
 4   effect on those type of activities?
 5        A.    My social life?
 6             MR. KLAYMAN:   That's a nice way of
 7        saying -- you know what I mean.
 8             THE WITNESS:  Yeah.  It was affected,
 9        yeah.
10   BY MR. HANDLER:
11        Q.    Can you describe it, please?
12        A.    (No response.)
13        Q.    Maybe I can help you out.
14             MR. KLAYMAN:   I was correct in my
15        characterization of what you were looking for,
16        right?
17             MR. HANDLER:  I --
18             MR. KLAYMAN:   I was trying to help her.
19        I don't want to put words in your mouth.
20   BY MR. HANDLER:
21        Q.    Are you married?
22        A.    I am living with someone.  Well, married.
23        Q.    Were you married --
24        A.    I am not married.
25        Q.    In April of 2000 were you married or with
```

47

1  anybody?

2      A.    Not really.

3      Q.    Do you have any children?

4      A.    Yes.

5      Q.    With regard to your social activities, I

6  mean, doing stuff with your children or doing

7  something with your significant other, did the

8  events of April 22nd, 2000 affect that -- those

9  relationships?  And if so, how did they affect it?

10     A.    I didn't do a lot of things I usually do

11 with my daughter and my grandson.

12     Q.    Such as?

13     A.    Such as go shopping.  Wouldn't want to go

14 shopping.  Go to the beach.  I didn't want to go to

15 the beach.  Gained a lot of weight.  Ate.  Just

16 upset.

17     Q.    How long did that go on for?

18     A.    I would over two years, I would say.

19     Q.    Now after two years, that returned to

20 normal?

21     A.    Not normal.

22     Q.    Okay.  What's different about it?

23     A.    Very disappointed, totally different

24 change.

25     Q.    This all has to relate to the manner in

48

1   which the government took away Elian Gonzalez?

2        A.    That's correct.

3        Q.    As you sit here today, have you told me

4   everything that you can remember about the events

5   that occurred on April 22nd, 2000 with regard to

6   the Federal Government taking Elian Gonzalez away

7   from Lazaro Gonzalez?

8        A.    (Witness nods head.)

9             MR. KLAYMAN:    Overly broad.  She answered

10        your question.

11   BY MR. HANDLER:

12        Q.    Can you remember anything else that's

13   significant?

14        A.    That went on?

15        Q.    Yeah.

16        A.    Not that I can recall right now.

17        Q.    You can't --

18        A.    What I have said is what I recall.

19        Q.    And have you told me about all of your

20   injuries?

21        A.    Yes.

22        Q.    Your physical and emotional injuries?

23        A.    Correct.

24             MR. HANDLER:  I have nothing further.

25             MR. KLAYMAN:   I have nothing.

1          MR. HANDLER:  Thank you very much.
2      Pleasure meeting you.  Good luck.
3          THE WITNESS:   Thanks.
4          MR. KLAYMAN:   Same to you.  Okay.
5      (Discussion off the record)
6          THE WITNESS:  I thought I was going to be
7      killed.
8  BY MR. HANDLER:
9      Q.    At the time?
10     A.    Yes.
11     Q.    So at the time that law enforcement
12 officers were there you thought that you were going
13 to be killed?
14     A.    Yes.
15     Q.    But that didn't happen, correct?
16     A.    No.
17     Q.    Nobody got killed, correct?
18         MR. KLAYMAN:   The facts speak for
19      themselves.  Res ipsa loquitur.  She's sitting
20      here today.
21         THE WITNESS:  It's scary, it's scary.
22      It's scary.
23         MR. HANDLER:  Okay.  That's it.  Thank you
24      very much.
25      (Thereupon, the taking of the deposition was

50

1        concluded at end time 12:31 p.m.)

2                            EXCEPT FOR THE CORRECTIONS
                             MADE HEREIN BY ME, I
3                            CERTIFY THIS IS A TRUE AND
                             ACCURATE TRANSCRIPT.
4                            FURTHER DEPONENT SAYETH
                             NOT.

5

6

7                            _____
                             SANDRA MARIA COBAS
    STATE OF FLORIDA   )
8                      )   SS
    COUNTY OF BROWARD  )

9

10              Sworn and subscribed to before me

11       this_____ day of_____, 2004.

12

13       PERSONALLY KNOWN _____  OR I.D. _____

14

                             _____
15                           Notary Public in and for the
                             State of Florida at Large
16

17

18

19

20

21

22

23

24

25

