**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 03-20588-CIV-MOORE/O'SULLIVAN

DONATO DALRYMPLE, *et al,*

      Plaintiff,

vs.

UNITED STATES OF AMERICA, *et al,*

      Defendants.

_____/



FILED by _____ D.C.
MAG. SEC.

DEC 1 7 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

## REPORT AND RECOMMENDATION

This matter came before the Court pursuant to the defendant United States'
Motion for Summary Judgment or, in the Alternative, for Dismissal (DE # 87, 10/13/04).
On September 11, 2003, this matter was referred to United States Magistrate Judge
John J. O'Sullivan by the Honorable K. Michael Moore, United Stated District Court
Judge for the Southern District of Florida (DE# 30).   Having carefully considered the
defendant's motions, the court file and applicable law, the undersigned respectfully
recommends that the defendant United States' Motion for Summary Judgment or, in the
Alternative, for Dismissal (DE # 87, 10/13/04) be GRANTED in part as to certain
plaintiffs in accordance with the following Report and Recommendation.  Because fact
questions exist regarding the claims of assault and battery and emotional distress of
certain plaintiffs, who were not on the Gonzalez property and were not advancing
towards the officers or the Gonzalez property and were gassed at close range on their
own property or behind the police barricade, defendant's motion for summary judgment
should be DENIED in part only as to these ten plaintiffs: Elsa Anderson, Sandra Cobas,

Ramon Diago, Antonio Ortega, Madeline Peraza, Maria Riera, Eduardo Rodriguez, Gloria Sanchez, Ileana Santana and Carmen Valdes. The defendant's motion for summary judgment should be granted as to all other plaintiffs.

## BACKGROUND

The suit arises out of the Immigration and Naturalization Service's ("INS") removal of Elian Gonzalez from the home of Lazaro, Angela and Marisleysis Gonzalez ("Gonzalez home") in the early morning hours of April 22, 2000. The plaintiffs, ninety-six individuals who were present during the removal, have asserted claims for negligence, assault and battery, false imprisonment, and intentional and negligent infliction of emotional distress under the Federal Tort Claims Act ("FTCA").[1] 28 U.S.C. §§ 1346(b), 2671, 2680.

The defendant previously filed three motions to dismiss, which alleged a lack of subject matter jurisdiction over the claims and also asked for dismissal for failure to state claims upon which relief may be granted. In its motion for summary judgment and alternative motion to dismiss, the defendant petitions the Court to enter judgment in its favor or dismiss the plaintiffs' suit in its entirety. Plaintiff, Sandra Cobas, Opposition to Motion for Summary Judgment or, in the Alternative, for Dismissal was filed on November 3, 2004. [DE # 101 ]. Plaintiff, Sandra Cobas', Statement of Material Facts at

---

[1] On August 30, 2004, ninety-five plaintiffs filed an Amended Complaint. Plaintiff, Sandra Cobas, who was a plaintiff in the original Complaint and who is now the only plaintiff who is separately represented, did not file an amended complaint. The claims of several plaintiffs have been or will be voluntarily dismissed. (Def. Statement of Material Facts Not in Dispute in Support of Its Motion for Summary Judgment, Fact No. 97). The claims of several other plaintiffs were dismissed by the Court in an Order dated March 29, 2004, and some of these plaintiffs filed appeals. Id.

Issue was filed on November 3, 2004. [DE # 102].   Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, or in the Alternative, for Dismissal and Plaintiff's Concise Statement of Material Facts in Genuine Dispute on behalf of all other plaintiffs were filed on November 3, 2004. [DE # 103-105].

## ANALYSIS

### Standard of Review on a Motion for Summary Judgment

The court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The moving party bears the burden of meeting this exacting standard.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986); <u>See also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  That is, "[t]he moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>U.S. v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting <u>Celotex</u>, 477 U.S. at 323).  In assessing whether the moving party has satisfied this burden, the court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party.

3

See Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994); See also Sheckells v. Agv-Usa Corp., 987 F.2d 1532, 1534 (11th Cir. 1993); Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990); Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1368 (11th Cir. 1982); Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)(per curiam).   Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain.   See Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997).   If the record presents factual issues, the court must deny the motion and proceed to trial.   Adickes, 398 U.S. at 157; See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the court occasioned by an unnecessary trial.   Celotex, 477 U.S. at 322-323.   Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures.   Id.   As the Supreme Court noted in Celotex,

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.   In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Id. at 322-323.   Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient.   There must be evidence on which the jury could reasonably find for the non-movant.   Anderson, 477 U.S. at 251; See also

4

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## DISCUSSION

### The United States' Motion for Summary Judgment

The defendant moves for summary judgment or, in the alternative, for dismissal of plaintiffs' amended complaint under Fed. R. Civ. P. Rule 12(b)(1), 12(b)(6) and 56(c) for judgment as a matter of law because the use of force under the circumstances at issue was reasonable and privileged. The defendant argues that it is entitled to a dismissal or a judgment as a matter of law and advances five grounds for its motion: (1) that because the use of force was privileged, the claims for assault and battery, false imprisonment,[2] and emotional distress fail as a matter of law; (2) that plaintiffs' claims are barred by the doctrine of illegality because certain plaintiffs have admitted that they engaged in conduct that constituted interference and/or obstruction with the execution of lawful search and administrative warrants; (3) that plaintiffs' long-term injuries are not proximately related to the negligence alleged against the United States; (4) that because the United States cannot be held liable solely based upon violation of federal law, plaintiffs' claims based on alleged violations of INS regulations, guidelines, policies, and procedures must be dismissed; and (5) that because plaintiffs' claims for intentional and negligent infliction of emotional distress are not actionable, such claims must be dismissed. This Report and Recommendation considers each ground set forth by the defendant in turn.

---

[2] Plaintiffs concede that seventy-five plaintiffs do not assert false imprisonment claims as stated in Plaintiffs' Answers to the United States' First Set of Interrogatories. (Def. Statement of Facts No. 96; Plaintiffs' Concise Statement of Material Facts in Genuine Dispute Nos. 96 and 97).

## Facts

On April 22, 2000, INS officers arrived in the street in front of the Gonzalez home in unmarked, white vans, and wearing law enforcement uniforms that had the words "INS FEDERAL OFFICER" on them to execute the lawful search and administrative arrest warrants for the removal of Elian Gonzalez,[3] who was being held by the Gonzalez family in their home, to return Elian to his father. (Plt. Statement, Fact Nos. 9-12; Def. Reply, Tab C, Ex. 2 and 5, Tab D, Ex. 2-4). The search warrant was supported by probable cause.  See Gonzalez v. Reno, 325 F.3d 1228, 1232 (11th Cir. 2003).

More than one hundred protestors were gathered near the Gonzalez home. Forty of the plaintiffs admitted that they crossed the barricades and intended to interfere with the INS officers' efforts to remove Elian from the Gonzalez home.  (Def. Statement of Facts Nos. 8, 9, 16-19, 24, 26, 33, 36, 39, 41-43, 48, 49, 53, 54, 57-59, 62, 65, 67-74, 77-79, 82, 84, 89, 90, 92, 95).   Certain protestors jumped over or pushed down the barricades, ran to the Gonzalez house, formed human chains, and/or threw objects. Every plaintiff who had physical contact with an INS officer either jumped over and/or passed through the front barricade, was in the front or back yard of the Gonzalez home, was in the path of the officers who were securing the area, or was inside the Gonzalez home.  (Def. Memorandum in Support of Motion, p. 5, n. 5; Def. Statement of Facts 9, 10, 13, 15, 20, 22, 23, 24, 25, 27, 29, 30, 31, 34, 35, 37, 40, 41, 44-48, 50, 56, 61, 64-

---

[3]Although the plaintiffs dispute that the INS officers identified themselves, the fact remains that the INS officers were wearing their uniforms with the words "INS FEDERAL OFFICER" on them and that certain plaintiffs admitted hearing the INS officers saying that they were federal officers and to stay back behind the barricade. (Def. Ex. 23, Espinosa Depo. at 16; Def. Ex. 29, R. Garcia Depo. at 27).

