IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

NIGHT BOX
FILED

CASE NO. 03-20588-CIV-MOORE/O'SULLIVAN

DONATO DALRYMPLE, *et al.*,    )
                               )
            Plaintiffs,        )
                               )
      v.                       )
                               )
UNITED STATES OF AMERICA,      )
                               )
            Defendant.         )
_____)

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, by counsel, pursuant to S.D. Fla. L.R. 16.1 (L) and the Court's June 20, 2003

Scheduling Order Setting Pretrial Conference and Trial Date, hereby respectfully submit Plaintiffs'

Proposed Findings of Fact and Conclusions of Law.

### Findings of Fact

1.      On November 25, 1999, Elian Gonzalez, a six-year old boy from Cuba, was found

adrift in the sea off the coast of Fort Lauderdale, Florida.  Three days earlier, Elian, his mother,

step-father and eight other persons had fled Cuba's communist regime in a small boat, seeking

freedom and the promise of a better life in the United States.  The boat capsized, and Elian's

mother, step-father and six other passengers drowned.  Elian was pulled from the sea as he clung

to an innertube.  The U.S. Coast Guard then took him to shore.

2.      After Elian was treated for dehydration and sun exposure at Hollywood Memorial

Hospital, the Immigration and Naturalization Service ("INS") paroled him into the United States,

without inspection, and released him into the custody of his great-uncle, Lazaro Gonzalez, a resident of Miami, Florida.

3.      At 5:15 a.m. on Saturday, April 22, 2000, the INS, by and through its employees as well as other law enforcement officers, conducted a law enforcement operation known as "Operation Reunion," wherein it executed search and administrative arrest warrants for six-year old Elian Gonzalez, who was then in the loving custody and care of Lazaro Gonzalez and his immediate family at 2319 N.W. 2nd Street, Miami, Florida, which led to Elian's return to Cuba.

4.      The "Appendix" to the INS's Operational Plan set forth the manner in which Operation Reunion was to be carried out. Of relevance here, the "Appendix" only authorized the use of "minimum force" standards, that is, the minimum force necessary to insure compliance with any given commands. *See* "Appendix" at 3, 5. The "Appendix" also only authorized the use of oleoresin capsicum ("OC" or "pepper spray") gas and only if there was a mass movement of demonstrators towards the secured perimeter, *i.e.*, a mass breech of the demonstrator barricade, and only if the command to use gas was given by the Perimeter Security Team Leader Supervisory Special Agent ("SSA") Richard McGahey. *Id.*

5.      At the time of Operation Reunion, the INS's standard concerning the authority of immigration agents to use nondeadly force and authorized nondeadly force devices was set forth in the INS's *Enforcement Standard: Use of Nondeadly Force* signed by INS Commissioner Doris Meissner on September 21, 1998. Said *Enforcement Standard: Use of Nondeadly Force* stated at section IV (B):

> The designated immigration officer shall always use the minimum nondeadly force necessary to accomplish the officer's mission and shall escalate to a higher level of nondeadly force only when such level is warranted by the situation, including the

actions, apparent intentions and capabilities of the suspect, the prisoner, or the assailant.

Said *Enforcement Standard: Use of Nondeadly Force* at section IV (D) also prohibited the use of

"mace, tear gas, or other chemical agents, except OC spray."

6.      At the time of Operation Reunion, the INS's standard concerning the authority of

immigration agents to use nondeadly force was set forth in 8 C.F.R. 287.8 (a)(iii).  8 C.F.R. 287.8

(a)(iii) stated:

> A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant.

7.      At the time of Operation Reunion, the INS's standard concerning the authority of

immigration agents to use force was set forth in the INS's *Investigator's Handbook.*  Said

*Investigator's Handbook* stated:

> The use of force in dealing with individuals with whom investigators have contact is permissible only to the degree that is necessary to protect oneself or a third party, to effect an arrest, or to prevent the escape of someone in custody.

8.      At the time of Operation Reunion, the INS's standard concerning the authority of

Border Patrol agents to use force was set forth in the INS's *Border Patrol Handbook.*  Said

*Border Patrol Handbook* stated at Chapter 5-8 and Chapter 17-5:

> Patrol agents may use force only to the degree necessary to protect themselves or third parties, to effect arrests, or to prevent the escape of persons in custody.

Said *Border Patrol Handbook* stated at Chapter 24-13:

> Employment of these devices [Service-owned tearing devices] is authorized for defensive purposes only when need is clearly demonstrated and use of a firearm is not immediately necessary.

-3-

\* \* \*

Aerosol tearing devices should never be fired at a subject's face from a distance of less than two feet.

