UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DONATO DALRYMPLE, et al. | ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 03-20588-CIV-MOORE |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) | |

## UNITED STATES' AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States of America respectfully requests that the Court make the following findings of fact and conclusions of law in this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, arising out of the execution of lawful search and administrative arrest warrants for the removal of Elian Gonzalez ("Elian"), who was being held by the Gonzalez family in their home, to return him to his father.

### I. FINDINGS OF FACT

1. On April 22, 2000, the Immigration and Naturalization Service ("INS"), by and through its employees as well as other law enforcement officers, conducted a law enforcement operation known as "Operation Reunion," wherein it executed search and administrative arrest warrants for Elian Gonzalez who was being held by the Gonzalez family at 2319 N.W. 2nd Street, Miami, FL, in order to return Elian to his father. The warrants were supported by probable cause.

2. Approximately 150 INS officers were involved in Operation Reunion, which consisted of several teams including, but not limited to, an entry team, which included the Border Patrol Tactical Unit ("BORTAC"), and a perimeter team. The entry team was tasked to "knock and announce" at the Gonzalez front door, request entry and then take custody of Elian after being allowed to enter or, if entry was refused, after they breached the door. The perimeter team

was responsible for securing the inner and outer perimeters surrounding the Gonzalez home. The inner perimeter primarily included the fenced yard of the Gonzalez home and outer perimeter primarily included the street in front of Gonzalez home. Officers were also tasked to secure the front and back yards of the house at 2322 NW 3rd Street, which was located behind the Gonzalez residence. The INS officers arrived in a variety of vehicles, including three white vans that parked in front of the Gonzalez home. The Miami Police Department was also involved in this operation, but only certain officers were informed in order to maintain the secrecy of the operation. The Miami Police Department assumed the responsibility for any civilians left "proned/cuffed," and for coordinating decontamination from the deployment of CS and/or OC gas and/or first aid.

3. When the law enforcement officers arrived at the scene, more than 100 protestors were gathered near the Gonzalez home; most of them were located behind the barricade on NW 2nd Street. The plaintiffs were located behind the barricades located near the Gonzalez home, in the alley way in between the Gonzalez house and the house next door, and on or near their own property. All of the officers were wearing uniforms clearly identifying them as law enforcement officers. Many officers were wearing blue shirts with the large words– "INS FEDERAL OFFICER"–stenciled in yellow on the back and front. Some officers had uniforms that had the words "Police Border Patrol" on them. The officers were carrying various law enforcement equipment including, but not limited to, helmets, sidearms, batons, OC spray cansisters, and handcuffs. One INS officer was carrying an Israeli Gas Gun. The BORTAC officers were carrying MP5 submachine guns.

4. When the officers exited their vehicles, they gave verbal commands and gestures to the protestors to stay back behind the barricades. But many protestors jumped over or pushed down the barricades, ran to the Gonzalez house, formed human chains, and threw objects at the INS officers as they proceeded to the Gonzalez house.

A. Although Leslie Alvarez was behind the barricade, she was subjected to the gas after she ran to front of the barricade and an officer told her get out of there.

B. When the officers arrived to secure the house located at 2322 NW 3rd Street, which is directly behind the Gonzalez home, there were approximately four or five men

2

and one woman in front of this home. Nancy Canizares was the woman. These individuals were drinking beer and belligerent. They refused to comply with the orders of drop the containers and get down and lay flat on the ground. The officers stated that they were told that they were federal agents. Ms. Canizares was holding a beer bottle and she approached the officers. She was told to stop, go back and drop the bottle. She refused and stated that she did not have to comply and that she was not going to do it. When she continued to advance she was turned around, pushed up against the fence, put down on the ground, restrained with flex cuffs, and placed on her side. Ms. Canizares was not subjected to any excessive physical force.

   C. Although Sandra Cobas was behind the barricade, she was subjected to the gas after she had advanced toward the front of the barricade and heard the officers yell "get back."

   D. Madeline Peraza lived next door to the Gonzalez home. When the INS officers arrived she (along with her husband) ran out of the house and along an alleyway toward the street where the officers were located. She stopped just before reaching the street when she came in contact with gas. She returned to her home for a few minutes, then went back outside and moved even further toward the street where the officers were located.

