IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 03-20588-CIV-MOORE

DONATO DALRYMPLE, et al,

    Plaintiffs,

vs.

UNITED STATES OF AMERICA,

    Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**



FILED by MT D.C.
MAY 6 2005
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

THIS CAUSE comes before the Court for final disposition after a six-day bench trial in Miami, Florida, from January 24, 2005, through January 31, 2005. Plaintiffs filed this action against the United States of America seeking damages under the Federal Torts Claims Act ("FTCA").

The Court, having heard six days of trial testimony, having reviewed the applicable pleadings, received evidence, and reviewed the applicable law, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

**BACKGROUND FACTS**

1. On November 25, 1999, six-year-old Elian Gonzalez, a Cuban boy, was found floating on an inner-tube off the coast of Fort Lauderdale, Florida. Dalrymple v. Reno, 334 F.3d 991, 992 (11th Cir. 2003).

2. The Coast Guard brought Elian into the United States, and the Immigration and Naturalization Service ("INS") paroled him into the country without inspection then released him into the custody of his great-uncle, Lazaro Gonzalez ("Lazaro"). Gonzalez v. Reno, 325 F.3d 1228, 1231 (11th Cir. 2003).

3. Lazaro filed a petition with the INS seeking political asylum on behalf of Elian. Id.

4. Elian also filed a petition for asylum on his own behalf. Id.

5. On January 5, 2000, INS Commissioner Meissner decided that the INS would not consider

the requests for asylum because Elian's father, a Cuban citizen, had requested that Elian be returned to Cuba. Id.

6. On January 7, 2000, Lazaro filed a petition for temporary custody of Elian in the Family Division of the Circuit Court for Miami-Dade County, which was granted pending a full hearing on the matter. Id.

7. On January 12, 2000, Attorney General Reno affirmed Meissner's decision not to consider the petitions for political asylum. Id.

8. Lazaro challenged Reno's ruling in the United States District Court for the Southern District of Florida, and the undersigned upheld Reno's decision. Id.

9. Lazaro appealed to the Eleventh Circuit Court of Appeals. See Gonzalez v. Reno, No. 00-11424-D (11th Cir. Apr. 19, 2000) (unpublished opinion). Id.

10. On April 6, 2000, while that appeal was pending, Elian's father arrived in the United States. Id.

11. On April 12, 2000, the INS instructed Lazaro to bring Elian to Opa Locka Airport, and advised Lazaro that the parole of Elian was being transferred to Elian's father. Id at 1232.

12. On April 13, 2000, the Circuit Court for Miami-Dade County dismissed Lazaro's petition for temporary custody and vacated its prior order granting temporary custody to Lazaro. Id.

13. The INS issued an administrative warrant for Elian on April 21, 2000, asserting that Elian was within the United States in violation of the immigration laws and could therefore be taken into custody. Id.

14. The INS then obtained a search warrant to enter the Gonzalez's home and search for Elian. Id.

15. The search warrants and administrative arrest warrants were supported by probable cause. Joint Pretrial Stipulation at ¶5(A).

16. At approximately 5:15 a.m. on Saturday, April 22, 2000, the INS, by and through its employees as well as other law enforcement officers, conducted a law enforcement operation known as "Operation Reunion," wherein it executed the search and administrative arrest warrants for Elian, who was being held by the Gonzalez family at 2319 N.W. 2nd Street,

Miami, Florida, in order to return Elian to his father. Id.

17. The original ninety-six Plaintiffs filed the instant action based on events that occurred during Operation Reunion.

18. On January 18, 2005, the undersigned adopted the recommendation of the Honorable John J. O'Sullivan, United States Magistrate Judge, that the use of gas during Operation Reunion was objectively reasonable given the circumstances involved in the operation. See Jan. 18, 2005, Order.

19. Because the use of gas during Operation Reunion was objectively reasonable, such use of force was privileged under Florida law.

20. As a result, summary judgment was entered in favor of the United States and against those Plaintiffs who did not allege that they were behind the barricades or on their own property when gassed at close range.

21. Therefore, the only issue remaining for trial was the remaining thirteen Plaintiffs' claim for assault and battery and emotional distress.

**OPERATION REUNION**

22. More than 100 protesters were gathered near the Gonzalez's home on the morning of April 22, 2000. Joint Pretrial Stipulation at ¶5(C).