```
 1                      CERTIFICATE OF OATH

 2    STATE OF FLORIDA    )                    Lois E. Guffey
                          )  SS                Commission #DD333909
 3    COUNTY OF BROWARD   )                    Expires: Aug 15, 2008
                                               Bonded Thru
                                               Atlantic Bonding Co., Inc.
 4         I, Lois E. Guffey, RDR, CRR, and Notary
      Public in and for the State of Florida at
 5    Large, do hereby certify that the witness,
      SANDRA MARIA COBAS, personally appeared before
 6    me and was duly.  Sworn
           Witness by hand and official seal this
 7    23rd of August, 2004, in the City of Hollywood,
      County of Broward, State of Florida.

 8

 9                       Lois E. Guffey, RDR, CRR
                         Notary Public, State of Florida
10

11

12            REPORTER'S DEPOSITION CERTIFICATE

13    STATE OF FLORIDA    )
                          )  SS
      COUNTY OF BROWARD   )
14
           I, Lois E. Guffey, RDR, CRR, do hereby
15    certify that I was authorized to and did
      stenographically report the deposition of
16    SANDRA MARIA COBAS, the witness herein; that a
      review of the transcript was requested; that
17    the foregoing pages, number from 1 through 51,
      inclusive, is a true and complete record of my
18    stenographic notes of the deposition by said
      witness; and that this computer-assisted
19    transcript was prepared under my supervision.

20         I FURTHER CERTIFY that I am not a
      relative, employee, attorney or counsel of any
21    of the parties, nor am I a relative or employee
      of any of the parties' attorney or counsel
22    connected with the action.

23         DATED at Hollywood, Broward County,
      Florida, this 23rd of August, 2004
24

25                       LOIS E. GUFFEY, RDR
                         Certified Realtime Reporter
```

53

1      FERNANDEZ & ASSOCIATES
              444 Brickell Avenue
2            Miami, Florida 33131
               (305) 374-8868
3
August 25, 2004
4

5

6
Larry Klayman, Esq.
7   LAW OFFICE OF LARRY KLAYMAN
540 Brickell Drive, Unit 732
8   Miami, Florida 33131

9

10       RE: Dalrymple v. United States
             Case No.: 03-20588 CIV MOORE
11
Dear Mr. Klayman:
12
         This letter is to advise you that the
13       transcript of the deposition of SANDRA MARIA
         COBAS taken in the above-styled cause on August
14       11, 2004, is complete and awaiting reading and
         signing.
15
         Please, arrange to stop by our office in Suite
16       718, 444  Brickell Avenue, Miami, Florida to
         read and sign this transcript.  Office hours
17       are from 9:00 a.m. to 4:00 p.m. Monday through
         Friday.   The transcript is 51 pages long and
18       you should allow yourself sufficient time.

19       If the reading and signing has not been
         completed prior to August 25, 2004, we shall
20       conclude that you have waived the reading and
         signing of the deposition transcript.   Your
21       prompt attention to this matter is appreciated.

22
         Sincerely,
23
         *Lois E. Guffey*
24       LOIS E. GUFFEY, RDR
         Registered Diplomate Reporter
25
         cc:  Original transcript

FERNANDEZ & ASSOCIATES   (305) 374-8868









## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2003, I caused to be served upon the following

counsel a true and correct copy of the Plaintiff, Sandra Cobas' Statement Of Material

Facts At Issue, via First Class Mail, Postage prepaid on the following:

Stephen E. Handler
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station
P.O. Box 888
Washington, DC 20044


Paul Orfanedes
Judicial Watch, Inc.
501 School Street
Suite 500
Washington, DC 20024


Larry Klayman