66, 68-72, 74, 76, 77, 81, 82, 84, 86-90, 92-95).  No arrests were made by federal agents during the operation except for six year old Elian Gonzalez. (Plts. Concise Statement of Material Facts in Genuine Dispute, Ex. 16 at 49; 130 at 33; 131 at 41).

Certain INS officers gassed, shoved, pushed, held down, pointed guns, and shouted at certain plaintiffs, who were inside the Gonzalez home, in the yard of the Gonzalez home, or crossed the barricades. (See, e.g., Def. Ex. 2, Abelairas Depo. at 18-21 (sprayed very close --approximately five feet away-- in the face after passed the barricade; sarcoidosis and hemorrhagic prostatitis; Def. Ex. 3, M. Alejandro Depo. at 29-31 (guns pointed at him as he attempted to run to the Gonzalez home; ordered to get on the ground for approximately 2-3 minutes); Def. Ex. 41, T. Benitez Depo. at 16); Def. Ex. 38, Y. Huet Depo. at 24-25 (nearby resident who was stopped by officers pointing guns as she tried to see her brother at the Gonzalez home); Def. Ex. 44, A. Martell Depo. at 21-22 (while in the backyard of the Gonzalez home, officers aimed guns and a pistol at his head when they directed him to get down on the ground and pushed him); Def. Ex. 46, F. Meana Depo at 13-14 (while in the backyard of the Gonzalez home, officers pointed a gun at him and sprayed the side of his face while he was on the ground); Def. Ex. 48, M. Miranda at 16-20 (sprayed with pepper spray in the yard of the Gonzalez home and ordered and thrown to the ground where she remained for 2-3 minutes).

Certain INS officers also gassed and shouted at certain other plaintiffs, who were either behind the barricades, on their own property, or inside their homes. (Plts. Concise Statement of Material Facts in Dispute, Plts. Ex. 6-12; Plts. Ex. 18, Dargan Depo. at 28 (INS officer testified that he sprayed gas in the direction of the barricade); Plts. Ex. 35,

L. Alvarez Depo. at 17 (sprayed in her face behind barricade); Plts. Ex. 77, M. Lorenzo Depo. at 26 (sprayed in her face behind barricade); Def. Ex. 4, A. Alonso Depo. at 19 (inhaled gas from front yard of his own property); Def. Ex. 5, T. Alonso Depo. at 19 (smelled gas inside home); Def. Ex. 6, L. Alvarez at 16-18 (sprayed in the face while behind the barricade); Def. Ex. 14, A. Castellanos Depo. at 34 (testified that the officer sprayed the whole crowd behind the barricade with a back and forth motion a few times); Def. Ex. 23, E. Espinosa Depo. at 26 (pushed by officers while behind barricade); Def. Ex. 26, P. Ferrer Depo. at 19-20; Def. Ex. 28, G. Galarraga Depo. at 15-16 (resident who awoke from the smell of gas); Def. Ex. 40, M. Lazo Depo. at 27 (remained on her own property and smelled gas in her home); Def. Ex. 53, Z. Nunez Depo. at 19, 28 (inhaled gas while in the front yard of a house); Def. Ex. 70, M. Riveron Depo. at 28, 33 (testified that the officers spraying the gas were closer than five feet away from the people; also testified that certain protestors formed human chains outside the Gonzalez home).

The ten plaintiffs for whom summary judgment is not recommended were not on the Gonzalez property, were not advancing towards the officers or the Gonzalez property, and were gassed at close range on their own property or behind the police barricade.   (Cobas' Statement of Material Facts, Cobas' Depo at 32 (sprayed 2-3 feet away from face while behind barricade); Def. Ex. 7, E. Anderson Depo. at 21-22 (sprayed in the face while immediately behind the barricade); Def. Ex. 21, R. Diago Depo. at 18-19 (sprayed in face 8 to 10 feet away while in front of the building where he lived); Def. Ex. 57, A. Ortega at 17, 20-22 (sprayed with gas in front of his building from a distance of approximately 8 feet after he witnessed protestors throwing objects at the

8

INS officers); Plts. Ex. 102, Def. Ex. 61, M. Peraza Depo. at 13-15 (sprayed at close range on her property next door to the Gonzalez home); Pltfs. Ex. 117, Def. Ex. 74, M. Riera Depo. at 25-26, 32, 35, 43 (sprayed with gas from a distance of 6 feet while standing in her driveway in her pajamas); Def. Ex. 72, E. Rodriguez Depo. at 21-23 (sprayed at close range while within his own fenced yard as he walked toward the fence with his camera); Def. Ex. 78, G. Sanchez Depo. at 10-15 (sprayed by two officers from both directions at a distance of approximately 6 or 7 feet after taking five steps outside daughter's kitchen door which is next door to the Gonzalez home); Def. Ex. 79, I. Santana Depo. at 18 (exited house next door to Lazaro Gonzalez and was sprayed quite close); and Pltfs. Ex. 126, C. Valdes Depo. at 11-12, 19 (sprayed with gas one foot away while she was behind barricade).

Officer Dargan testified that he was 10 to 15 feet away from the barricades when he sprayed the gas. (Def. Reply, Tab C, Dargan Depo. at 27, 29).  Officer Machin opined that   the minimum distance for use of the Israeli gas gun on an individual is twelve feet.  (Def. Reply, Tab A, Machin Depo. at 25 ).

The INS officers and City of Miami Police officers used certain physical force, such as hitting, pushing, shoving, kicking and throwing protestors to the ground, in order to execute the warrant for Elian Gonzalez.   (See, infra, section 1(B) (false imprisonment); see also,(Plts. Ex. 132, P. Hudgens Depo. at 28); (Def. Statement of Facts, Tab 11, Betancort-Garcia Depo. at __ (page not legible in record)(pushed by a City of Miami Police Officer against chainlink fence outside the Gonzalez home).

There is no evidence that any of the plaintiffs were hospitalized[4] as a direct result of the physical contact with the officers at the scene. (Def. Statement of Facts No. 7). Some of the plaintiffs did seek medical attention shortly after their exposure to the gas. (See, e.g., Def. Ex. 2, H. Abelairas Depo at 24; Def. Ex. 8, G. Arce Depo. at 29, 31 (went to doctor for shortness of breath and vomiting); Def. Ex. 10, T. Benitez Depo. at 37-38 (went to doctor for dryness in eyes and inability to wear contacts); Def. Ex. 12, T. Camacho Depo. at 8 (went to hospital for breathing difficulty - asthma); Def. Ex. 23, E. Espinosa at 31 (went to doctor for stuffiness in head, but not for injuries from fall); Def. Ex. 31, N. Gomez Depo. at 28 (received medical care for the gas); Def. Ex. 41, M. Lorenzo Depo. at 26-28 (went to doctor for discomfort in ears, throat and sinuses); Def. Ex. 43, M. Marcos Depo. at 35 (received medical treatment on scene from rescue workers for nausea and vomiting); Def. Ex. 53, Z. Nunez Depo. at 47 (went to several local hospitals for asthma); Def. Ex. 59, M. Palacio Depo. at 18 (went to doctor several days later); and others).

INS officer Daniel Dargan initially used the Israeli gas gun because numerous people were running toward the barricade, objects including a stool, rocks and bottles were thrown over the barricade, and Dargan was hit by a rock and a flag pole. (Def. Reply, Tab C, Dargan Depo. at 26-29, 45-46; Def. Statement of Facts, Tab 57; Antonio F. Ortega Depo. at 23)   During Operation Reunion, Supervisory Special Agent McGahey saw approximately thirty to forty people cross the barricade. (Def. Reply, Tab

---

[4]Plaintiff Abelairas testified that three days after his exposure to the gas he went to Baptist Hospital because he had blood in his urine (i.e. hemorrhagic prostatitis). Mr. Abelairas testified that he had surgery to correct the condition in April or May of 2000. (Def. Ex. 2, H. Abelairas Depo. at 24).