\* \* \*

Any person sprayed with Mace must be examined as soon as possible by a physician if (1) their eyes have been sprayed; (2) there is an indication of possible injury, or (3) any injury is claimed.

9.     At the time of Operation Reunion, the INS's standard concerning the authority of immigration agents to use non-deadly physical force was set forth in the INS's *The Law of Arrest, Search & Seizure Manual M-69*.  Said *The Law of Arrest, Search & Seizure Manual M-69* stated at Chapter 3 Section (B)(2)(b):

INS policy permits the use of non-deadly physical force only in self-defense, in defense of a fellow officer or third party, or when it is necessary to make an arrest or prevent an escape.

10.     At the time of Operation Reunion, the INS's standard concerning the proper conduct with aliens and the general public was set forth in the INS's *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public*.  Said *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public* stated at Part II "Use of Physical Force and 'Third Degree Methods'":

The use of physical force or violence in handling detained aliens or other persons with whom official business is being conducted is permissible only in self-defense, in defense of another person, or to such an extent as is absolutely necessary in making an arrest or preventing an escape.

Said *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public* stated at Part II "Relationship with the Public":

Every Member of the public is entitled, as an absolute right, to courteous, fair,

-4-

impartial, and sympathetic treatment from every employee of the service.

Said *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public* stated at Part II "Poise and Dignity in Performance of Official Duties":

> The importance of poise, dignity, sympathy, honest simplicity, and self control even under the most severe provocation cannot be overemphasized. . . . He should never use profanity or vulgarity.

Said *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public* stated at Part II "Courtesy":

> The Service takes the realistic view that courtesy is necessary in our activities and its almost as much a job requirement as any other. It is your duty to be considerate and polite to the public at all times.

Said *Officers' Handbook, (M-68): A Guide for Proper Conduct and Relationships with Aliens and the General Public* stated at Part II "Be Patient":

> It is often difficult to be patient and to exercise self restraint in the face of verbal criticism or threatened physical violence, but such restraint and patience usually will enlist the support of witnesses and pay dividends in increased respect for the individual and the Service. Officers of this Service have the difficult problem of dealing with persons of a wide range of intelligence, mood, temperament and cultural backgrounds. No matter how exasperating the circumstances become, you must bear in mind that you are a representative of our Government and you must conduct yourself in a worthy manner.

11. At the time of Operation Reunion, the INS's standard concerning the proper use of firearms was set forth in the INS's *Firearms Policy: Administrative Manual* adopted on August 8, 1996 by INS Commissioner Doris Meissner. Said *Firearms Policy: Administrative Manual* stated at Section 20.012, Subsection 38 "Firearms Safety":

> Except for training exercises under strictly controlled conditions involving unloaded firearms, Service officers shall not point a weapon, loaded or unloaded, at anyone or anything, unless intending to discharge the weapon.

12.     Approximately 130 federal agents from the INS, supported by twenty (20) U.S. Marshals, participated in Operation Reunion. For the operation, some INS agents were issued and/or wore: gas masks, goggles, riot helmets, battle dress uniform trousers, and body armor. In addition, some INS agents carried MP-5 machine guns, handguns, shotguns, steel batons, Cap-Stun Weapon System Standard Duty units filled with OC spray, Mark IX-Magnums filled with OC spray, and an Israeli Gas Gun filled with a prohibited substance under INS policies called 0-chlorobenzalmalononitrile ("CS" or "tear gas").

13.     Prior to Operation Reunion, the INS conducted surveillance of the Gonzalez house and its immediate surroundings. A surveillance team consisting of six (6) Special Agents and two (2) Border Patrol Agents conducted surveillance of the "outer perimeter" for several hours leading up to the execution of the operation. The "Appendix" to the Operational Plan defined the "outer perimeter" as the street in front of the Gonzalez house to include from the intersection of N.W. 2nd St. and N.W. 23rd Avenue to the barricades established for supporters by the City of Miami and the media tents across the street from the Gonzalez house. *See* "Appendix" at 1. The "inner perimeter" was defined as inside the fenced yard of the Gonzalez house. *Id.*

14.     On April 22, 2000, at approximately 5:15 a.m., a Rear Security element with four (4) vehicles containing thirty (30) Special Agents and/or Border Patrol Agents arrived on the scene at the intersection of 23rd Avenue and 3rd Street. They cleared the police barricade at that location and agents from that team simultaneously proceeded to the front and back yards of the house at 2322 NW 3rd Street, located to the rear of the Gonzalez residence.