   E. Gloria Sanchez was visiting the Peraza home when the INS officers arrived. She followed the Perazas out of the house and along the alleyway toward the street where the officers were located. Like the Perazas, she stopped before reaching the street when she came in contact with gas. She too returned to the Peraza's home for a few minutes, then went back outside and moved even further toward the street where the officers were located.

   F. Ileana Santana was also visiting the Peraza home when the INS officers arrived. She left the house and moved along the alleyway toward the front of the Gonzalez house. She came in contact with gas before reaching the front of the Gonzalez home. Despite the gas, and in defiance of the commands of INS officers, Ms. Santana continued across the front yard of the Gonzalez house and turned down the alleyway, moving along the opposite side of the Gonzalez house.

   5. Because the INS officers believed that the plaintiffs' conduct, as set forth in paragraph 4, as well as similar conduct engaged in by other protestors, was interfering with the

operation in question, certain INS officers displayed and used force including, but not limited to, hitting, pushing, shoving, and throwing protestors to the ground. No deadly force was used and none of the plaintiffs were hospitalized as a direct result of physical contact with the officers at the scene.

6. In addition, oleoresin capsicum ("OC") and O-chlorobenzalmalonotrile ("CS"), were deployed, through the use of the Israeli Gas Gun and other devices, to control the crowd, protect the officers, and the ensure that the operation could be accomplished.

As the officers approached the Gonzalez house, the Team Leader of the perimeter team saw protestors running from the barricade of the demonstrators towards the Gonzalez house. Initially, he saw about 3 or 4 people running around the barricade, but during the entire operation he saw about 30 to 40 come across the barricade and run towards the Gonzalez home. The Team Leader gave the order to use the Israeli Gas Gun because the demonstrators were interfering with the operation by disobeying commands–verbal and physical gestures–to stay back behind the barricade. The Team Leader also deployed OC through a device known as a Magnum Mark IX Defogger to prevent several individuals, who had passed through the barricade and were heading toward the Gonzalez house, from interfering with the operation. The Team Leader believed that the use of the OC gas was justified, reasonable, and in accordance with standard law enforcement practice.

Initially, the Israeli Gas Gun was used because the officers were being assaulted, *i.e.*, numerous people were running toward the barricade, objects were flying over the barricade, and the officer using the gas gun was hit with a rock and a flag pole. He deployed gas on several other occasions when the crowd behind the barricade repeatedly surged toward the front of the barricade and when more objects, including a stool, were thrown at the officers. This officer was never closer than 10 to15 feet from the barricade when he deployed the gas and did not spray anyone at point blank range. This officer believed that the use of the Israeli Gas Gun was justified, reasonable, and in accordance with standard law enforcement practice.

Several other officers subjected protestors to CS and/or OC gas because they were advancing toward the Gonzalez home during the execution of the warrants. The officers' use of the CS and/or OC gas was justified, reasonable, and in accordance with standard law

4

enforcement practice.

The videotapes of the operation show that certain protestors were interfering and/or obstructing the INS officers as they approached the Gonzalez home. It appears that as many as a hundred protestors were present, some of whom were running toward the home and throwing objects at the officers. An INS officer is seen deploying gas at the protestors who are advancing upon the officers, running to the Gonzalez house, and throwing objects at the officers. Commands can be heard to "stay back behind the barricade," but they were not followed by certain protestors. During the operation, many protestors appeared to become more violent and aggressive and, therefore, more gas was deployed. The tapes do not depict any of the officers spraying protestors in the face with the gas or that the deployment of an excessive amount of gas.

CS and/or OC gas should be sprayed in the face of individuals and/or a crowd that are engaging in assaultive and/or obstructive behavior to a law enforcement operation in order to incapacitate or disperse them. The manner in which to do so depends upon the circumstances.

7.   The following plaintiffs stayed behind the barricade and were subjected to the CS and/or OC gas that were being sprayed on the protestors who were surging towards the barricade, jumped the barricade, and throwing objects at the officers: Elsa Anderson, Armanda Santos, and Carmen Valdes. These plaintiffs subjected to an excessive amount of gas.

8.   The following plaintiffs stayed on or near their property and were subjected to the CS and/or OC gas that were being sprayed on the protestors who were surging towards the barricade, jumped the barricade, and throwing objects at the officers, but who did not have any physical contact with the law enforcement officers: Ramon Diago, Antonio F. Ortega, Eduardo Rodriguez, and Maria Rodriguez (Riera). These plaintiffs were not subjected to an excessive amount of gas.