23. A large contingent of agents entered Northwest 2nd Street from Northwest 23rd Avenue and approached the Gonzalez's house in a convoy of vans, sport utility vehicles and trucks. Trial Tr. Vol. IV at 130; Vol. V at pg. 180; Defendant's Exhibit 16.

24. The Operational Plan, which set forth the manner in which Operation Reunion was to be carried out, defined the "outer perimeter" as the street in front of the Gonzalez's house, from the barricade erected directly to the west of the Gonzalez's house across NW 2nd Street ("street barricade") to the intersection of Northwest 2nd Street and Northwest 23rd Avenue. Id.

25. In general, the perimeter security team was to create a secure area in the outer perimeter, with officers positioned inside the street barricade and inside the barricade erected in front of the news tents located along Northwest 2nd Street across the street from the Gonzalez's house

("media barricade"). Trial Tr. Vol. IV at 126-27, 261.

26. Three white, unmarked vans proceeded to the Gonzalez's house and parked single file in the street, with the first van parked in front of the house to the west of the Gonzalez's house and the last van parked in front of the two story apartment building to the east of the Gonzalez's house. Trial Tr. Vol. IV at 130-131.

27. Some members of the perimeter security team proceeded to the front and back yards of the Gonzalez's house. Trial Tr. Vol. I at 112; Plaintiffs' Exhibit 99; Defendant's Exhibits 7 and 8.

28. Other members of the perimeter security team maintained positions along Northwest 2nd Street, including some who proceeded to the street barricade and the area around the media tents on the opposite side of Northwest 2nd Street from the Gonzalez's house. Trial Tr. Vol. IV at 286; Defendant's Exhibits 7 and 8.

29. The purpose of stationing the officers in these positions was to stop the demonstrators from getting into the street in front of the Gonzalez's house. Trial Tr. Vol. IV at 127.

30. Every officer on the perimeter security team was wearing dark blue shirts with very bright yellow letters that stated "INS Federal Officer" in order to make them easily identifiable as federal officers. Trial Tr. Vol. IV, at 129, 283; Defendant's Exhibits 7 and 8.

31. One agent was assigned to use an Israel gas gun, if necessary, during Operation Reunion. Trial Tr. Vol. IV at 47.[1]

32. An Israeli gas gun looks like a mini scuba tank and is filled with compressed air and a solution containing oleresin capsicum ("OC"). Trial Tr. Vol. IV at 45; Plaintiffs' Exhibit 93.

33. Some of the other federal officers carried magnum foggers. Trial Tr. Vol. IV at 282.

34. A magnum fogger is a device that looks like a hair spray can and is filled with compressed air and a solution containing OC. Trial Tr. Vol. IV at 48-49; Defendant's Exhibit 14; Plaintiffs' Exhibit 93.

35. As the vans carrying the members of the perimeter security team approached the Gonzalez's

---

[1] No evidence was presented at trial that there was more than one Israeli Gas Gun used during Operation Reunion.

house, the crowd of demonstrators behind the barricades began "scrambling to life, starting to get very agitated." Trial Tr. Vol. IV at 131; Defendant's Exhibits 7 and 8.

36. Some demonstrators were seen running from the far side of the street barricade towards the Gonzalez's yard. Trial Tr. Vol. IV at 133-34, 230-32; Defendant's Exhibits 7 and 8.

37. The federal officers instructed the demonstrators to return to the opposite side of the street barricade. Trial Tr. Vol. IV at 133-34; Defendant's Exhibits 7 and 8.

38. Many of the demonstrators did not comply with the agents' commands. Trial Tr. Vol. IV at 135-36; Defendant's Exhibits 7 and 8.

39. As a result, one of the federal officers used a magnum fogger to deploy gas in the direction of some demonstrators who were advancing on the Gonzalez's property. Trial Tr. Vol. IV at 135.

40. Upon using gas on these demonstrators, the agent then yelled "gas, gas, gas" to warn everyone that gas was being used. Trial Tr. Vol. IV at 137.

41. Meanwhile, the demonstrators behind the street barricade were surging toward the front of the barricade and throwing objects at the officers. Id. at 53-4.

42. A four-man team, one of whom was carrying the Israeli gas gun, was positioned in front of the street barricade. Id. at 139.

43. The team's role was to keep the demonstrators out of the outer perimeter because the presence of the demonstrators posed a threat to the officers, to Elian's removal from the house, and to the other demonstrators attempting to impede the officers from departing the area. Id. at 138.