D, McGahey Depo. at 33, 37)  Supervisory Special Agent McGahey gave the order to use the gas gun because the demonstrators were interfering with the operation by disobeying oral commands and physical gestures to stay back behind the barricades. (Id. at 33, 37, 54, 100, 103)

The INS officers who borrowed and used an Israeli gas gun from Lt. Armando Guzman of the Miami Police Department had no knowledge that the gas in the Israeli gas gun was CS gas ("tear gas") rather than OC ("pepper spray").  (Def. Reply, Tab A, Machin Depo. at  11, 15-16; Tab C, Dargan Depo. at 27).  Tear gas is used by the Miami Police Department as a standard and reasonable practice to control a crowd. (Def. Reply, Tab B, Guzman Depo. p. 27-29).  The Appendix of the Operational Plan ("Plan") for Operation Reunion provides that "in the event of a mass movement of demonstrators towards the secured perimeter, O/C gas will be deployed as necessary and only upon the order of the Team Leader (Supervisory Special Agent McGahey) [for] the safety of the officers involved."  (Plts. Ex. No. 22, p. 3, ¶ 3).  The INS officers also used pepper spray.

Plaintiffs claim they suffered one or more of the following injuries: eye, nose, throat and skin irritation and burning, coughing, choking and difficulty breathing as a result of exposure to tear gas and/or pepper spray, as well as injuries caused by being kicked, shoved, pushed and emotional distress.

### Limited Waiver of Sovereign Immunity under the FTCA

The defendant argues that the use of tear gas, pepper spray and/or physical force  by certain INS officers to accomplish Operation Reunion was privileged under Florida law and thus, not tortious.  The Federal Tort Claims Act ("FTCA") is a limited

waiver of sovereign immunity.  United States v. Kubrick, 444 U.S. 111, 117-118 (1979).

The Act grants subject matter jurisdiction over certain tort claims and withholds

jurisdiction over others.  United States v. Orleans, 425 U.S. 807, 813-14 (1976).

Section 2680 of Title 28 of the United States Code sets forth certain exceptions

regarding the waiver of sovereign immunity for tort claims.  In particular, subsection (h)

provides, in pertinent part, that the waiver does not apply to:

> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process ... *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.  For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h).

Under the FTCA, the United States is liable only "in the same manner and to the

same extent as a private individual under like circumstances. . . ."  28 U.S.C. § 2674.

"Congress's chief intent in drafting the FTCA was not 'to create new causes of action'

but 'simply to provide redress for ordinary torts recognized by state law.'"  Pate v.

Oakwood Mobile Homes, Inc., 374 F.3d 1081 (11th Cir. 2004)(quoting Howell v. United

States, 932 F.2d 915, 917 (11th Cir. 1991)).  "It was not 'intended as a means to enforce

federal statutory duties.'"  Id.  "[E]ven where specific behavior of federal employees is

required by statute, liability to the beneficiaries of that statute may not be founded on

the [FTCA] if state law recognizes no comparable private liability."  Sellfors v. United

States, 697 F.2d 1362, 1367 (11th Cir. 1983), cert. denied, 468 F.2d 1204 (1984).  "An

12

action under the FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." <u>Carlson v. Green</u>, 446 U.S. 14, 23, 64 L. Ed. 2d 15, 100 S. Ct. 1468 (1980).

The United States can only be liable under the FTCA if a comparable private party would likewise be liable under Florida law.  "[W]here the federal employee is a law enforcement officer without a private analogue, the courts have abandoned the 'private individual' analogy under § 1346(b) and looked to the liability of government employers under state law." <u>Garza v. United States</u>, 881 F. Supp. 1103, 1105 (S.D. Tex. 1995) (citing <u>Crider v. United States</u>, 885 F.2d 294, 296 (5th Cir. 1989), <u>cert. denied</u>, 495 U.S. 956 (1990)).

## 1. Privileged Use of Force

The defendant asserts that the plaintiffs' claims for assault and battery, false imprisonment, and emotional distress arose from the plaintiffs' contact with the INS, and that the INS officers were privileged to use force to carry out their lawful duties.  Since the use of force was privileged, the defendant argues, the INS officers' conduct was not tortious and the plaintiffs' claims are not actionable.

The defendant bases its argument upon Section 776.05, Florida Statutes, the statutory authority for the use of reasonable force.  The statute reads in pertinent part:

> A law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.  The officer is justified in the use of any force:
> (1) Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest ; ....

Fla. Stat. § 776.05 (2000).

In support of its privilege argument, defendant cites <u>Hinojosa v. City of Terrell</u>, 834 F.2d 1223 (5th Cir. 1988), <u>cert. denied</u>, 493 U.S. 822 (1989) (citing Restatement (Second) of Torts 10; W. Keeton, Prosser and Keeton on Torts 16 (5th ed. 1984)); <u>Andrade v. United States</u>, 116 F. Supp. 2d 778 (W.D. Tex. 2000), <u>aff'd</u>, 338 F.3d 448 (5th Cir. 2003), <u>cert. denied</u>, 124 S. Ct. 1655 (2004); and <u>Garza v. United States</u>, 881 F. Supp. 1103 (S.D. Tex. 1995).

In <u>Hinojosa</u>, the plaintiff was a bystander to an arrest who allegedly resisted the arrest of his acquaintance by grabbing the arresting officer's arm.  The plaintiff was arrested himself; he did not resist his own arrest.  <u>Hinojosa</u>, 834 F.2d at 1225-26.  The plaintiff was ultimately found not guilty of the crime of resisting arrest. <u>Id.</u> at 1226 n.2.  The plaintiff then brought a suit against the city and its police force alleging, among other things, assault by the police officers and false arrest.  The court found that the officers did not commit assault on the plaintiff, noting that "activity that would otherwise subject a person to liability in tort for assault does not constitute tortious conduct if the actor is 'privileged' to engage in that conduct." <u>Id.</u> at 1231 (citations omitted).  The <u>Hinojosa</u> case does not deal with officers using force to subdue a suspect; but, rather, as in the case at hand, the plaintiff was neither a suspect, nor subject to arrest, until he began resisting the arrest of his acquaintance.

The other cases the defendant cites do, as the plaintiffs argue, deal with law enforcement agents using force in apprehending suspects.  <u>See</u>, <u>e.g.</u>, <u>McCormick v. City of Fort Lauderdale</u>, 333 F.3d 1234, 1245 (11th Cir. 2003), <u>reh'g en banc denied</u>, 85 Fed. Appx. 728, __ F.3d ___, 2003 WL 22438591 (11th Cir. 2004)(police arrested man who struck woman, verbally assaulted her, resisted arrest, and advanced on police

14

officer with a walking stick raised above his head); Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000) (police officers arrested 17-year-old for fighting at a fair); Jones v. City of Dothan, 121 F.3d 1456 (11th Cir. 1997) (police officers responding to a harassment complaint detained suspect who closely resembled the description given by the victim); Garza v. United States, 881 F. Supp. 1103, 1107-08 (S.D. Tex. 1995) (border patrol agents detained men suspected of alien and/or drug smuggling, and were privileged in drawing and pointing their weapons at suspects).  It is not clear, however, that the suspect status of the plaintiffs in each case was what made the use of force privileged, and neither Fla. Stat. § 776.05 (2000) nor the cases annotating it address this precise point.

The undisputed evidence in the record establishes that many protestors sought to interfere with the INS officers' ability to execute the warrants and remove Elian Gonzalez from the Gonzalez home.  Numerous plaintiffs testified that many protestors went across the police barricades towards the Gonzalez home in an effort to thwart the INS officers' ability to remove Elian.  The fact that none of the plaintiffs were arrested is of no consequence.  The evidence in the record is clear that the conduct of many protestors and certain plaintiffs would constitute obstruction and/or interference under both Florida and federal law.  See, United States v. Johnson, 412 F.2d 906 (5th Cir. 1969) (defendant, who knew the purpose of the officers, interfered with the officer in the execution of a search warrant by continuing to destroy evidence and brandishing a weapon); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1558-59 (11th Cir. 1993), as modified by 14 F.3d 583 (11th Cir. 1994); Francis v. State, 736 So. 2d 97 (Fla. 4th DCA 1999) (finding mother's conduct of blocking officer's path when he attempted to assess

15

the condition of her son in response to a 911 call about an abused child constituted obstruction); Wilkerson v. State, 556 So. 2d 453, 455-56 (Fla. 1st DCA 1999) (arrested only after she refused to leave the area where the police were attempting to make arrests and determine that no weapons were on the persons and because the officer considered her presence was obstructing or impeding him in the performance of his duties).