15.     A Perimeter Security Team consisting of approximately twenty (20) Special Agents and/or Border Patrol Agents and a Detention Enforcement Officer, a High Risk Security

-6-

Team consisting of six (6) Border Patrol Tactical Unit ("BORTAC") agents, a Recovery Team consisting of two (2) INS officers and a Breech Team consisting of two (2) Immigration Enforcement Agents, approached the Gonzalez house in a convoy of vans and sport utility vehicles. The barricade at the intersection of 23rd Avenue and 2nd Street was removed by officers. Three (3) white, unmarked vans with members of the aforementioned teams proceeded to the Gonzalez house and parked single file in the street. The various teams exited the vehicles.

16.    Some members of the Perimeter Security Team proceeded to the front and back yards of the Gonzalez house. And still other members of the Perimeter Security Team proceeded to the demonstrator barricade and the area around the media tents on the opposite side of Northwest 2nd Street from the Gonzalez house. The morning of the operation, there were approximately 100 Elian supporters behind the barricade. The supporters present were mostly women and the elderly. No weapons were observed or found on any civilians during the operation.

17.    Detention Enforcement Officer ("DEO") Daniel Dargon was a member of the Perimeter Security Team and was assigned to secure the outer perimeter, including the demonstrator barricade. DEO Dargon was assigned an "Israeli Gas Gun" that had been borrowed from the Miami Police Department. The Israeli Gas Gun had been loaded by the Miami Police Department and contained prohibited tear gas. Defendant knew that the Israeli Gas Gun contained tear gas because 1) Defendant asserted that it requested Lt. Armando Guzman of the Miami Police Department load OC spray in the Israeli Gas Gun, but Lt. Armando Guzman testified that if he would have been asked to load the gun with OC spray he would have told Defendant that he could not comply with their request as the gun was pre-loaded with tear gas,

-7-

and 2) tear gas has an odor that is distinct from OC spray when deployed. Defendant's agent who supervised the operation, the agent who retrieved the Israeli Gas Gun, and the agent who used the Israeli Gas Gun all testified that they failed to even attempt to ascertain what was in the gun, nor do they know of anyone else who did. During Operation Reunion, DEO Dargon deployed the Israeli Gas Gun at Plaintiffs and others on more than one occasion despite the INS's prohibition on the use of tear gas. DEO Dargon also used the Israeli Gas Gun in violation of the Appendix to the Operational Plan as he did not wait for a command to use the gun by SSA McGahey and he used the gun despite no "mass breech of the barricade," but instead because someone threw an object. Even further, some Plaintiffs testified that the gas was deployed as soon as Defendant's agents arrived and/or before any objects were thrown into the street.

18.     SSA Richard McGahey was the Team Leader of the Perimeter Security Team and was assigned to secure the outer perimeter, including the demonstrator barricade. SSA McGahey was assigned a MK IX-Magnum filled with OC spray that he deployed at Plaintiffs and others on numerous occasions during Operation Reunion.

19.     Immigration Enforcement Agent ("IEA") Frank Repinski was a member of the Perimeter Security Team and was assigned to secure the outer perimeter, including the demonstrator barricade. IEA Repinski carried a MK IX-Magnum filled with OC spray and deployed it at Plaintiffs and others on more than one occasion during Operation Reunion. IEA Repinski testified that he threw his MK IX-Magnum out of the window of the van he was riding in as his van was leaving the scene.

20.     Special Agent ("SA") Rick Bendel was a member of the Perimeter Security Team and was assigned to maintain a clear egress route at the intersection of 2nd Street and 23rd Avenue

for the three (3) white, unmarked vans parked in front of the Gonzalez house.  During Operation Reunion, SA Bendel deployed a Cap-Stun Weapon System Standard Duty unit filled with OC spray at Plaintiffs and others.

21.     These and other INS officers sprayed gas indiscriminately and continuously at Plaintiffs throughout Operation Reunion at close range while they were on their own property and/or were behind the barricade even though Plaintiffs made no attempt to interfere with and/or obstruct the operation.  Defendant's agents also deployed Federal Riot Grenades that expelled prohibited tear gas.  Defendant's agents who deployed the gas testified that the accumulation of gas used during Operation Reunion was "thick" and/or "heavy."  In addition, Defendant's agents used physical force, such as hitting, pushing, shoving, kicking and stepping on Plaintiffs.  Defendant's agents also shouted obscenities and racial slurs at, pointed guns at, and threatened to shoot Plaintiffs.

22.     Plaintiff Leslie Alvarez testified that she never crossed the barricade during the operation, but nonetheless "an agent came near and told me, get out of here, pointing a weapon at me.  Another one came over and he said, get out of here, you fucking bitch, pointing like a large sprayer, looks like a fire extinguisher.  And sprayed me in the face."  At no time during the operation was Plaintiff Alvarez in the inner or outer perimeter, nor did Plaintiff Alvarez attempt to interfere with and/or obstruct the operation or advance on Defendant's agents.  Nonetheless, Plaintiff Alvarez was shot directly in the face with gas at close range by an INS agent.  As a result of being sprayed, Plaintiff Alvarez suffered injuries.  Plaintiff Alvarez had not suffered from these symptoms before she was sprayed with gas.  Plaintiff Alvarez also suffered emotional distress as a result of being sprayed with gas.