9.   After Elian was taken into custody, the entry team and Elian got into one of the vans and then all INS vehicles and personnel proceeded to leave the area. Numerous protestors ran toward the retreating officers yelling and throwing objects at the officers. Several other officers were hit and/or were forced to dodge water bottles, chairs and other objects. As the officers were backing away from the Gonzalez house, gas was deployed from the Israeli Gas Gun to keep the protestors from interfering with the officers exiting the area.

10. Dr. Bryan Ballantyne is a well-qualified expert. He has extensive practical experience, over a period of 35 years, in the specialization of toxicology, particularly clinical, occupational and forensic toxicology. He has researched, performed developmental work, and written extensively on various aspects of chemical warfare, including CS and/or OC. Dr. Ballentyne's opinions are based upon a reasonable degree of scientific and medical certainty, his experience, and his knowledge regarding the credible published reports in the scientific and medical literature regarding the exposure to CS and/or OC.

11. According to Dr. Ballentyne, CS and OC, which are deployed to control crowds and to avoid the possibility of physical injury to bystanders, produce transient (reversible) harassing or incapacitating effects by interacting with the sensory nerve receptors in exposed body surfaces which results in the development of uncomfortable sensations such as stinging or burning to pain. Exposure to the eyes causes stinging, burning or severely painful sensations, which slowly disappear within two to three hours. Redness of the eyes normally completely disappears within 24 hours. Inhalation of CS or OC will cause stinging and burning sensations in the nose and throat, and excess mucus and may cause sneezing, coughing, a choking sensation, and rapid shallow breathing, which will begin to subside 15 minutes or so after the person begins to breathe fresh air. Exposure to the skin will cause stinging or burning sensations, including local reddness of the area, which will subside within a few hours. Swallowing CS or OC will cause stinging or burning sensations in the mouth and throat and may cause a burning sensation in the chest; these effects will subside within 24 hours. CS or OC may also irritate the stomach causing a feeling of nausea which may result in vomiting; these effects will subside in two or three days. There are no appreciable differences in the harassing or incapacitating effects of OC and CS.

12. Dr. Ballantyne has opined that the plaintiffs' exposure to CS and OC produced short-term effects, *i.e.*, peripheral sensory irritation to the eyes, skin, mouth, throat, esophagus and stomach, most of which were transient and likely to have disappeared within 24 hours. Dr. Ballentyne has also opined that exposure to CS or OC does not produce any other effects than the short-term effects.

13. Plaintiffs Rodriguez (Riera), Ortega, and Anderson have failed to present

sufficient and/or competent evidence in support of their claims for economic losses, including but not limited to lost wages and medical expenses.

## II. CONCLUSIONS OF LAW

1. The FTCA subjects the United States to tort liability for negligent wrongful acts and omissions of federal employees according to the law of the place where the alleged torts occurred. 28 U.S.C. §§ 1346(b), 2671-2680; *see Gonzalez-Jimenez De Ruiz v. United States*, 231 F.Supp.2d 1187, 1194 (M.D. Fl. 2002).

2. Plaintiff's Complaint is based on conduct that allegedly took place in Florida. Thus, to the extent state law governs, the law of Florida will apply. *See Gonzalez-Jimenez De Ruiz v. United States*, 231 F.Supp.2d 1187, 1194 (M.D. Fl. 2002).

Assault and Battery

3. A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent. *Sullivan v. Atlantic Fed. Sav. & Loan Ass'n*, 454 So.2d 52, 54 (Fla. 4th DCA 1984), review denied, 461 So.2d 116 (Fla.1985); *Chorak v. Naughton*, 409 So.2d 35, 39 (Fla. 2d DCA 1981).