44. The agent assigned to the Israeli gas gun was positioned in the middle of the street approximately 10 to15 feet from the street barricade. Id. at 55, 67; Defendant's Exhibits 7 and 8.

45. Agents gestured and verbally commanded the demonstrators to stay back behind the barricades. Trial Tr. Vol. IV at 135, 167-68; Defendant's Exhibits 7 and 8.

46. The demonstrators behind the street barricade did not comply with the verbal and physical commands of the federal officers and began throwing, among other things, rocks, bottles,

coolers, and wooden bar stools. Trial Tr. Vol. IV at 54, 136, 163, 289; Defendant's Exhibits 7 and 8.

47. Some of the officers, including the officer assigned to Israeli gas gun, were hit with the objects being thrown by the demonstrators behind the street barricade. Trial Tr. Vol. IV at 54, 139.

48. As a result of the surge of demonstrators who continued to move towards the front of the street barricade and throw projectiles at the federal officers, the Israeli gas gun was used. Trial Tr. Vol. IV at 53; Defendant's Exhibits 7 and 8.

49. When the Israeli gas gun was used, the federal officer was approximately 10 to15 feet from the front of the street barricade. Trial Tr. Vol. IV at 55, 90; Defendant's Exhibits 7 and 8.

50. The Israeli Gas Gun was not targeted at any specific individuals; it was sprayed in the direction of the threats. Trial Tr. Vol. IV at 55, 95.

51. When the demonstrators receded and stopped throwing objects, the officer stopped deploying gas from the Israeli gas gun. Id. at 55, 68, 290-91; Defendant's Exhibits 7 and 8.

52. Shortly thereafter, the crowd returned to the front of the street barricade and threw more objects at the federal officers. Id.

53. The Israeli gas gun was again used to respond to the threat. Id.

54. The Israeli gas gun was never used closer than 10 to 15 feet from the front of the street barricade. Trial Tr. Vol. IV at 56, 61, 290; Defendant's Exhibits 7 and 8.

55. After Elian was removed from the Gonzalez's home, the agent assigned to use the Israeli gas gun was assigned to provide security in front of the vans in order for the federal officers to retreat unimpeded down the street toward NW 23rd Avenue. Trial Tr. Vol. IV at 57.

56. As the officers began to retreat, many of the demonstrators crossed the street barricade and continued to throw numerous objects at the federal officers. Trial Tr. Vol. IV at 58-9, 298; Defendant's Exhibits 7 and 8.

57. The Israeli gas gun was again used to halt the demonstrators who were past the barricade, proceeding toward the retreating vans, and throwing objects. Id.

58. The Israeli gas gun was not sprayed between the Gonzalez's house and the house immediately

west of the Gonzalez's house,[2] at the apartment building that was located immediately east of the Gonzalez's house[3] or at the news tents.[4] Trial Tr. Vol. IV at 59-60, 102, 298-99; Defendant's Exhibits 7 and 8.

59. The Israeli gas gun was also not used in the front yard of the house located west of the Gonzalez's house and adjacent to the barricade.[5] Trial Tr. Vol. IV at 101, 102; Defendant's Exhibits 7 and 8.

60. When the federal officers made their way far enough east on Northwest 2nd Street, away from the Gonzalez's home and the demonstrators who continued to throw objects, the officers entered the vehicles and left the area. Trial Tr. Vol. IV at 300.

61. Other officers were assigned to secure the area to the rear of the Gonzalez's property. Trial Tr. Vol. V at 133.

62. Two white, unmarked vans of 28 federal officers cleared the police barricade at the intersection of 23rd Avenue and northwest 3rd Street and proceeded to the house at 2322 NW 3rd Street, located to the rear of the Gonzalez's residence. Trial Tr. Vol. V at 133-35.

63. These officers were assigned to secure the perimeter fence behind the Gonzalez's home, which required securing the residence at 2322 NW 3rd Street. Id.

64. The officers wore black shirts that had prominent writing on the front and back clearly indicating that they were federal border patrol officers. Id. at 136-37.

65. Upon arriving at the front of the home located at 2322 NW 3rd Street, three individuals were standing in front of the fence that enclosed the yard of that residence. Id. at 140, 142.