Such obstruction and/or interference justified the use of CS and/or OC gas under the circumstances. Because the INS officers' use of gas was objectively reasonable, such force was privileged under Florida law as to all plaintiffs except those plaintiffs that have presented questions of fact (i.e. plaintiffs who were gassed at close range).

A. *De Minimus* Force Principle

The defendant advances as a second argument that the use of force in the instant case was *de minimus*, and therefore privileged and not actionable. The Eleventh Circuit has established the rule that the application of *de minimus* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment. Nolin, 207 F.3d at 1257. Thus, a minimal amount of force and injury will not defeat a qualified immunity defense in an excessive force case. Id. at 1258. The defendant herein asserts that the force used against the plaintiffs was *de minimus*. Therefore, according to the defendant, the force was privileged, and not tortious. However, in each of the cases the defendant cites in support of this argument-- Nolin, Jones, and McCormick-- force was utilized against a criminal suspect. This differs, perhaps significantly, from the state of affairs in the instant case, in which allegedly peaceful protestors contend that their peaceful protests were met with force.

16

The defendant suggests that the Court may declare that the force utilized was *de minimus* because the plaintiffs' medical complaints were, the defendant implies, non-serious.  The plaintiffs have alleged that many of the plaintiffs suffered common injuries, including eye, nose, throat and skin irritation and burning, coughing, choking, difficulty breathing, headaches, sleeplessness, anxiety, and nausea.  Although certain plaintiffs did seek medical care after the incident, there is no evidence in the record that any plaintiff was hospitalized[5] as a result of the exposure to the gas or physical contact with the INS officers.

The defendant argues that "[a] court can 'determine as a matter of law that the amount of force was *de minimus*' based upon a 'factual record establishing the degree of Plaintiffs' injuries,'" and cites Dalrymple v. Reno, 164 F. Supp. 2d 1364, 1373 (S.D. Fla. 2001), rev'd on other grounds, 334 F.3d 991 (11th Cir.), reh'g en banc denied, 82 Fed. Appx. 220 (2003), cert. denied, 124 S. Ct. 1655 (2004).

In Dalrymple v. Reno, this Court stated:

> [D]efendant argues that Plaintiffs' claims are foreclosed by the holding in Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000) that a 'minimal amount of force and injury . . . will not defeat an officer's qualified immunity in an excessive force case.' Id. at 1258.  Nolin was decided on summary judgment, and the record there reflected an important fact not plead in the Amended Complaint; none of plaintiff's injuries necessitated medical treatment.  The Court cannot determine as a matter of law that the amount of force was *de minimus* without a factual record establishing the degree of Plaintiffs' injuries. Allowing every permissible inference in Plaintiffs' favor, as the Court must on a motion to dismiss, Plaintiffs have

---

[5]Only Plaintiff Hector Abelairas testified that he had surgery for hemorrhagic prostatitis (i.e. blood in the urine) in April or May of 2000. (Def. Ex. 2, Abelairas Depo. at 27).

> sufficiently plead the issue of whether the amount of force was excessive.

Dalrymple, 164 F. Supp. 2d at 1373 (deletions in original).

The Eleventh Circuit "has established the principle that application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."[6]   Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000).   In Nolin, the Eleventh Circuit held that "minimal amount of force and injury, as present in the facts of this case, will not defeat an officer's qualified immunity in an excessive force claim."  Id. at 1258; see, Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997) (police had qualified immunity from excessive force claim where suspect suffered minor skin abrasions from handcuffs applied too tightly, but did not seek medical attention); see also, Jones v. City of Dothan,121 F.3d 1456 (11th Cir. 1997) (finding the amount of force was minimal and the injuries inflicted were minor).

Courts have recognized the use of riot control agents such as pepper spray and tear gas as an appropriate law enforcement tool.  See, McCormick, 333 F.3d at 1245 ("Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others.  Shock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects."); Clemmons v. Greggs, 509 F.2d 1338, 1339 (5th Cir. 1975) ("The use of tear gas when reasonably

---

[6]Although Nolin and other Bivens type cases cited by defendant analyze the excessive force claims in the context of constitutional violations, such analysis is instructive in the present case because the reasonableness of the INS officers' use of force is determined objectively.

18

necessary to prevent riots or escapes or to subdue recalcitrant prisoners does not constitute cruel and unusual punishment.") (citation omitted); see also, Andrade v. United States, 116 F. Supp. 2d 778 (W.D. Tex. 2000), aff'd, 338 F.3d 448 (5th Cir. 2003), cert. denied, 124 S. Ct. 1655 (2004) (finding "as a matter of law that the use of tear gas, an accepted law enforcement practice, was reasonable under the circumstances, given the refusal of the [Branch] Davidians to comply with lawful orders to surrender"); Ellsworth v. City of Lansing, 34 F. Supp. 2d 571, 581 (W.D. Mich. 1998), aff'd without opinion, 205 F.3d 1340 (6th Cir. 2000) (finding that release of tear gas in open air was arguably the lowest level of force the police could have used to obtain compliance).

The Eleventh Circuit determined that pepper spray gas, which was used to facilitate the execution of a warrant, "is an especially non-invasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others." McCormick, 333 F.3d at 1245. "'[A]s a means of imposing force, pepper spray is generally of limited intrusiveness,' and it is 'designed to disable a suspect without causing permanent physical injury." Vineyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (quoting Gainor v. Douglas County, 59 F. Supp. 2d 1259, 1269 (M.D. Ala. 1996)).

Although not binding on this court, the decision in Ellsworth v. City of Lansing, 34 F. Supp. 2d 571 (W.D. Mich. 1998), aff'd without opinion, 205 F.3d 1340 (6th Cir. 2000), is factually similar and persuasive. The plaintiffs were union demonstrators and area residents in their homes who asserted claims of constitutional violations against the police department for the use of tear gas without warning or notice. The plaintiffs, who

were picketing, blocked ingress and egress of employees to and from their workplace at

a plant.  The court determined that the "police actions taken to force demonstrators to

move away from the gate area was objectively legally reasonable...."  Id. at 578.

Because the plaintiffs failed to introduce any evidence of wrongful intent in the dispersal

of the tear gas to interfere with plaintiffs' First Amendment rights, defendants were

entitled to summary judgment.  Id. at 579.  In Ellsworth, the court stated that it "is

unaware of any precedent that would require police officers to provide notice and an

opportunity to be heard prior to the release of tear gas to obtain compliance with lawful

police orders ...."  Id. at 580.

          The Supreme Court has established that excessive force claims require an

objective analysis that excludes the intentions of the officer.  See, Graham v. Connor,

490 U.S. 386, 396 (1989)(The objective analysis requires consideration of factors

including "the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight.")

          A claim that a law enforcement officer used excessive force in the course of an

arrest, an investigatory stop, or any other seizure of a free citizen is "most properly

characterized" under the Fourth Amendment and its "reasonableness" standard.

Graham, 490 U.S. at 394; Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002).  Such

an analysis requires a court to balance "the nature and quality of the intrusion on the

individual's fourth amendment interests against the importance of the government

interest alleged to justify the intrusion." Graham, 490 U.S. at 396 (internal quotations

omitted).

The factors to consider when determining whether the necessity for an application of force include (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. See Lee, 284 F.3d at 1197-98. In determining whether the force applied was "reasonable" under the circumstances, the Court must examine: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; and (3) the extent of the injury inflicted upon the individual to whom the force was applied. See id. at 1198. "Reasonableness," for purposes of such an analysis, is judged according to an objective standard under the totality of the circumstances, without regard to the officers' underlying intent. See Graham, 490 U.S. at 397. The court must judge use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 394.