23.     Plaintiff Elsa Anderson testified that she was among the supporters assembled peacefully behind the barricade when Defendant's agents arrived.  At no time during the operation was Plaintiff Anderson in the inner or outer perimeter, nor did Plaintiff Anderson attempt to interfere with and/or obstruct the operation or advance on Defendant's agents.  Nonetheless, Plaintiff Anderson was shot directly in the face with gas at close range by an INS agent, which blinded Plaintiff Anderson causing her to fall.  As a result of being sprayed, Plaintiff Anderson suffered injuries.  Plaintiff Anderson had not suffered from these symptoms before she was sprayed with gas.  Plaintiff Anderson also suffered emotional distress as a result of being sprayed with gas.

24.     Plaintiff Nancy Canizares, who is disabled, testified that she was sitting in a lawn chair on the sidewalk in front of a house one entire street away from the Gonzalez family home and barricades.  Two (2) vans  stopped directly in front of where she sat and Defendant's agents exited the vans screaming, "Don't move, or we'll shoot!  You want to die!  You want to die!" Although Plaintiff Canizares did nothing to resist or pose any threat to Defendant's agents and was not blocking their path as she was not sitting near the gate to the chain link fence behind her, one federal agent instructed her to get up, which she did, and shoved her against the chain link fence, then threw her to the ground and held her at gunpoint.  Defendant's agents then walked on Plaintiff Canizares and used her as a springboard to jump the chain link fence.  After Plaintiff Canizares and the two individuals sitting near her were secured, Defendant's agents sprayed them all with gas, likely using Federal Riot Grenades containing prohibited tear gas as Plaintiff Canizares heard a ping when Defendant's agents dropped canisters that sprayed her with gas.  As the federal agents returned to their vans to depart the neighborhood, Plaintiff heard one federal

-10-

agent ask their apparent leader, "What are we going to do with them?," in reference to Plaintiff and two other peaceful bystanders who Defendant's agents had tied to their lawn chairs. The federal agent in charge responded, "Fuck 'em!," and the vans departed. At no time during the operation was Plaintiff Canizares in the inner or outer perimeter, nor did Plaintiff Canizares attempt to interfere with and/or obstruct the operation or advance on Defendant's agents. Nonetheless, Plaintiff Canizares was sprayed with gas at close range by an INS agent and pushed, shoved, and thrown up against a fence and to the ground and walked on. As a result of being sprayed and thrown around by INS agents, Plaintiff Anderson suffered injuries. Plaintiff Anderson had not suffered from these symptoms before she was sprayed with gas. Plaintiff Anderson also suffered emotional distress as a result of being sprayed with gas and thrown around by INS agents.

   25. Plaintiff Ramon Diago testified that he was outside his apartment building on his own property, located directly to the east of the Gonzalez family home, waiting for his ride to work when the operation began. At no time during the operation was Plaintiff Diago in the inner or outer perimeter, nor did Plaintiff Diago attempt to interfere with and/or obstruct the operation or advance on Defendant's agents. Nonetheless, Plaintiff Diago was shot directly in the face with gas at close range by an INS agent and fell down "in shock" into the street. As a result of being sprayed, Plaintiff Diago suffered eye pain and irritation for approximately two (2) days and had difficulty breathing for some time. Plaintiff Diago had not suffered from these symptoms before he was sprayed with gas. Plaintiff Diago also suffered emotional distress as a result of being sprayed with gas.

   26. Plaintiff Antonio Ortega testified that he was outside his apartment building on his

own property, located directly to the east of the Gonzalez family's home, preparing to leave for work when the operation began. At no time during the operation was Plaintiff Ortega in the inner or outer perimeter, nor did Plaintiff Ortega attempt to interfere with and/or obstruct the operation or advance on Defendant's agents. Nonetheless, as Plaintiff Ortega put his lunch in the back of his car, he was shot directly in the face with gas by an INS agent. As a result of being sprayed, Plaintiff Ortega suffered eye pain and irritation and had difficulty breathing for some time. Plaintiff Ortega had not suffered from these symptoms before he was sprayed with gas. Plaintiff Ortega also suffered emotional distress as a result of being sprayed with gas.