Pursuant to Florida law, police officers are privileged to use reasonable force in order to carry out their law enforcement activities. *See* Fla. Stat. § 776.05 (West 2003) ("A law enforcement officer . . . is justified in the use of force . . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest"). Accordingly, "activity that would otherwise subject a person to liability in tort for assault does not constitute tortious conduct if the actor is "privileged' to engage in that conduct." *Hinojosa v. City of Terrell*, 834 F.2d 1223 (5th Cir. 1988), *cert. denied*, 493 U.S. 822 (1989), citing *Restatement (Second) of Torts* 10; W. Keeton, *Prosser and Keeton on Torts* 16 (5th ed. 1984); *see also, Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), *aff'd*, 338 F.3d 448 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1655 (2004); *Garza v. United States*, 881 F. Supp. 1103 (S.D. Tex. 1995).

The INS officers were privileged to use reasonable force, including the deployment of CS and/or OC gas and physical force, against all plaintiffs who jumped over and/or passed through the front barricade, were in the front or back yard of the Gonzalez house,

7

were in the path of the officers who were securing the area, or were the inside the Gonzalez house, while the officers were on the scene to execute the warrants in question. Accordingly, because plaintiffs Alvarez, Canizares, Cobas, Peraza, Sanchez, and Santana advanced in the direction of the officers who were on the scene, it was justified and reasonable to subject these plaintiffs to the gas.

Because it was reasonable to deploy CS and/or OC gas against the aforementioned plaintiffs, it was an unavoidable consequence of the operation that the plaintiffs who were not interfering with the operation because they were behind the barricade, in their homes, on their property, or in or near the Gonzalez family home were subjected to the gas. Accordingly, it was justified and reasonable to subject plaintiffs Anderson, Diago, Ortega, Riera, Rodriguez, Santos, and Valdes to the gas.

The United States is entitled to judgment on plaintiffs' claims for assault and battery because the use of force under the circumstances at issue was reasonable and, therefore, privileged and not excessive.[1]

False Imprisonment

4.   False imprisonment is the unlawful restraint of a person against his will. *Johnson v. Weiner*, 155 Fla. 169 (Fla. 1944). A claim for false imprisonment will not lie where the restraint was lawful and/or the person was free to leave. *See Gatto v. Publix Supermarket, Inc.*, 387 So.2d 377, 379 (Fla. App. 1980) (court directed verdict on false imprisonment claim where evidence showed plaintiff "considered himself free to leave and was never restrained from leaving"); *see also, Caswell v. BJ's Wholesale Co.*, 5 F. Supp.2d 312, 319 (E.D. Pa. 1998) (false imprisonment claim dismissed because there was no evidence plaintiff was confined); *Caldwell v. Linker*, 901 F. Supp. 1010, 1015 (M.D. NC. 1995) (false imprisonment claim dismissed

---

[1] To the extent that any claims for long-term (chronic) damages still exist, the United States is entitled to judgment on such claims as a matter of law because plaintiffs cannot establish that such injuries were legally caused by the inhalation of the CS and/or OC gas by competent substantial evidence. In other words, plaintiffs' testimony alone is insufficient to satisfy their burden of proof that the INS's use of the gas caused their long-term (chronic) injuries. *See Greene v. Flewelling*, 366 So.2d 777 (Fla. Dist. Ct. App. 1979). Further, according to Dr. Ballentyne, there are no credible published reports in the scientific and medical literature that exposure to this type of gas produces any long-term (chronic) effects.

8

because plaintiff was free to leave); *Tomrell v. Leavenworty County, Kansas*, 845 F. Supp. 1454 (D. Kan. 1994) (false imprisonment claim dismissed because "plaintiff was always free to leave").

The United States is entitled to judgment on plaintiff Cobas' claim for false imprisonment because she remained behind the barricade and was not prevented from leaving the area. This claim is also not actionable because the INS officers were privileged to temporarily restrain any and all plaintiffs during Operation Reunion.

Intentional Infliction of Emotional Distress

5.  To establish a claim for intentional infliction of emotional distress, a plaintiff is required to show: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress." *Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp.2d 1187, 1187 (M.D. Fl. 2002). Outrageous conduct has been defined as "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985). "Only in extremely rare circumstances will courts uphold claims for intentional infliction of emotional distress." *Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp.2d 1187. "The determination of whether a plaintiff has alleged conduct which meets the essential elements for a claim for intentional infliction of emotional distress is a matter of law to be decided by the court." *Id.*; *see also, Hare v. Citrus World Inc.*, 39 F. Supp.2d 1365, 1369 (M.D. Fl. 1999), citing *Baker v. Florida National Bank*, 559 So.2d 284, 287 (Fla. Ct. App. 1990). The Florida Supreme Court has also found that a defendant's actions that are otherwise "legally permissible" and "privileged under the circumstances," as a matter of law, cannot be considered the type of "atrocious conduct" needed to establish a claim for intentional infliction of emotional distress. *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278-79; *see also, Baker v. Fla. Nat'l Bank*, 559 So.2d 284 (Fla. 4th Dist. App. 1990).