66. The officers announced themselves loudly as federal agents in both English and Spanish. Id. 143-44.

67. The individuals were ordered to assume a prone position. Id. at 144-46.

---

[2]This is where plaintiffs Madeline Peraza, Gloria Sanchez, and Ileana Santana were located.

[3]This is where plaintiffs Antonio Ortega and Ramon Diago were located.

[4]This is where plaintiffs Maria Riera and Eduardo Rodriguez were located.

[5]This is where Armanda Santos was located.

68. Two of the individuals complied with the command. Id. at 146.

69. A third individual, a female with a beer bottle in her hand and matching the physical description of plaintiff Nancy Canizares, did not comply with the verbal commands. Id. at 146-47.

70. The woman was instructed to drop the bottle and get down on the ground. Id.

71. The woman refused to drop the bottle and stated that she did not have to comply with the officers' commands. Id.

72. After the woman refused to comply with the verbal commands, one officer, considering the beer bottle a potential weapon, raised his weapon and gave her a third verbal command. Id.

73. After she refused to comply with the third command, two nearby agents were instructed to take her to the ground. Id. at 147-48.

74. The woman thereafter stopped resisting and remained on the ground after she had been placed there. Id. at 148, 152.

75. No chemical irritant was deployed by any federal agent during the operation in the immediate vicinity of the woman. Id. at 153-56, 172.

76. No agents had any further physical contact with the woman. Id. at 148, 150.

77. After the completion of Operation Reunion, the federal officers left the area without having to further restrain the woman. Id. at 150-56.

78. Operation Reunion took less than 3 minutes. Trial Tr. Vol. IV at 68, 241; Defendant's Exhibits 7 and 8.

**VIDEOTAPES**

79. Various members of the media were present during Operation Reunion. Defendant's Exhibits 7 and 8.

80. The videotapes, taken from different angles, appear to capture, in substantial part, the events that transpired in the street in front of the Gonzalez's house during Operation Reunion. Id.

81. Seconds before the arrival of the three vans that transported certain INS officers to the Gonzalez's house, demonstrators are seen running from the street and media barricades toward the Gonzalez's house. Id.

82. Numerous demonstrators are seen in the front yard of the Gonzalez's house. Some of the demonstrators were forming human chains in order to prevent the officers from gaining access to the house. Id.

83. Other demonstrators are seen actively interfering and/or obstructing the INS officers, including throwing objects at the officers. Id.

84. Upon exiting the vehicles, the federal officers issued verbal and physical commands for the demonstrators to stay behind the barricades. Id.

85. Many demonstrators ignored the commands of the federal officers. Id.

86. INS officers are seen deploying gas at demonstrators who were advancing toward the officers, throwing objects at the officers and running towards the Gonzalez's house. Id.

87. As Operation Reunion was proceeding, many demonstrators appeared to become more violent and aggressive. Id.

88. The tapes do not depict any officers spraying gas at close range at the demonstrators who are standing on their own property or who are standing behind the barricades. Id.

89. Similarly, the tapes do not show any of the federal officers using obscenities; the only use of obscenities appears to be coming from the demonstrators. Id.

90. Although a few individuals are seen rubbing their eyes and coughing, it does not appear that the deployment of gas was excessive; no one appears to be incapacitated by the gas. Id.

91. The agent who used the Israeli gas gun is seen spraying gas in a westerly direction toward the street barricade from a distance of 10 to 15 feet in response to the surging crowd of demonstrators who are throwing numerous objects at the officers. Id.

92. The agent who used the Israeli gas gun is also seen using the gun to prevent the demonstrators from advancing towards the agents while the agents were attempting to depart the neighborhood after taking custody of Elian. Id.

93. The agent who used the Israeli gas gun is not seen spraying any gas at the north side of the street toward the Gonzalez's house, at the house and apartment building located on either side of the Gonzalez's house, or toward the south side of the street at the news tents. Id.

94. The tapes corroborate the material portions of the testimony of the federal officers regarding

their conduct in dealing with the demonstrators during Operation Reunion.