In Graham, the Supreme Court did not provide a precise test. Rather, the Court explained that

> the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.

Id. at 396-97.

The undisputed evidence in the record establishes that more than one hundred protestors were gathered near the Gonzalez home when the INS officers arrived. A substantial number of the protestors were the plaintiffs in this case. Many of the plaintiffs have testified that they crossed the police barricade with the intention to

prevent the officers from taking Elian Gonzalez away and/or otherwise interfering with the operation.  Many plaintiffs, including the ones who were interfering, testified that they observed other protestors jump over and/or push down the barricade, run toward the Gonzalez home, form human chains, and/or observed objects being thrown at the officers.  Forty plaintiffs have admitted that they engaged in conduct that resisted, obstructed and/or opposed the INS' operation to execute the warrants in question.  (Def. Mot. p. 10).  There is no evidence in the record that any of the plaintiffs were hospitalized as a direct result of any physical assault by any of the law enforcement officers at the scene.

In dicta, analyzing the facts presented by the removal of Elian in a separate case, the Eleventh Circuit acknowledged

> A reasonable inference drawn from these facts would be that the presence of so many protestors in the neighborhood added to the uncertainty and risk of the mission to seize Elian, thereby necessitating the use of more agents to insure the agents' safety and the mission's success. Indeed, the plaintiffs' own complaint further bears this inference out because the complaint alleges that thirty-three of the plaintiffs who were allegedly unlawfully seized were actually moving closer to the Gonzalezes' home as the raid was being executed, undoubtedly causing the agents to feel uncertainty and perhaps alarm regarding the plaintiffs' possible intentions to interfere with the agents' mission.

Dalrymple v. Reno, 334 F.3d 991, 997 (2003).

Applying the objective test of reasonableness, the use of tear gas and/or pepper spray under the circumstances was reasonable as a matter of law as to those plaintiffs who were in the Gonzalez home, in the front or back yard of the Gonzalez home, crossed the barricades, behind the barricades, or were in their own homes and/or on their own property and were not gassed at close range. See, Andrade v. United States,

116 F. Supp. 2d 778 (W.D. Tex. 2000), aff'd, 338 F.3d 448 (5th Cir. 2003), cert. denied, 124 S. Ct. 1655 (2004) (finding "as a matter of law that the use of tear gas, an accepted law enforcement practice, was reasonable under the circumstances, given the refusal of the Davidians to comply with lawful orders to surrender"). To the extent that other plaintiffs were sprayed or simply smelled the gas, but who were located behind the police barricade, on their property, or otherwise in their homes, their claims also fall within the privilege because the dispersal of the gas was an unavoidable consequence of the effort to control the situation and the crowd, which included individuals who were jumping over the barricade to get to the Gonzalez house or advancing upon the officers who were executing the warrants. See, Ellsworth, 34 F. Supp. 2d 571 (granting summary judgment in favor of law enforcement and against the protestors and residents who were gassed).

However, the undersigned agrees with the plaintiffs' argument that questions of fact exist as to whether the amount of force used by INS officers was reasonable as to certain other plaintiffs who were gassed at close range on their own property or behind the police barricade. Plaintiffs rely upon Miami v. Albro, 120 So. 2d 23 (Fla. 3d DCA 1960), wherein the appellate court determined that "[t]he limit of the force to be used by the police is set at the exercise of such force as reasonably appears necessary to carry out the duties imposed upon the officers by the public." Id. at 26 (citations omitted). The Albro court explained

> In any case the officer can never use more force than reasonably appears to be necessary, or subject the person arrested to unnecessary risk of harm. If the officer exceeds the amount of force he is privileged to use under the circumstances, he is liable for only so much of the force as is excessive.

23

Id. In Albro, the appellate court reversed a jury verdict in favor of the plaintiff because the issue of excessive force was not submitted to the jury.

Plaintiffs' reliance on Wright v. State of Florida, 705 So. 2d 102, 104 (Fla.4th DCA 1998) is misplaced. In Wright, a defendant appealed the trial court's refusal to instruct the jury on the affirmative defense of self-defense to the charge of battery against a law enforcement officer. The defendant claimed that she bit the officer during an unprovoked police beating. The record is devoid of evidence that the plaintiffs were acting in self-defense when they threw objects at the officers and attempted to interfere with execution of the warrants.

To the extent that the defendant applied the force to certain plaintiffs who claim they were non-violent and remained on their own property fact questions exist as to whether the force was excessive and not privileged. The cases cited by the defendants as to why their use of force was only a de minimus use of force are distinguishable because the force used in those case occurred prior to the arrest and securing of the arrestee. See Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (officer arrested plaintiff for public fighting, grabbed the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of a van, searched his groin area in an uncomfortable manner, and handcuffed him); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (force used was de minimis when officers arresting plaintiff for harassment slammed the plaintiff against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket before ultimately releasing plaintiff); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559-1560 (11th Cir. 1997) (force used

was de minimis when officer arresting plaintiff for building code violation pushed the plaintiff against a wall and applied a choke-hold before placing the plaintiff in handcuffs, then pushed plaintiff against wall after handcuffed, even though the plaintiff did not resist).

Utilizing the factors enunciated in <u>Graham</u>, and viewing the evidence in favor of the non-moving party, certain plaintiffs have met their burden of showing that there exists a triable issue of material fact regarding the defendant's alleged use of excessive force.  The use of tear gas and/or pepper spray at point blank range on certain plaintiffs who were on their own property or behind the barricade may constitute an excessive use of force.  Employing  certain plaintiffs' version of the facts, they posed no threat to the defendants or other bystanders, nor were the plaintiffs interfering or obstructing the operation at this point. <u>See</u>, <u>e.g.</u>, <u>Lee</u>, 284 F.3d at 1198 (slamming the head of a handcuffed, subdued arrestee against the trunk of the car held unnecessary and disproportionate); <u>Slicker v. Jackson</u>, 215 F.3d 1225, 1232-33 (11th Cir. 2000) (officer not entitled to qualified immunity after police officers arrested, handcuffed, and secured plaintiff on charges for disorderly conduct then kicked the plaintiff and hit his head on the pavement).  Defendant is entitled to judgment as a matter of law as to all plaintiffs' claims of excessive force except those of the following plaintiffs, who were gassed at close range while they remained behind the police barricade or on their own property without advancing towards the officers and/or the Gonzalez property:  Elsa Anderson, Sandra Cobas, Ramon Diago, Antonio Ortega, Madeline Peraza, Maria Riera, Eduardo Rodriguez, Gloria Sanchez, Ileana Santana and Carmen Valdes.

B. <u>The Plaintiffs' Claims for False Imprisonment</u>

Plaintiffs' concede that seventy-five plaintiffs either never maintained false imprisonment claims or their claims have been dismissed. (Plts. Concise Statement of Material Facts in Genuine Dispute, Fact Nos. 96 and 97). Fourteen plaintiffs allege that they were held at gunpoint and/or physically restrained by the defendant's agents. The plaintiffs for- whom this is alleged are: Miguel Alejandro, Guillermo Arce, Joel Beltran, Teresa Benitez, Nancy Canizares, Lenia Fernandez, Martha Teresita Lara, Morgan Marcos, Alfredo Martell, Felix Meana, Troadio Mesa, Mario Miranda, Martha Oropesa, and Maria E. Rodriguez. See Amended Complaint at ¶¶ 185, 193-195, 199, 214, 275.

False imprisonment is the unlawful restraint of a person against his will. Geidel v. City of Bradenton Beach, 56 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999) (citing Johnson v. Weiner, 155 Fla. 169, 171 (Fla. 1944)). The "gist of [a false imprisonment] action is the unlawful detention of the plaintiff and deprivation of his liberty." Id. Accord Blumel v. Mylander, 919 F. Supp. 423, 427 (M.D. Fla. 1996). To be "unlawful" as the tort of false imprisonment is defined in Florida, the detention must be unreasonable and unwarranted under the circumstances. Id (citations omitted). In addition, the defendant must have detained the plaintiff for the purpose of imposing a confinement, or with the knowledge that such confinement will, with a substantial certainty, result. Id (citations omitted).