27.    Plaintiff Madeline Peraza testified that when the operation began she was inside her home located adjacent to the Gonzalez family home, along with her husband, her mother and a friend. Plaintiff Peraza stated that she heard a noise and walked outside of the side kitchen door that faces the middle of the Gonzalez house to investigate the noise. At that moment, an INS agent came from the front alley onto her property and shot Plaintiff Peraza directly in the face with gas at close range while using profane language. Plaintiff Peraza retreated into her home, but the house was filled with gas, and Plaintiff had to go outside again, trying to get fresh air. INS agents again doused Plaintiff with gas, while using profane language. Plaintiff again entered her home to call the rescue squad, but there was no telephone service. At no time during the operation was Plaintiff Peraza in the inner or outer perimeter, nor did Plaintiff Peraza attempt to interfere with and/or obstruct the operation. As a result of being sprayed, Plaintiff Peraza suffered injuries. Plaintiff Peraza had not suffered from these symptoms before she was sprayed with gas. Plaintiff Peraza also suffered emotional distress as a result of being sprayed with gas.

28.    Plaintiff Maria Riera (formally Rodriguez) was sleeping in her house, located

-12-

almost directly across the street from the Gonzalez family home, when the operation began. Plaintiff Riera stated that she was awoken by the noise of the raid, and she went outside to see what was happening. As Plaintiff stood in her fenced in front yard, still in her pajamas, an INS agent pointed a shotgun at her and stated, "fucking get inside or I will shoot." Plaintiff raised her hands in the air, and another INS agent ran up and sprayed her directly in the face with gas at close range. At no time during the operation was Plaintiff Riera in the inner or outer perimeter, nor did Plaintiff Riera attempt to interfere with and/or obstruct the operation. As a result of being sprayed, Plaintiff Riera suffered eye pain and irritation, shortness of breath, and nausea. Plaintiff Riera had not suffered from these symptoms before she was sprayed with gas. Plaintiff Riera also suffered emotional distress as a result of being sprayed with gas.

29.     Plaintiff Eduardo Rodriguez testified that he was sleeping in his house, located almost directly across the street from the Gonzalez family home, when the operation began. As Plaintiff stood in his fenced in front yard, an INS agent shouted for Plaintiff Rodriguez to leave and then shot him directly in the face with gas at close range. At no time during the operation was Plaintiff Rodriguez in the inner or outer perimeter, nor did Plaintiff Rodriguez attempt to interfere with and/or obstruct the operation. As a result of being sprayed, Plaintiff Rodriguez suffered injuries. Plaintiff Rodriguez had not suffered from these symptoms before he was sprayed with gas. Plaintiff Rodriguez also suffered emotional distress as a result of being sprayed with gas.

30.     Plaintiff Gloria Sanchez testified that on the morning of Operation Reunion she was visiting her daughter who lived in the house adjacent to the Gonzalez house. Plaintiff Sanchez stated that she heard a noise and walked outside of the side kitchen door that faces the

middle of the Gonzalez house with her daughter, daughter's husband and a friend to investigate the noise. At that moment, an INS agent came from the front alley and, without saying anything, shot Plaintiff Sanchez with gas in the face at close range while on her daughter's property. Contemporaneously, another INS agent, coming from behind, jumped the her daughter's fence and sprayed Plaintiff Sanchez again with gas at close range. Plaintiff Sanchez immediately vomited and urinated on herself. At no time during the operation was Plaintiff Sanchez in the inner or outer perimeter, nor did Plaintiff Sanchez attempt to interfere with and/or obstruct the operation. As a result of being sprayed, Plaintiff Sanchez suffered eye pain and irritation for approximately a week and a hoarse throat for approximately fifteen (15) days, for which she sought medical attention. Plaintiff Sanchez had not suffered from these symptoms before she was sprayed with gas. Plaintiff Sanchez also suffered emotional distress as a result of being sprayed with gas.

31. Plaintiff Ileana Santana testified that on the morning of Operation Reunion she was visiting with Plaintiffs Madeline and Cristobal Peraza who lived in the house adjacent to the Gonzalez house. Plaintiff Santana stated that she heard a noise and walked outside of the side kitchen door that faces the middle of the Gonzalez house with Plaintiffs Madeline and Cristobal Peraza and a friend. As Plaintiff Santana's husband Felix Meana was an invitee of the Gonzalez family, she proceeded to the Gonzalez house. Upon entering the Gonzalez front yard, Plaintiff Santana was cursed by an INS agent who then sprayed her with gas in the face at close range, which caused her to immediately vomit and urinate on herself. Plaintiff Santana then walked to the side of the Gonzalez house to use the spigot to wash herself off where she stood screaming for her husband who came to her aid. At no time during the operation did Plaintiff Santana

attempt to interfere with and/or obstruct the operation.  As a result of being sprayed, Plaintiff

Santana suffered eye pain and irritation and difficulty breathing.  Plaintiff Santana had not suffered

from these symptoms before she was sprayed with gas.  Plaintiff Santana also suffered emotional

distress as a result of being sprayed with gas.