The United States is entitled to judgment on plaintiffs' claims for Intentional Infliction of Emotional Distress because the execution of the warrants in question, which

included the use of reasonable physical force and the deployment of CS and/or OC gas, was privileged and/or did not constitute outrageous behavior.

Negligent Infliction of Emotional Distress

6.  In order to state a claim for negligent infliction of emotional distress, a plaintiff must show that (1) the defendant's negligent act caused plaintiff a demonstrable injury, and (2) this physical injury caused plaintiff's emotional distress. *See R.J. v. Humana of Florida, Inc.*, 652 So.2d 360, 363 (Fla. 1995).

The United States is entitled to judgment on plaintiffs' claims for negligent infliction of emotional distress because the INS officers were not negligent in the execution of the warrants in question, which included the use of reasonable physical force and the deployment of gas.

The Illegality Doctrine

7.  Florida has long recognized the well-established principle that "no court shall aid men who found their cause of action upon illegal acts." *Goldring v. Johnson*, 65 Fla. 381, 382 (1913) (quoting *Cook v. Fernandez*, 11 Fla. 100 (1864)). Florida courts have consistently barred claims that are grounded on illegal activities. *Goldring*, 65 Fla. at 382 (dismissing claim for recovery under contract requiring the defendant to buy liquor from plaintiff and resell it using plaintiff's license contrary to law); *Hauer v. Thum*, 67 So.2d 643, 645 (Fla. 1953) (holding that defendant in a contract action cannot use defense that contract under which plaintiff brought suit was consummated pursuant to a conspiracy to defraud the lending bank); *Yost v. Rieve Enterprises, Inc.*, 461 So.2d 178, 184 (Fla.App. 1984) (holding that broker could not bring action against seller of real property for unpaid commission where broker participated in seller's defrauding the buyer). Florida law prohibits resistence, obstruction or opposition to law enforcement operations.

Florida Statute § 843.02, "Resisting officer without violence to his or her person," states in pertinent part: that "[w]hoever shall resist, obstruct, or oppose any . . . person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree. . . ." Florida courts, in interpreting Fla. Stat. § 843.02, have

held that violations occur when individuals block an officer's path, refuse to obey a command and/or engage in conduct that appears threatening to an officer's efforts to carry out his authorized duties and responsibilities. *See H.A.P. v. State*, 834 So.2d 237 (Fla. Dist. Ct. App. 2002); *Francis v. State*, 736 So.2d 97 (Fla. Dist. Ct. App. 1999); *M.M. v. State*, 674 So.2d 883 (Fla. Dist. Ct. App. 1996); *Wilkerson v. State*, 556 So.2d 453 (Fla. Dist. Ct. App. 1990), *review denied*, 564 So.2d 1088 (Fla. 1990).

Under Florida law, "it is a crime not only to oppose or to obstruct a law officer in the execution of the officer's duty, but also to attempt to oppose or obstruct the officer. And none of these crimes require violence or the offer to do violence." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558-59 (11th Cir. 1993) (holding that the plaintiff's conduct of continuing to talk after being told to keep quiet constituted interference with the execution of a law enforcement officer's duties where the area was crowded and the officer knew that defendant resisted arrest on a previous occasion). *See L.S.T., Inc. v. Crow*, 49 F.3d 679, 681, 685 (11th Cir. 1995) (holding that plaintiff resisted law enforcement officer by refusing to comply with three lawful orders to leave a crowded parking lot so that order could be restored); *Dreske v. Holt*, 536 F.2d 105, 106-107 (5th Cir. 1976) (holding that plaintiff resisted arrest by refusing to accompany police officers to sheriff's department to post bond and locking himself inside his car during a routine traffic stop).

Federal law also prohibits the interference with the execution of search warrants. 18 U.S.C. § 2231 states in pertinent part:

> Whoever forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties, shall be fined under this title or imprisoned not more than three years, or both.