95. The tapes contradict the material portions of Plaintiffs' testimony regarding whether and how they were exposed to gas.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter. 28 U.S.C. § 1346.
2. In this civil action, Plaintiffs' burden of proof is a preponderance of the evidence. Sandoval v. Hagan, 7 F. Supp. 2d 1234, 1245 (M.D. Ala. 1998).
3. "A preponderance of the evidence means such evidence, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved 'is more likely true than not true.'" Id. (citing Eleventh Circuit Pattern Jury Instructions).
4. Compared to the summary judgment stage where the court was legally required to view the evidence in the light most favorable to Plaintiffs, and all reasonable inferences to be dawn therefrom, the Court is now required to weigh all the evidence .
5. Plaintiffs' claims arise under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680.
6. The FTCA provides that the "United States may be liable for the conduct of its employees 'in the same manner and to the same extent as a private individual under like circumstances.'" Pate v. Oakwood Mobile Homes, 374 F.3d 1081, 1083 (11th Cir. 2004).
7. As a result, in analyzing Plaintiffs' claims, the Court must look to the law of the jurisdiction in which the wrongs are alleged to have occurred, which undisputedly is the state of Florida.

**ASSAULT AND BATTERY**

8. A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent. Sullivan v. Atlantic Fed. Sav. & Loan Ass'n, 454 So.2d 52, 54 (Fla. Dist. Ct. App. 1984), review denied, 461 So.2d 116 (Fla. 1985); Chorak v. Naughton, 409 So.2d 35, 39 (Fla. Dist. Ct. App. 1981).
9. "An 'assault' is an intentional, unlawful offer of corporal injury to another by force, or

exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." Sullivan, 454 So. 2d at 54.

10. Under Florida law, a law enforcement officer may use an amount of force as reasonably appears necessary to "defend himself or another from bodily harm while making the arrest ." Fla. Statute § 776.05.

11. "Whether the force used is reasonable is a question of fact to be determined in light of the circumstances of each particular case. In any case the officer can never use more force than reasonably appears to be necessary, or subject the person arrested to unnecessary risk of harm." Miami v. Albro, 120 So. 2d 23, 26 (Fla. Dist. Ct. App. 1960).

12. Prior to trial, the Court held that "the use of CS and/or OC gas was objectively reasonable under the circumstances involved in the seizure of Elian Gonzalez from the Gonzalez's home." See Jan. 18, 2005 Order.

13. Therefore, the only issue left for trial was whether the remaining thirteen plaintiffs could prevail on their claims against the United States. Id.

14. Each of the remaining Plaintiffs alleged that they had been sprayed at close range while on their own property or behind the barricades.[6] However, these Plaintiffs failed to establish by a preponderance of the credible evidence that the federal officers use of force was unreasonable under the circumstances[7], or that any of the remaining thirteen Plaintiffs were sprayed at close range while on their own property or behind the police barricades.

15. Plaintiff Maria Riera, testified that she was asleep at her ex-husband, Eduardo Rodriguez's house, located across the street from the two-story apartment building that is next to the Gonzalez's home, when Operation Reunion began. Trial Tr. Vol. I at 25.

---

[6] Plaintiff Canizares also claims that she was physically assaulted by certain officers.

[7] See also, Dalrymple v. Reno, 334 F.3d 991 (11th Cir. 2003), for a discussion of the circumstances surrounding Operation Reunion ("[A] reasonable inference drawn from these facts would be that the presence of so many protestors in the neighborhood added to the uncertainty and risk of the mission to seize Elian, thereby necessitating the use of more agents to insure the agents' safety and the mission's success. Indeed, the plaintiffs' own complaint further bears this inference out because the complaint alleges that thirty-three of the plaintiffs who were allegedly unlawfully seized were actually moving closer to the Gonzalez's home as the raid was being executed, undoubtedly causing the agents to feel uncertainty and perhaps alarm regarding the plaintiffs' possible intentions to interfere with the agents' mission").

16. Ms. Riera and her husband got out of bed, and he went outside to see what was happening. Id. at 26.

17. Her husband returned very nervous and upset, and he told her not to go outside and that he was going to the roof. Id.

18. Ms. Riera then disregarded her husband's advice and exited the front door of the house and ran to the edge of the property, adjacent to the sidewalk. Id. at 26-28.

19. Ms. Riera testified that she was then sprayed with gas from a distance of eight to ten feet with a device that resembles the Israeli gas gun by a federal officer, who was dressed in all black and on her property. Id. at 30-33.

20. After she was sprayed with gas, Ms. Riera testified that she briefly went back inside her house and then ran back outside. Id. at 42.

21. While Ms. Riera claims that she was sprayed with the Israeli gas gun while on her own property, the credible evidence demonstrates that the agents did not cross the barricade and move into the media tents or spray any gas into this area.