These fourteen plaintiffs were located in the yard and/or in close proximity to the property of the Gonzalez home (See, e.g., Def. Ex. 9, J. Beltran Depo. at 53, 54 (next door to Gonzalez home); Def. Ex. 24, L. Fernandez Depo. at 25-27 (jumped fence of Gonzelez neighbor)). Some of these plaintiffs admitted that they intended to prevent the officers from removing Elian Gonzalez from the home. (See, e.g., Def. Ex. 3, M.

Alejandro Depo. at 29; Def. Ex. 8, G. Arce Depo. at 22 (formed human chain); Def. Ex. 43, M. Marcos Depo. at 35, 36 (formed human chain)). Their detention was brief in duration (i.e. minutes). (See, e.g., Def. Ex. 3, M. Alejandro Depo. at 31; Pltfs. Ex. 44, N. Canizares Depo. at 14-16, 22, 45 (detention lasted minutes); Def. Ex. 24, L. Fernandez Depo. at 27 (pushed to the floor after she jumped the fence). Because the undersigned finds that the detention of these fourteen plaintiffs was objectively reasonable and thus, lawful under the circumstances as more fully analyzed in section 1, supra, the defendant is entitled to judgment in its favor on their claims of false imprisonment.

### 2. Doctrine of Illegality

The defendant's argument that the doctrine of illegality bars plaintiffs' claims lacks merit.  None of the cases cited by defendant involve facts similar to those in the instant case or claims presented under the FTCA for torts committed by law enforcement officers.  If we were to adopt defendant's argument, it would create the absurd result that any person arrested for criminal conduct would never have a claim for police brutality, which is contrary to federal and Florida law.  In addition, there is no evidence in the record that the ten plaintiffs for whom summary judgment is not recommended were involved in any illegal activity. The undersigned recommends that defendant's motion for summary judgment on this ground be denied.

### 3. Proximate Cause

The defendant argues that it is entitled to judgment as a matter of law on plaintiffs' negligence claims because the plaintiffs' cannot prove that their long-term (chronic) injuries were caused by the inhalation of the CS and/or OC gas by competent substantial evidence.

Under Florida law, to establish liability for negligence, the plaintiff must show that: (1) the defendant had a duty to the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages. See, Lake Parker Mall, Inc. v. Carson, 327 So.2d 121, 123 (Fla. 2d DCA 1976).

"In negligence actions[,] Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." Gooding v. University Hospital Building, Inc., 445 So. 2d 1015, 1018 (Fla. 1984) (citations omitted). The Florida Supreme Court explained that Prosser analyzed this standard of proof as follows:

> On the issue of fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

Id. (quoting Prosser, Law of Torts § 41 (4th ed. 1971) (footnotes omitted)). In Gooding, the Florida Supreme Court found that the defendant was entitled to a directed verdict on plaintiff's wrongful death claim based on medical malpractice.

In support of its argument that plaintiffs failed to prove that their long-term injuries were legally caused by defendant, defendant relies on Greene v. Flewelling, 366 So. 2d 777 (Fla. 2d DCA 1977), cert. denied, 374 So. 2d 99 (Fla. 1979). "The general rule seems to be that it is necessary to demonstrate legal causation by expert testimony where the issue is beyond the common knowledge of laymen." Id. at 779 (citing W.

28

Prosser, The Law of Torts 241 (4th ed. 1971)).  In <u>Greene</u>, the court acknowledged that "several recent Florida cases seem to indicate that expert testimony is Not necessary to establish legal causation, even in instances where this issue is beyond the common knowledge of laymen." <u>Greene</u>, 366 So. 2d at 779 (citing <u>Hernandez v. Clinica Pasteur, Inc.</u>, 293 So. 2d 747 (Fla. 3d DCA 1974)(emphasis in original)); <u>Alton Box Board Co. v. Pantya</u>, 236 So. 2d 452 (Fla. 1st DCA 1970)).  "But even these cases do not obviate the claimant's burden of demonstrating legal causation by some competent evidence in order for him to recover for his injuries."  <u>Id.</u>

In <u>Greene</u>, plaintiff claimed that he was able to taste and smell before the accident at issue, but could not do so after the accident.  A physician testified that plaintiff reported a loss of the senses of taste and smell, but that such occurrence usually only results when the olfactory nerve is damaged, which was not the case.  The physician concluded that the plaintiff had "'a subjective complaint that can't be corroborated with objective findings.'"  <u>Id.</u> at 778.  On appeal, the court held that plaintiff failed to "carry his burden of demonstrating that [the defendant's] negligence was the legal cause of his loss of smell and taste, because the 'only evidence of legal causation' was simply that plaintiff 'could smell and taste before the accident, but could not shortly thereafter.'"  <u>Id.</u>   The court found that such evidence "only raises a mere possibility of legal causation, and nothing more ...." <u>Id.</u>

Likewise, in the present case, plaintiffs have failed to rebut the affidavit of the government's expert witness.  Defendant filed the affidavit of Dr. Ballantyne, who has expertise in clinical, occupational and forensic toxicology. (Def. Fact No. 6, Tabs 1 and A) In his affidavit, Dr. Ballantyne opined that the exposure to CS and OC gas produces

short-term effects, i.e., peripheral sensory irritation to the eyes, skin, mouth, throat, esophagus and stomach, most of which are transient and likely to have disappeared within 24 hours. Many plaintiffs testified that the duration of the effects of their exposure to CS and/or OC was much longer than what is supported by the credible published scientific and medical literature and/or that they suffered from illnesses that are not associated with such exposure.

Plaintiffs assert that the effects of the CS and/or OC gas lasted days, weeks, months, and even years. (See Pltfs. Statement, Facts Nos. 9, 14, 16-18, 21-25, 27, 29-35, 37, 40, 41, 43, 44, 47-51, 53, 54, 58, 61, 70, 71, 77, 78, 79, 91, 84, 85, 87-90, and 92-95). Other plaintiffs claim that exposure to the CS and/or OC gas caused them to suffer from sarcoidosis, retinal hemorrhage, hypothyroidism, prostatitis, and attempted suicide. (See, i.d., Fact Nos. 8, 63, 65, and 76). Plaintiffs offer their own testimony to prove causation.

Dr. Ballantyne opines that CS and OC gas produce reversible harassing or incapacitating effects by interacting with sensory nerve receptors in exposed body surfaces which causes uncomfortable sensations such as stinging, burning and/or pain. (See, Statement, Fact No. 6, Tab 1). The symptoms resulting from exposure to CS and/or OC gas usually disappear anywhere from minutes (e.g. for uncomfortable sensations such as stinging or burning to pain) to up to three days (e.g. for nausea and vomiting). Id.

Plaintiffs' rely on Alton Box Board, which is factually distinguishable. In Alton Box Board, plaintiff filed an action for personal and property damages allegedly due to pollutants emitted from defendant's plant. Six lay witnesses testified that debris from

the stacks damaged whatever it landed on.  The damage to vegetation could be observed by the naked eye.  On appeal, the defendant challenged the proof as inadequate because plaintiff did not provide expert testimony.  The appellate court "conclude[d] that plaintiff presented adequate testimony for the trial judge to submit to the jury the critical question of causal relationship. The question of when expert testimony is essential in proving a particular issue is determined by the issue involved." Id. at 454.  In Alton Box Board, no expert testimony was offered to rebut the testimony of "six lay witnesses [who] graphically described the pollutants and resulting damage sustained" or "as to the chemical properties of the pollutants emitted by defendant's plant or the inability of same to cause the damage alleged." Id. at 455.