32.    Plaintiff Armanda Santos testified that when Operation Reunion began she was in

her kitchen while her husband, Orlando Santos, was asleep in his bedroom.  Plaintiff's home is the

second house to the right of the Gonzalez family home.  Plaintiff Santos was startled by the noises

from the raid and tried to see what was happening when supporters attempted to enter her home

to get away from the gas, although Plaintiff Santos' home was filled with gas also.  Federal agents

came onto Plaintiff's property and sprayed her with gas.  Plaintiff never left her property during

the operation.  At no time during the operation was Plaintiff Santos in the inner or outer

perimeter, nor did Plaintiff Santos attempt to interfere with and/or obstruct the operation.  As a

result of being sprayed, Plaintiff Santos suffered eye pain and irritation and breathing difficulty.

Plaintiff Santos had not suffered from these symptoms before she was sprayed with gas.  Plaintiff

Santos also suffered emotional distress as a result of being sprayed with gas.

33.    Plaintiff Carmen Valdes testified that she was among the supporters assembled

peacefully behind the barricade praying the Rosary when Defendant's agents arrived.  At no time

during the operation was Plaintiff Valdes in the inner or outer perimeter, nor did Plaintiff Valdes

attempt to interfere with and/or obstruct the operation or advance on Defendant's agents.

Nonetheless, an INS agent approached Plaintiff, screamed, "You fucking bitch, get back!" and

"You fucking whores, shit Cubans" and sprayed a shot of gas directly into her face at point blank

range, which caused her contacts to immediately dissolve in her eyes.  Plaintiff became disoriented

and terrified. Plaintiff's husband approached and tried to help her, whereupon a federal agent sprayed her with gas again. Plaintiff tried to moved away in order to seek safety and relief from the effects of the gas attack. Nonetheless, a federal agent sprayed Plaintiff with gas for a third time. As a result of being sprayed, Plaintiff Valdes suffered eye pain and irritation, shortness of breath, fatigue and throat irritation. Plaintiff Valdes had not suffered from these symptoms before she was sprayed with gas. Plaintiff Valdes also suffered emotional distress as a result of being sprayed with gas.

34. Contemporaneously, the Breech Team forced entry into the Gonzalez home where the High Risk Entry Team and Recovery Team entered and retrieved Elian Gonzalez from Plaintiff Donato Dalrymple who voluntarily handed the boy to INS agents. Elian Gonzalez was then carried to and loaded in one of the white, unmarked vans.

35. The three (3) white, unmarked vans backed out of the search area and all team members cleared the area with no reported injuries to Defendant's agents.

## Conclusions of Law

1. Plaintiffs' claims arise under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. 28 U.S.C. § 2674 provides that the "United States may be liable for the conduct of its employees 'in the same manner and to the same extent as a private individual under like circumstances.'" *Pate v. Oakwood Mobile Homes*, 374 F.3d 1081, 1083 (11th Cir. 2004). As a result, the Court must look to the law of the jurisdiction in which the wrongs are alleged to have occurred in analyzing Plaintiffs' claims, which undisputedly is the State of Florida.

Plaintiffs' Negligence Claims

2. "To succeed on a negligence claim in Florida, Plaintiff must 'show that

-16-

the defendant owed a duty of care to the plaintiff, that the defendant breached the duty, that the breach caused the plaintiff's injury, and that damages are owed.'" *Miles v. Naval Aviation Museum Foundation, Inc.*, 289 F.3d 715, 722 (11th Cir. 2002) (citing *Ewing v. Sellinger*, 758 So. 2d 1196, 1197 (Fla. Dist. Ct. App. 2000)). "Florida law provides that the duty element of negligence focuses on whether the defendant's conduct forseeably created a broader 'zone of risk' that poses a general threat of harm to others." *Id.* at 723. "This analysis applies equally to the actions of both public and private defendants." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001). "[W]hen a defendant, including a police officer, by his or her conduct creates a foreseeable zone of risk, the law imposes a duty owed by the defendant to all individuals within the zone to act with reasonable care." *Id.* The Florida Supreme Court has clearly stated that, while "written agency protocols, procedures and manuals do not create an independent duty of care," "a written policy or manual may be instructive in determining whether the alleged tortfeasor acted negligently in fulfilling an independently established duty of care." *Pollack v. Florida Department of Highway Patrol*, 882 So. 2d 928, 936-37 (Fla. 2004). "A proximate cause produces the result in continuous sequence, and without which the result would not have occurred." *Tampa Electric Co. v. Jones*, 138 Fla. 746, 749 (1939). The standard for proving proximate cause "has traditionally been one of probability." *Lazenby v. Beisel* , 425 So. 2d 84, 86 (Fla. Dist. Ct. App. 1983).