Courts have interpreted 18 U.S.C. § 2231 to prohibit "[a]nything which interferes with the physical ability of officers of the law...." *Lewin v. United States*, 62 F.2d 619, 620 (1st Cir. 1933) (holding that placing an incapacitating smoke screen in the path of an officer pursuing by boat constituted interference); *United States v. Johnson*, 412 F.2d 906 (5th Cir. 1969) (defendant who, after being advised of identity of officers and their purpose, interfered with officer in the

11

execution of search warrant by continuing to destroy evidence and brandishing a weapon).

Plaintiffs Alvarez, Canizares, Cobas, Peraza, Santana, and Sanchez engaged in conduct that constituted interference and/or obstruction with the execution of lawful search and administrative arrest warrants, thus barring their claims under the doctrine of illegality. Accordingly, the claims of these plaintiffs are barred.

Comparative Negligence

8. In order to establish the defense of comparative negligence, a defendant must prove each of the elements of negligence; that the plaintiffs owed themselves a duty of care, that they breached that duty and that the breach was the proximate cause of the damages they sustained. *Borenstein v. Raskin*, 401 So.2d 884, 885 (Fl.3d Dist. 1981).

Because plaintiffs Alvarez, Canizares, Cobas, Peraza, Sanchez, and Santana advanced in the direction of the officers who were on the scene, their negligence resulted in their own injuries.

Plaintiff Rodriguez's (Riera) Pecuniary Claim is Not Cognizable under the FTCA

9. The FTCA expressly bars all claims "arising out of . . . interference with contract rights." *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 378 (5th Cir. 1987). "In determining the applicability of the 2680(h) exceptions, a court must look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim he asserts." *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir.), *cert. denied*, 426 U.S. 921 (1976). Further, liability under the FTCA may be imposed only for negligent or wrongful conduct of federal employees. 28 U.S.C. §§1346(b), 2671.

The interference with contract rights exception bars actions arising out of interference with both existing and prospective contract rights, including claims arising out of interference with prospective economic advantage. *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985) (claims based on government actions constituting unlawful defacto debarment and resulting in damage to economic relationships between plaintiff and third parties); *Moessmer v. United States*, 760 F.2d 236 (8th Cir. 1985) (claims for interference with prospective employment contract); *Chen v. United States*, 854 F.2d 622, 628 (2d Cir. 1988) (claim for loss of future contracts because of government suspensions and debarment

proceedings in connection with fraud investigation); *O'Ferrell v. United States*, 968 F. Supp. 1519, 1530 (M.D. Ala. 1997) (claims based on FBI's closure of plaintiffs' business during execution of search warrant).

Here, Rodriguez (Riera) claims that she suffered certain pecuniary damages as a result of the law enforcement operation at issue because the news media blocked her driveway, which was located across the street from the Gonzalez home, and, thus, inhibited her ability to drive to her business and make sales. Because this claim falls within the confines of the interference with contract rights exception of 28 U.S.C. §2680(h), it is barred.

In addition, the United States can be held liable under the FTCA only for the conduct federal employees. *See* 28 U.S.C. §§1346(b), 2671(b). Because the alleged blocking of the driveway was committed by news media personnel, the United States cannot be held liable on this claim.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of the United States.

Dated: __1/24/2005__

          Respectfully submitted,

          PETER D. KEISLER
          Assistant Attorney General
          Civil Division

          PHYLLIS J. PYLES
          Director, Torts Branch
          Civil Division

          _/s/ Stephen Handler_
          STEPHEN E. HANDLER
          Special Bar No. A5500749
          Lead Counsel
          CLAY MAHAFFEY
          Special Bar No. A5500845
          Trial Attorney
          TRACEY HARDIN
          Special Bar No. A5500873
          Trial Attorney
          KIMBERLY ZIROPOULOS
          Special Bar No. A5500874
          Trial Attorney
          Torts Branch, Civil Division
          U.S. Department of Justice
          P.O. Box 888
          Washington, D.C. 20044
          (202) 616-4279
          (202) 616-5200 (fax)
          Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the United States' Amended Proposed Findings of Fact and Conclusions of law were hand delivered to the attorneys representing the plaintiffs, Paul Orfanedes and Larry Klayman, this 24th day of January, 2005.

Stephen E. Handler