22. The credible evidence also shows that the Israeli gas gun was not used in the area described by Ms. Riera.

23. Indeed, the credible evidence demonstrates that no federal officers went behind the media barricade.

24. The credible evidence also demonstrates that no INS federal agents were dressed all in black, without any identifying lettering.

25. As a result, the Court concludes that Ms. Riera has failed to show by a preponderance of the credible evidence that she was gassed at close range.

26. Therefore, that Court finds against Ms. Riera on her claims for assault and battery.

27. Plaintiff Eduardo Rodriguez (Ms. Riera's ex-husband) was inside his home with Ms. Riera when Operation Reunion began. Trial Tr. Vol. I at 60; Plaintiffs' Exhibit 87A.

28. Mr. Rodriguez heard commotion outside as the officers were arriving and exited the front door of his house. Id. at 61-62.

29. Mr. Rodriguez then went back inside his house to get a video camera, and re-exited his house

12

with the camera in his hand. Id.

30. Mr. Rodriguez testified that he walked towards the sidewalk with his camera in hand and, as he reached the edge of his property, he encountered an officer, dressed in a dark suit with no identifying lettering, who told him to "get out of here." Id.

31. According to Mr. Rodriguez, this officer then sprayed him with gas, with a device consistent with a description of the Israeli gas gun, from a distance of 2½ to 3 feet. Id. at 69.

32. Mr. Rodriguez testified that the officer who sprayed him was walking along the sidewalk, in front of his home and behind the news tents, in an easterly direction from NW 23rd Ave. Id. at 64.

33. However, the credible evidence demonstrates that the officer who was using the Israeli gas gun did not cross the barricade and move into the area behind the news tents or spray gas into the news tents.

34. Indeed, the credible evidence demonstrates that no federal officers went behind the media barricade.

35. The credible evidence also demonstrates that no INS federal agents were dressed all in black, without any identifying lettering.

36. Accordingly, the Court concludes that Mr. Rodriguez has failed to show by a preponderance of the credible evidence that he was sprayed with gas by the Israeli gas gun from a distance of 2½ to 3 feet while on his own property.

37. The Court therefore finds against Mr. Rodriguez on his claims for assault and battery.

38. Plaintiff Ramon Diago lived in an apartment building next door to the Gonzalez's home. Trial Tr. Vol. I at 77-78; Plaintiffs' Exhibit 87A.

39. Mr. Diago was outside his apartment building standing on the walkway behind a fence when Operation Reunion began. Trial Tr. Vol. I at 81.

40. A fence and bushes separated the yard of the apartment building from the sidewalk in front of the building. Id. at 81-82.

41. These bushes were the same height as Mr. Diago's chest. Id.

42. Mr. Diago testified that, seconds after seeing the officers exit three white vans, an officer

approached him and sprayed him in the face with gas from a distance of 3 to 6 feet. Id. at 83, 85.

43. Because of the fence, Mr. Diago could only see the head and shoulders of the officer and could not see what the officer was wearing because of the bushes. Id. at 84.

44. Mr. Diago identified the Israeli gas gun as similar to the device that sprayed him. Id. at 85.

45. Mr. Diago testified on direct examination that the officer was holding the Israeli gas gun at his hips and moving it in a spraying motion from right to left. Id.

46. On cross-examination, however, Mr. Diago admitted that, had the officer been carrying the device in that manner, he would not have been able to see it because of the bushes. Id. at 92.

47. Mr. Diago then testified on cross-examination that he saw the officer holding the device at shoulder height. Id. at 93.

48. The Court concludes that the credible evidence shows that the officer who was assigned to the Israeli gas gun did not approach the apartment building when he exited the van, or at any other time, and did not spray gas in the direction of the apartment building.

49. The credible evidence also demonstrates that the federal officer never lifted the Israeli gas gun to shoulder height.

50. As a result, the Court concludes that Mr. Diago has failed to show by a preponderance of the credible evidence that he was gassed at close range while on his own property.

51. Therefore, the Court finds against Mr. Diago on his claims for assault and battery.

52. Plaintiff Antonio Ortega was outside his apartment building, located next to the Gonzalez's residence, when Operation Reunion began. Id. at 110; 112.

53. At no time during the operation did Plaintiff Ortega leave his property, enter the street in front of his house or otherwise enter the inner or outer perimeter, nor did Plaintiff Ortega attempt to interfere with and/or obstruct the operation. Id. at 117.