Unlike the expert testimony in Alton Box Board, in the present case, Dr. Ballantyne's expert testimony provides that "the signs and symptoms produced by [CS and OC gas] have been extensively documented and have a transient (reversible) harassing or incapacitating effect through a common mechanism know as the peripheral sensory irritation." (Def. Statement, Fact No. 6, Tab 1).  Dr. Ballantyne's affidavit also states that "[c]redible published reports and opinions in the scientific and medical literature regarding the effects of exposures to the irritant riot control agents CS and OC, particularly when such exposures are brief and in the open air, do not associate long-term irritant or psychosomatic sequelae with such exposures." (Id.) Dr. Ballantyne opined that "[t]here are no credible published reports in the scientific and medical literature that exposure to CS and/or OC has caused specific medical conditions such as sarcoidosis, retinal hemorrhage, hypothyroidism, prostatis or suicide. (Id.)

Unlike, Alton Box Board, the chronic injuries of which plaintiffs' complain are not

obvious.  Without expert medical and/or scientific evidence quantifying to some degree that plaintiffs' chronic injuries more likely than not resulted from exposure to the CS and/or OC gas, plaintiffs' evidence is insufficient.  See, Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004) (reversing denial of the officers' motion for summary judgment and holding that officers did not violate arrestee's Fourth Amendment right; finding plaintiff's evidence was insufficient on the excessive force claim against Georgia police officers because no medical testimony was submitted on the issue on the risk of serious injury or death associated with fettering, i.e, tying arrestee's wrists less than 12 inches from his ankles).  Possibility is not sufficient to satisfy the burden of proof as to causation under Florida law.  Without more, plaintiffs' testimony that exposure to the CS and/or OC gas caused their chronic injuries is insufficient as a matter of law.  Plaintiffs are not entitled to damages for any alleged long-term injuries.

### 4. <u>Violations of Federal Law and/or Policies Not Tortious</u>

"The violation of a federal statute or regulation by government officials does not create a cause of action under the FTCA."  See, Art-Metal-USA v. United States, 753 F.2d 1151, 1157 (D.D.C. 1985) (citing Zabala Clemente v. United States, 567 F.2d 1140 (1st Cir. 1977), cert. denied, 435 U.S. 1006 (1978); Pate v. Oakwood Mobile Homes, Inc., 374 F.3d 1081 (11th Cir. 2004); Hardaway Co. v. United States Army Corps of Engineers, 980 F.2d 1415 (11th Cir.), cert. denied, 510 U.S. 820 (1993)).  The waiver of sovereign immunity is limited under the FTCA.  See, 28 U.S.C. § 2674.  The waiver "cannot apply where the claimed negligence arises out of the failure of the United States to carry out a statutory duty in the conduct of its own affairs."  United States v. Smith,

32

324 F.2d 622, 624-25 (5th Cir. 1963); see, Sellfors v. United States, 697 F.2d 1362 (11th Cir. 1983), cert. denied, 468 F.2d 1204 (1984).

Defendant argues that plaintiffs' negligence claims, which are based on violations of INS policies and procedures as well as the guidelines for the operation, should be dismissed for lack of subject matter jurisdiction because the United States cannot be held liable under the FTCA solely for violations of federal statutes, regulations or guidelines where, as here, no analogous state law basis for liability exists. 28 U.S.C. § 1346(b); Art-Metal, 753 F.2d at 1156-58; Sellfors, 697 F.2d at 1365.

While the general proposition for which defendant cites various Eleventh Circuit decisions remains, none of the cases cited by the defendant analyze the violations of government policies under Florida law. Nor do the defendant's cases involve violations of regulations and guidelines by law enforcement officers.

Defendant relies upon McCormick, supra; Vineyard, 311 F.3d 1340 (11th Cir. 2002); and Pate v. Oakwood Mobile Homes, Inc., 374 F.3d 1081 (11th Cir. 2004), among others, to support its argument that the use of CS and/or OC gas was reasonable and did not breach any corresponding duty under Florida law. In Pate, the Eleventh Circuit held that the district court erred by inquiring into whether OSHA officers violated their own regulations when it determined whether the OSHA officers were negligent. Id. at 1084. Under the FTCA, "[t]he United States can only be found liable if a comparable private party would likewise be liable under [state] law." Id. In Pate, a roofer was injured after working on the roof of a manufacturer that failed to remedy OSHA safety violations. Applying Georgia law, the Eleventh Circuit found that no corresponding liability existed for OSHA as regulator-enforcer under state law. Because

the employer, not OSHA, is responsible for workplace safety, OSHA was not liable under the FTCA.

Similarly, in <u>Howell v. United States</u>, 932 F.2d 915 (11th Cir. 1991), the Eleventh Circuit affirmed a summary judgment in favor of the FAA because it held that the FAA did not owe any duty to the passengers of a plane that crashed. Because there is no similar state FAA, courts "look to the closest state analogue: the 'good samaritan' doctrine" when considering FTCA liability in a regulatory-enforcement context. <u>Id.</u> at 918 (citing <u>Indian Towing Co. v. United States</u>, 350 U.S. 61, 64-65 (1955)). The good samaritan doctrine "provides that one who undertakes to warn of danger, and thereby induces reliance, must perform his undertaken task in a careful manner." <u>Id.</u> (citing <u>Indian Towing</u>, 350 U.S. at 64-65).

Plaintiff argues that the defendant is liable because the INS officers created a "zone of risk" when they dispersed "a substance that was known to be highly dangerous – CS gas" in violation of policies against its use.[7]

Plaintiff is correct that Florida courts recognize an affirmative common law duty on the part of law enforcement officers who create a "zone of risk." <u>See</u>, <u>City of Pinellas Park v. Brown</u>, 604 So. 2d 1222 (Fla. 1992) (holding that the conduct of the law enforcement officers who initiated and maintained a high-speed chase involving a large

_____

[7]Plaintiff's reliance on <u>United States v. Dukovich</u>, 11 F.3d 140 (11th Cir. 1994), for the proposition that "CS gas, a/k/a tear gas, was classified by the Eleventh Circuit as a 'deadly weapon'" is misplaced. In <u>Dukovich</u>, the Eleventh Circuit determined that tear gas is a "dangerous weapon" within the meaning of the sentencing guidelines. U.S.S.G. § 1B1.1 (n.1.(d)) (1989) (defining "serious bodily injury" as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization or physical rehabilitation). <u>Dukovich</u>, 11 F.3d at 142.

number of vehicles on a public thoroughfare created a zone of risk including the motorist plaintiffs). In holding that the police owed a duty to the motorists in <u>Brown</u>, the Florida Supreme Court explained that

> the acts alleged here describe a situation in which motorists in Pinellas County were placed in deadly peril by as many as twenty police vehicles attempting to chase down a single man who had run a red light. On its face, this allegation alone definitely makes out a case for a duty owed to all persons who might encounter the police caravan that was chasing [the suspect].

<u>Id.</u> at 1226. The Florida Supreme Court held that the duty existed irrespective of the hot-pursuit policy and the order to cease their pursuit. <u>Id.</u>

Plaintiffs' reliance on *dicta* in <u>Pollock v. Florida Dept. of Highway Patrol</u>, 882 So. 2d 928, 929 (Fla. 2004), to support its position that INS officers were negligent in using CS gas because INS policies against the use of CS gas existed is misplaced. In fact, to the contrary, in <u>Pollock</u>, the Florida Supreme Court held that FHP's internal operating policies **did not** impose a duty to dispatch officers to the scene of the stalled tractor-trailer. <u>Id.</u> at 937. In <u>Pollock</u>, the Florida Supreme Court explained

> [o]n this issue, we approve the reasoned analysis of the district court which concludes that, <u>in the context of governmental tort litigation, written agency protocols, procedures and manuals do not create an independent duty of care</u> ... While a written policy or manual may be instructive in determining whether the alleged tortfeasor acted negligently in fulfilling an independently established duty of care, <u>it does not itself establish such a legal duty vis-a-vis individual members of the public</u>.

<u>Id.</u> at 936-937 (internal and other citations omitted) (emphasis added). The Florida Supreme Court clarified that its reference to the hot-pursuit policy in <u>Brown</u> did not form the basis of the duty owed to the motorists at large. Rather, "the duty ... arose from the danger created when as many as twenty police vehicles attempted to chase down one man who had run a red light." <u>Id.</u> (citation omitted). In <u>Pollock</u>, the Florida Supreme

35

Court found "that the assertion that such policies create an independent duty of care is legally erroneous, and cannot sustain an otherwise insufficient claim against a motion to dismiss." Id.