In this case, Plaintiffs have provided ample evidence that Defendant owed Plaintiffs a common law duty of reasonable care that arose from the "zone of risk," which is recognized under Florida common law, that Defendant created when it undertook a large-scale search and seizure operation with 151 heavily-armed agents with the knowledge that Plaintiffs were innocent

-17-

bystanders to the government operation at the scene and could be harmed.  Defendant breached

this duty of reasonable care, which resulted in harm to Plaintiffs that must be compensated.

Evidence of this breach can be gleaned from Defendant's violation of its own policies that were

created to ensure Plaintiffs' safety and well being.  For instance, it's undisputed that Defendant's

agents violated INS polices and procedures by spraying Plaintiffs with a chemical irritant that they

were prohibited to use, namely tear gas, via an Israeli Gas Gun.[1]  In addition, the record contains

competent evidence that Defendant's agents also deployed Federal Riot Grenades that contained

prohibited tear gas.

Likewise, the record reveals that Defendant's agents violated the Operational Plan in place

for the operation.  Specifically, the "Appendix" to the Operational Plan permitted deployment of a

cloud of OC spray "only" in the event of a mass breach of the demonstrator barricade and "only"

upon command by INS Supervisory Special Agent Richard T. McGahey.  DEO Daniel Dargan,

the agent who used the Israeli Gas Gun, however, testified that he decided to use the gun and

spray the supporters because someone threw an object and he doesn't remember receiving an

order to use the gun.  SSA McGahey, who drafted the "Appendix" and supervised and briefed the

team that manned the barricade, testified that throwing an object did not constitute a "mass breech

of the barricade."

The record also reveals that the OC spray that Defendant's agents used was too "hot" as

_____

[1]      Even if Defendant's agents did not know that the Israeli Gas Gun contained tear
gas – which they clearly did – Defendant was negligent in failing to ascertain what type of
chemical irritant was in fact in a gun they intended to use on the public.  Defendant's agent who
supervised the operation, the agent who retrieved the Israeli Gas Gun, and the agent who used the
Israeli Gas Gun all testified that they did not attempt to ascertain what was in the gun, nor do they
know of anyone else who did.

evidenced by the extent of Plaintiffs' injuries such as scaring, burning and blistering, or at the least

questions of fact exist regarding the same.  Lastly, the record is clear that Defendant's agents used

an unreasonable amount of gas as evidenced by the extent and severity of Plaintiffs' injuries and

the fact that Plaintiffs who lived several houses away from the Gonzalez family home were

affected by the gas in and outside of their homes.

Plaintiffs' Assault and Battery Claims

    3.    A battery consists of the infliction of a harmful or offensive contact upon another

with the intent to cause such contact or the apprehension that such contact is imminent.  *Sullivan*

*v. Atlantic Fed. Sav. & Loan Ass'n*, 454 So.2d 52, 54 (Fla. 4th DCA 1984), review denied, 461

So.2d 116 (Fla.1985); *Chorak v. Naughton*, 409 So.2d 35, 39 (Fla. 2d DCA 1981).  "An 'assault'

is an intentional, unlawful offer of corporal injury to another by force, or exertion of force

directed toward another under such circumstances as to create a reasonable fear of imminent

peril."  *Sullivan*, 454 So. 2d at 54.

    Under Florida law, a law enforcement officer may use an amount of force as reasonably

appears necessary to "defend himself or another from bodily harm while making the arrest ."

Florida Statute § 776.05.  "Whether the force used is reasonable is a question of fact to be

determined in light of the circumstances of each particular case.  In any case the officer can never

use more force than reasonably appears to be necessary, or subject the person arrested to

unnecessary risk of harm."  *Miami v. Albro*, 120 So. 2d 23, 26 (Fla. Dist. Ct. App. 1960).  In

Florida, a person may resist the use of excessive force.  *See Wright v. State fo Florida*, 705 So. 2d

102, 104 (Fla. Dist. Ct. App. 1998).