54. Mr. Ortega testified that he was approached by an officer coming from the street, who spoke to him and then sprayed gas from a distance of 10 to 15 feet. Id. at 115-116; 124.

55. Mr. Ortega identified the magnum fogger as the device that sprayed him. Id. at 116; Plaintiffs' Exhibit 93.

56. Mr. Ortega acknowledged on cross-examination that he was not sprayed until after other individuals jumped the street barricade and ran toward the Gonzalez's house. Id. at 123.

57. Mr. Ortega further acknowledged, on re-cross-examination, that the officer could have been spraying in the direction of the people running towards the Gonzalez's house. Id. at 128.

58. Accordingly, the Court concludes that Mr. Ortega was likely exposed to gas directed at demonstrators who were attempting to breach the street barricade, and that Mr. Ortega was not sprayed at close range.

59. Since the Court has already determined that the use of gas to prevent the demonstrators from advancing on the Gonzalez's house was reasonable under the circumstances and therefore privileged under Florida law, the Court finds against Mr. Ortega on his claims for assault and battery.

60. Plaintiffs Carmen Valdes, Elsa Anderson, Sandra Cobas and Leslie Alvarez were among the demonstrators assembled behind the barricade when Operation Reunion began Id. at 133; Trial Tr. Vol. II at 23-4, 48, 72.

61. Each of them claim that they were sprayed at close range with gas from the Israeli gas gun while standing behind the street barricade. Trial Tr. Vol. I at 140; Trial Tr. Vol. II at 27, 51-2, 74-5.

62. However, the credible evidence demonstrates that the officer who used the Israeli gas gun did not spray any gas at the demonstrators who were behind the street barricade from a distance of less than 10 to 15 feet.

63. The credible evidence also shows that, each time gas was deployed from the Israeli gas gun, it was in reaction to threatening activity by the demonstrators and therefore privileged under Florida law.

64. Accordingly, the Court finds that Ms. Valdes, Ms. Anderson, Ms. Cobas and Ms. Alvarez have failed to show by a preponderance of the credible evidence that they were gassed at close range while behind the street barricade.

65. As a result the Court finds against these Plaintiffs on their claims for assault and battery.

66. Plaintiff Armanda Santos was inside her home located two doors west of the Gonzalez's

residence, on the pedestrian side of the street barricade, when Operation Reunion began. Trial Tr. Vol. II at 102; Plaintiffs' Exhibit 87A.

67. Ms Santos testified that certain demonstrators ran inside her home in order to remedy the effects of gas. Trial Tr. Vol. II at 102.

68. As the officers were leaving the neighborhood, Ms. Santos stepped outside onto her front steps. Id. at 102-3.

69. Ms. Santos testified that the federal officers entered her property, and sprayed gas in her house. Id.

70. However, Ms. Santos admitted that there were a lot of people on her property and had difficulty remembering the events that occurred on April 22, 2000. Id. at 109-121.

71. Ms. Santos also could not describe the federal officers. Id. at 108.

72. Furthermore, Ms. Santos gave conflicting testimony regarding whether she had actually seen the federal officers spray gas inside her house. Id. at 109, 122.

73. As a result, the credible evidence demonstrates that no officers crossed the street barricade and did not enter Ms. Santos's house.

74. Accordingly, the Court concludes that Ms. Santos has failed to show by a preponderance of the credible evidence that she was sprayed at close range while on her own property.

75. Therefore, the Court finds against her on her claims for assault and battery.

76. Plaintiffs Madeline Peraza, Gloria Sanchez and Ileana Santana were in Ms. Peraza's home located next to the Gonzalez's home on the morning of April 22, 2000.[8] Trial Tr. Vol. III at 7, 36, 84.

77. These Plaintiffs exited the house and headed towards Northwest 2nd Street via an alleyway alongside the Gonzalez's house. Id. at 13, 51.

78. Ms. Peraza testified that she was sprayed with gas by a federal officer with a device she described as the Israeli gas gun. Id. at 39-40.

79. However, both Ms. Sanchez and Ms. Santana admitted that they were sprayed with gas by the

---

[8]Ms. Peraza's husband was also at the house on the morning of April 22, 2000. However, the Court dismissed his claims at the summary judgment stage.

16

magnum fogger. Id. at 16, 90; Plaintiffs Exhibit 93.