Unlike the officers in Brown, the INS officers did not create a zone of risk by using CS and/or OC gas.  The cases cited by plaintiffs are factually and legally distinguishable. In accordance with Florida and federal law, defendant is entitled to judgment as a matter of law on plaintiffs' negligence claim that is based on violations of internal INS policies, regulations and protocols.

**5. Emotional Distress**

The defendant contends that the plaintiffs' claims for intentional and negligent infliction of emotional distress fail as a matter of law and should be dismissed. Defendant argues that it is entitled to judgment as a matter of law on plaintiffs' claims of emotional distress because the INS officers' conduct in executing the warrants was "legally permissible" and their use of force was "privileged under the circumstances." See, Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985).  In McCarson, the Florida Supreme Court held that actions that are "legally permissible" and "privileged" cannot constitute the "atrocious conduct" necessary to establish a claim of emotional distress.  Id.

A. Intentional Infliction of Emotional Distress

The Florida Supreme Court has recognized a cause of action for the tort of intentional infliction of emotional distress. McCarson, 467 So. 2d at 278. Florida courts have found outrageous conduct to be "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and

36

utterly intolerable in a civilized community." McCarson, 467 So. 2d at 278-79.  The

Florida Supreme Court acknowledged that

> The conduct, although it would otherwise be extreme and outrageous may be
> privileged under the circumstances. The actor is never liable, for example, where
> he has done no more than to insist upon his legal rights in a permissible way,
> even though he is well aware that such insistence is certain to cause emotional
> distress.

Id. at 279 (quoting Restatement (Second) of Torts § 46 (1965)).  "Conduct is intentional

where the actor knows that severe distress is certain, or substantially certain to result

from his conduct." Hart v. United States, 894 F.2d 1539, 1548 (11th Cir.), cert. denied,

498 U.S. 980 (1990).

Under Florida law, a claim for intentional infliction of emotional distress requires

the plaintiff to show: "(1) extreme and outrageous conduct; (2) an intent to cause, or

reckless disregard to the probability of causing, emotional distress; (3) severe emotional

distress suffered by the plaintiff; and (4) proof that the conduct caused the severe

emotional distress." Gonzalez-Jiminez de Ruiz v. United States, 231 F. Supp. 1187,

1199 (M.D. Fla. 2002), aff'd, 378 F.3d 1229 (11th Cir. 2004).

B.     Negligent Infliction of Emotional Distress

The Florida Supreme Court has opined that before a plaintiff can recover

damages for emotional distress caused by the negligence of another, the emotional

distress suffered must flow from physical injuries sustained in an impact. See R.J. v.

Humana of Florida, Inc., 652 So. 2d 360, 362 (Fla. 1995).  The Florida Supreme Court

has established the following elements of a negligent infliction of emotional distress

claim: "(1) the plaintiff must suffer a physical injury; (2) the plaintiff's physical injury must

be caused by the psychological trauma; (3) the plaintiff must be involved in some way in

the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person." Zell v. Meek, 665 So. 2d 1048, 1054 (Fla. 1995) (finding that plaintiff failed to establish the legal relationship requirement for the negligent infliction of emotional distress claim)  See also Gonzalez-Jimenez de Ruiz, 231 F. Supp. at 1200-01 (stating that "Florida does not recognize the tort of negligent infliction of emotional distress).  Rather, under Florida law, recovery of damages for negligent infliction of emotional distress is not permitted 'unless the plaintiff manifests some physical injury as a result of the emotional trauma.'") (citing Holt, 798 So. 2d at 769).

The plaintiffs cite Rowell, 850 So. 2d 474 (Fla. 2003), in support of their argument that the so-called "impact rule" does not preclude recovery for plaintiffs who have suffered emotional distress or psychological harm but no physical impact. The defendant asserts that the plaintiffs' reliance on Rowell is misplaced because the general rule in Florida is that a claim for negligent infliction of emotional distress requires physical impact under Florida law.  Rowell, 850 So. 2d at 477-78 ("[B]efore a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress suffered must flow from physical injuries sustained in an impact.")  The defendant argues that the Florida Supreme Court in Rowell explained that

> Exceptions to the [impact] rule have been narrowly created and defined in a certain very narrow class of cases in which the foreseeability and gravity of the emotional injury involved, and lack of countervailing policy concerns, have surmounted the policy rationale undergirding application of the impact rule.

Id. at 477-78.

In <u>Rowell</u>, the Florida Supreme Court stated that "[t]he impact rule does not apply to recognized intentional torts that result in predominantly emotional damages, including the intentional infliction of emotional distress . . . " <u>Id</u> at 478 n.1 (citations omitted). Ultimately, the court in <u>Rowell</u> allowed the plaintiff recovery for psychological damages suffered as a result of his court-appointed attorney's negligent conduct that resulted in an unnecessary 10-day delay in the plaintiff's release from prison. The court stated that it was foreseeable that emotional distress would result from the attorney's negligent actions. <u>Id</u> at 480. Thus, under Florida law, a claim for negligent infliction of psychological damages is not necessarily precluded by the impact rule, and damages may be awarded for merely emotional distress.

Additionally, the Florida Supreme Court acknowledged that the requisite impact is slight. <u>Zell</u>, 665 So. 2d at 1050 (citing <u>Eagle-Picher Indus., Inc. v. Cox</u>, 481 So. 2d 517 (Fla. 3d DCA 1985), <u>rev. denied</u>, 492 So. 2d 1331 (Fla. 1986)). In <u>Cox</u>, the court explained

> The essence of impact, then, it seems, is that the outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body.

<u>Id.</u> (quoting <u>Cox</u>, 481 So. 2d at 527). Construing the evidence in the light most favorable to the plaintiffs, the evidence in the record establishes that the plaintiffs were gassed and thus, suffered an impact.

However, because the undersigned finds the conduct of the INS officers legally permissible and privileged as to the vast majority of the plaintiffs identified in section 1, <u>supra</u>, those plaintiffs' claims fail as a matter of law and defendant is entitled to

judgment in its favor on those plaintiffs' intentional and negligent emotional distress claims.

Fact questions exist only as to those ten plaintiffs whose excessive force claims present fact questions as to whether the force was privileged because those ten plaintiffs were gassed at close range behind the police barricade and/or on their own property and were not advancing on the officers or the Gonzalez property.   Although the parties dispute whether the impact rule precludes plaintiffs' claims of negligent infliction of emotional distress, because those ten plaintiffs' claims are based on exposure to CS and/or OC gas with the INS officers, the undersigned finds that those ten plaintiffs satisfy the impact rule for the purpose of defeating the motion for summary judgment.  The undersigned recommends that the intentional and negligent emotional distress claims of those previously identified ten plaintiffs likewise present questions of fact.  The undersigned recommends that the motion for summary judgment on those previously identified ten plaintiffs' claims be denied.

<u>**CONCLUSION**</u>

In accordance with the foregoing it is hereby

**RECOMMENDED** that the defendant's Motion for Summary Judgment, or in the Alternative, for Dismissal (DE# 87, 10/13/04) be **GRANTED in part** on all claims with respect to all plaintiffs' except as to the following ten plaintiffs' claims for assault and battery and emotional distress that present questions of fact:  Elsa Anderson, Sandra Cobas, Ramon Diago, Antonio Ortega, Madeline Peraza, Maria Riera, Eduardo Rodriguez, Gloria Sanchez, Ileana Santana and Carmen Valdes.

The parties may serve and file written objections to this Report and Recommendation with the Honorable K. Michael Moore, United States District Judge, within ten (10) days of receipt.  See 28 U.S.C. § 636(b)(1)(c); United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982).

RESPECTFULLY SUBMITTED, in Chambers, at Miami, Florida, this ___17___ day of December, 2004.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
United States District Judge Moore
All Counsel of Record

41