    In this case, Plaintiffs have provided ample evidence that Defendant's agents assaulted and

battered Plaintiffs by intentionally threatening and spraying them with gas. Defendant's use of force was not privileged because it was excessive and unreasonable as: (1) Plaintiffs did not attempt to interfere with and/or obstruct the operation; (2) Plaintiffs were gassed at close range, most in the face; (3) Plaintiffs were gassed on their own property or behind the police barricade; (4) Defendant violated its own policy regarding the prohibited use of tear gas;[2] (5) Defendant violated its own Operational Plan as to when the gas was to be used; (6) the gas used by Defendant was too "hot;" and (7) Defendant's agents used an unreasonable amount of gas as evidenced by the testimony of Defendant's agents, extent and severity of Plaintiffs' injuries, and the fact that Plaintiffs who lived several houses away from the Gonzalez family home were affected by the gas in and outside of their homes.

Plaintiffs' Intentional Infliction of Emotional Distress Claims

      4.     To establish a claim for intentional infliction of emotional distress, a plaintiff must show: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress." *Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp.2d 1187, 1199 (M.D. Fl. 2002). Outrageous conduct has been defined as "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985). "The conduct, although it would otherwise be extreme and outrageous, may be privileged under the

---

[2]     Whether the Miami Police Department or any other law enforcement agency was authorized to use tear gas at the time of Operation Reunion is of no consequence here as the INS was clearly prohibited from such use and any such use in violation of the policy was unreasonable.

circumstances." *Id.* at 279. "Conduct is intentional where the actor knows that severe distress is certain, or substantially certain to result from his conduct." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990). The determination of whether a plaintiff has alleged conduct which meets the essential elements for a claim for intentional infliction of emotional distress is a matter of law to be decided by the court. *Gonzalez-Jimenez de Ruiz*, 231 F. Supp.2d at 1199.

Plaintiffs have provided ample evidence that Defendant intentionally, or with reckless disregard, caused Plaintiffs infliction of emotional distress when its agents shot Plaintiffs directly in the face at close range with gas on their own property or behind the barricade. This conduct was extreme and outrageous as: (1) Plaintiffs were gassed at close range, most in the face; (2) Plaintiffs were gassed on their own property or behind the police barricade, even though they did not attempt to interfere with and/or obstruct the operation; (3) Defendant shot Plaintiffs with tear gas, a prohibited substance; (5) Defendant violated its own Operational Plan as to when the gas was to be used; (6) the gas used by Defendant was too "hot;" and (7) Defendant's agents used an unreasonable amount of gas as evidenced by the testimony of Defendant's agents, extent and severity of Plaintiffs' injuries, and the fact that Plaintiffs who lived several houses away from the Gonzalez family home were affected by the gas in and outside of their homes. Defendant's conduct was not privileged because it was excessive and unreasonable.

Plaintiffs' Negligent Infliction of Emotional Distress Claims

5.      To recover on a negligent infliction of emotional distress claim in Florida, a plaintiff must show that he suffered emotional distress caused by a physical impact which manifested itself into some physical injury resulting from another's negligence. *See Mistretta v. Volusia County Dep't of Corrections*, 61 F. Supp. 2d 1255, 1265-66 (M.D. Fla. 1999) (citing

*Reynolds v. State Farm Mutual Automobile Ins. Co.*, 611 So. 2d 1294, 1296 (Fla. Dist. Ct. App. 1992), *rev. denied*, 623 So. 2d 494 (Fla. 1993)).

In this case, Plaintiffs have provided ample evidence that Defendant breeched a duty of reasonable care owed to Plaintiffs as a result of the zone of risk they created when Defendant's agents shot Plaintiffs directly in the face with gas at close range while they stood on their own property or behind the barricade. *See* section on negligence above. Plaintiffs have also shown that they sustained physical and emotional injuries as a result of this impact. Thus, Plaintiffs have proven their claims for negligent infliction of emotional distress.

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2005 a true and correct copy of the foregoing PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW was served by first-class mail, postage prepaid, on the following:

Stephen E. Handler
Trial Attorney/Torts Branch
Civil Division
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
P.O. Box 888
Washington, DC  20044


Larry Klayman, Esq.
540 Brickell Key Drive, #732
Miami, FL  33131



_____
Bertha Ronda

Respectfully submitted,

JUDICIAL WATCH, INC.

Paul J. Orfanedes, Esq.
Admitted Pro Hac Vice
Michael Hurley, Esq.
Motion for admission Pro Hac Vice pending
Dale L. Wilcox, Esq.
Admitted Pro Hac Vice
501 School Street, S.W., Suite 500
Washington, DC 20024
Tel.: 202-646-5172
Fax.: 202-646-5199
porfanedes@judicialwatch.org
dwilcox@judicialwatch.org


Neil M. Nameroff, Esq.
ATTORNEY AT LAW
Florida Bar No. 230723
100 SE 2nd Street, Suite 3920
Miami, Florida 33131
Tel.: 305-349-2391
Fax.: 305-374-9054

Attorneys for Plaintiffs

-23-