80. Furthermore, while Ms. Peraza testified that they were only attempting to see what was going on outside, Ms. Santana admitted that she was attempting to advance on the Gonzalez's property. Id. at 98.

81. Accordingly, the Court concludes that these Plaintiffs were likely exposed to gas after advancing towards the Gonzalez's property and ignoring the directions of the federal officers to stop their advance on the Gonzalez's property.

82. The Court has already concluded that the federal officers' use of gas during Operation Reunion to prevent the demonstrators from advancing on the Gonzalez's property was privileged under Florida law.

83. As a result, the Court finds against Ms. Peraza, Ms. Sanchez and Ms. Santana on their claims for assault and battery because they have failed to show by a preponderance of the credible evidence that they were unreasonably gassed at close range.

84. Plaintiff Nancy Canizares was sitting on a chair in front of the house directly behind the Gonzalez's house when Operation Reunion began. Id. at 139; Plaintiffs' Exhibit 87A.

85. There were two other people with her at that time. Trial Tr. Vol. III at 143.

86. The officers told Ms. Canizares to get up, to turn around, and to raise her hands. Id. at 147.

87. Ms. Canizares testified that she became confused and had difficulty complying with the command to raise her hands. Id. at 147-48.

88. Ms. Canizares next testified that she was placed in the prone position, that the federal agents walked on her as she lay on the ground, and that the federal officers dropped a gas canister as they were leaving the scene. Id. at 151-56.

89. Ms. Canizares then drove to her aunt's house, some distance away. Trial Tr. Vol. IV at 11.

90. Ms. Canizares' testimony was directly contradicted by members of the Boarder Patrol Team who testified that Ms. Canizares did not listen to their commands and had to be placed in the prone position.

91. These officers also testified that no gas was used on Ms. Canizares.

92. The Court concludes that Ms. Canizares has failed to establish by a preponderance of the

credible evidence that she was walked on and gassed by Defendants.

93. Accordingly, the Court finds that Ms. Canizares has failed to show by a preponderance of the evidence that the federal officers used unreasonable force in restraining her and therefore finds against her on her claims for assault and battery.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

94. Plaintiffs' claims for intentional infliction of emotional distress also arise under the FTCA.

95. To establish a claim for intentional infliction of emotional distress under Florida law, a plaintiff must show: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress." Gonzalez-Jimenez de Ruiz v. United States, 231 F. Supp.2d 1187, 1199 (M.D. Fl. 2002).

96. Outrageous conduct has been defined as "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985).

97. "The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances." Id. at 279.

98. "Conduct is intentional where the actor knows that severe distress is certain, or substantially certain to result from his conduct." Hart v. United States, 894 F.2d 1539, 1548 (11th Cir. 1990).

99. Based on the Court's conclusions that the use of gas during Operation Reunion was privileged under Florida law, and that the federal officers did not use excessive force or assault or batter any of the remaining Plaintiffs, the Court finds that these thirteen remaining Plaintiffs have

failed to establish by a preponderance of the credible evidence that the federal officers engaged in extreme or outrageous conduct.[9]

100.  Therefore the Court finds against these Plaintiffs on their claims for intentional infliction of emotional distress.[10]

**CONCLUSION**

Based on the foregoing it is ORDERED AND ADJUDGED that Judgment is entered for Defendant on all Counts.  All pending motions not otherwise ruled upon are DENIED AS MOOT. The Clerk of Court is directed to CLOSE this case.  Defendants shall move for final judgment within ten (10) days from the date of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 6th day of May, 2005.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

copies provided:
All counsel of record

---

[9] Based on the Court's conclusion that the Plaintiffs have failed to show that Defendant engaged in any extreme and outrageous conduct, the Court need not address Plaintiffs' evidence with respect to the other elements of a claim for intentional infliction of emotional distress.

[10] To the extent that Plaintiffs maintain that their claim for negligent infliction of emotional distress survived summary judgment, they are incorrect. An element of a claim for negligent infliction of emotional distress is a negligent act. See Mistreta v. Volusia County Dep't of Corrections, 61 F. Supp. 2d 1255, 1265 (M.D. Fla 1999). At the summary judgment stage of the case, the Court held that Defendant was entitled to judgment as a matter of law on Plaintiffs' negligence claims. Accordingly, once Plaintiffs' negligence claims were dismissed, so too were their claims for negligent infliction of emotional distress.